Rebecca Castaneda
Massachusetts Bar No. 676527
The Castaneda Law Firm PLLC
506 N. Armenia Avenue
Tampa, Florida 33609
rc@attorneyrebeccacastaneda.com
Counsel for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### BOSTON DIVISION

ROBERT VON SMITH
TERRY HOPE
RAMEZ TOHME
MATTHEW PITTARD
MATTHEW ALLENDE
JASON MOLLENBRINK

Case Number: 20-11143

                      Plaintiffs,

   v.

**COMPLAINT AND
DEMAND FOR JURY TRIAL**

HE SHEIKH KHALID BIN HAMAD BIN KHALIFA AL THANI;
    a/k/a
HE SHEIKH KHALID BIN HAMAD BIN KHALIFA AL-THANI;
HH SHEIKH KHALID BIN HAMAD AL THANI;
HH SHEIKH KHALID BIN HAMAD AL-THANI;
SHEIKH KHALID BIN HAMAD AL THANI;
SHEIKH KHALID BIN HAMAD AL-THANI;
SHEIKH KHALID AL THANI;
SHEIKH KHALID AL-THANI;
KHALID AL THANI;
KHALID AL-THANI;
KHALID HAMID AL THANI;
KHALID HAMAD AL-THANI;
KHALID BIN HAMID AL THANI;

KHALID BIN HAMAD AL-THANI;
KHALID BIN HAMAD;
KHALID BIN HAMAD BIN KHALIFA AL THANI;
KHALID BIN HAMAD BIN KHALIFA AL-THANI; and
DONALD GREENBAUM;
AL ANABI RACING USA, LLC;
AL ANABI RACING LIMITED;
AL ANABI PERFORMANCE, LLC;
SPEEDTECH, LLC;
        d/b/a
AL ANABI,
Al-ANABI,
Al ANABI CARS LLC,
AL-ANABI CARS LLC,
AL ANABI DRAG RACING LLC,
AL-ANABI DRAG RACING LLC,
AL ANABI AWESOME SPEEDTECH LLC,
AL-ANABI AWESOME SPEEDTECH LLC,
AL ANABI RACING,
AL-ANABI RACING,
AL ANABI RACING, LLC
AL-ANABI RACING, LLC,
AL ANABI PERFORMANCE,
AL-ANABI PERFORMANCE,
Al ANABI RACING TEAM,
AL-ANABI RACING TEAM,
AL-ANABI RACING USA, LLC,
AL ANABI RACING USA,
AL-ANABI RACING USA,
AL ANABI PERFORMANCE,
AL-ANABI PERFORMANCE,
AURUM,
AURUM COMPUTER CORP.,
AURUM TELEMEDIA CO., and
GULF TRACK SERVICES.

Defendants.

## NATURE OF THE ACTION

1.      Plaintiffs Robert Von Smith, Terry Hope, Ramez Tohme, Matthew Pittard, Matthew Allende and Jason Mollenbrink, ("Plaintiffs"), bring this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et. seq.,* and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, in order to remedy Defendants' systematic wrongful withholding of Plaintiffs' earned wages and overtime compensation, and Defendants' retaliation, and intentional unfair and/or deceptive acts. Plaintiffs also bring claims under Florida, California, and Tennessee state statute and common law.

2.      Defendants engaged in unlawful conduct pursuant to a policy of minimizing labor costs and denying employee compensation by knowingly violating the FLSA, RICO, and Florida, California and Tennessee law. Defendants breached express and implied contracts, created an environment of hostility, falsely imprisoned employees, caused personal injury, assaulted and battered employees, inflicted emotional distress, engaged in retaliation, and intentionally interfered in business relationships.

3.      Defendant Sheikh Khalid bin Hamad bin Khalifa Al Thani and Defendant Donald Greenbaum operated Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC as Defendant Khalid's alter egos, creating an international-level of systemic fraud that failed to

honor contractual obligations and communicated false statements about pay and benefits, allowing Defendant Khalid to continue operating, uninterrupted, in the race car industry, and maintain a forged and false image of wealth and stature.

## JURISDICTION AND VENUE

### A. Federal Question Jurisdiction and Supplemental Jurisdiction

4.     This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the civil action herein arises under the laws of the United States, namely, the Fair Labor Standards Act and 29 U.S.C. §§ 201 *et seq.*, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Additionally, this Court has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. §1367(a).

### B. Personal Jurisdiction

5.     This Court may properly maintain personal jurisdiction over Defendants under Fed. R. Civ. P. 4 as Defendants contacts with this state and this judicial district are sufficient for exercise of jurisdiction over Defendants so as to comply with traditional notions of fair play and substantial justice.

### C. Venue

6.     Venue is proper in the District of Massachusetts under 28 U.S.C. §§ 1391 (b) (1-3), and (c)(1-3).

## THE PARTIES

**D. Plaintiffs**

7.      Plaintiff Robert Von Smith ("Plaintiff Smith") is an adult individual residing in the State of Tennessee, County of Roane.

8.      Plaintiff Terry Hope ("Plaintiff Hope") is an adult individual residing in the State of Tennessee, County of Anderson.

9.      Plaintiff Ramez Tohme ("Plaintiff Tohme") is an adult individual residing in the State of California, County of Los Angeles.

10.      Plaintiff Matthew Pittard ("Plaintiff Pittard") is an adult individual residing in the State of Florida, County of Pasco.

11.      Plaintiff Matthew Allende ("Plaintiff Allende") is an adult individual residing in the State of California, County of Los Angeles.

12.      Plaintiff Jason Mollenbrink ("Plaintiff Mollenbrink") is an adult individual residing in the State of California, County of Los Angeles.

13.      During the relevant time periods, Plaintiffs were covered employees within the meaning of the FLSA, 29 U.S.C. § 203(e), and Florida, California, and Tennessee law, and employed by Defendants.

14.      During the relevant time period, Plaintiffs were employees engaged in commerce, within the meaning of the FLSA, 29 U.S.C. § 203(c), Florida, California, and Tennessee, since a substantial part of their job requirements were

to accompany and work for Defendants in the United States and foreign countries in order to perform their job functions.

15.    Plaintiffs consent in writing to being parties to the FLSA claims in this action, pursuant to 29 U.S.C. §216(b), and their consent forms are attached hereto [Exhibits 1-6].

**E. Defendants**

16.    Defendants Al Anabi Racing USA, LLC; Al Anabi Racing Limited; Al Anabi Performance; Speedtech LLC; and Defendant Khalid were Plaintiffs employer and employed Plaintiffs individually and jointly.

17.    Defendant Al Anabi Racing USA, LLC is a United States business entity, organized under the laws of Massachusetts, with its principal place of business in Massachusetts, that conducts business in the United States and elsewhere, conducts business with United States citizens and businesses, and hires United States citizens as employees.

18.    Defendant Donald Greenbaum, a United States citizen and Massachusetts resident, is the President of Defendant Al Anabi Racing USA, LLC.

19.    Defendant Khalid is the owner and operator of Al Anabi Racing USA, LLC.

20.     Defendant Al Anabi Racing Limited is a Republic of Cyprus-registered foreign company, organized under the laws of the Republic of Cyprus, that

6

conducts business in the United States, and elsewhere; is a corporate member of Alabama-registered Al Anabi Alabama Property, LLC; is a designated agent of co-defendant Al Anabi Racing USA LLC with regards to U.S. Patent Office filings; conducts business with United States citizens and businesses; and hires United States citizens as employees.

21.     The Director of Defendant Al Anabi Racing Limited is Defendant Donald Greenbaum.

22.     Defendant Khalid is the owner and operator of Defendant Al Anabi Racing Limited.

23.     Defendant Al Anabi Performance, LLC is a United States business entity, organized under the laws of North Carolina, with its principal place of business in Duxbury, Massachusetts, that conducts business in the United States and elsewhere, conducts business with United States citizens and businesses, and hires United States citizens as employees.

24.     The Chief Executive Officer of Defendant Al Anabi Performance, LLC is Defendant Donald Greenbaum.

25.     Defendant Khalid is the owner and operator of Defendant Al Anabi Performance, LLC.

26.     Defendant Speedtech, LLC is a United States business entity, organized under the laws of Alabama, with its principal place of business in Alabama, that

conducts business in the United States and elsewhere, conducts business with United States citizens and businesses, and hires United States citizens as employees.

27.     Defendant Speedtech, LLC's President is Defendant Al Anabi Racing USA, LLC.

28.     Defendant Speedtech, LLC's Organizer is Defendant Donald Greenbaum.

29.     Defendant Khalid is the owner and operator of Speedtech, LLC.

30.     Defendant Khalid is an adult individual, and a foreign citizen of the State of Qatar.

31.     Defendant Khalid is a Sheikh of the royal Al Thani family, the ruling family of Qatar.

32.     Defendant Donald Greenbaum is a United States citizen and Massachusetts resident.

33.     At all relevant times throughout Plaintiffs' employment, Defendant Khalid was the director, owner, and majority shareholder engaged in the operations and managing of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC.

34.     Defendant Khalid exercised sufficient control of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC such that he can be deemed to be liable to the same extent as

Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi
Performance, LLC, and Speedtech, LLC.

35.     Defendant Donald Greenbaum actively participated to a substantial degree
in the business operations of Defendants Al Anabi Racing USA, LLC, Al Anabi
Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, and acted in
concert with Defendant Khalid, such that he can be deemed to be liable to the
same extent as Defendants Al Anabi Racing USA, LLC, Al Anabi Racing
Limited, Al Anabi Performance, LLC, and Speedtech, LLC.

**F. Alter Egos of Defendant Khalid**

36.     Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al
Anabi Performance, LLC, and Speedtech, LLC are the alter egos for Defendant
Khalid in the United States and elsewhere.

37.     Defendants commingle assets, and Defendant Khalid diverts company
assets for his personal use.

38.     The budgets of Defendants' Al Anabi Racing USA, LLC, Al Anabi Racing
Limited, Al Anabi Performance, LLC, and Speedtech, LLC are inflated to allow
for Defendant Khalid to utilize a portion of them for personal use to make
purchases, such as luxury sports cars, motorcycles, and personal services.

39.     The Defendants have the same officers, directors, presidents, and
organizers.

40.   The Defendants share products, goods, services, assets, employees, management, legal counsel, consultants, security services, medical services, housing, information technology, financial and accounting services, travel services, and bank accounts.

41.   Contractual documents and non-disclosure agreements of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, name Defendant Sheikh Khalid as the owner of co-defendants, and as the protected and contracting party of the documents.

42.   At all relevant times throughout Plaintiffs employment, Defendant Khalid had the discretionary power to create and enforce personnel decisions including, but not limited to: hiring and terminating employees; setting and authorizing issues of wages; maintaining employee records; setting employee schedules; instructing and supervising employees; dictating physical movement of employees; and controlled the terms and conditions of employment of the Plaintiffs.

43.   Defendant Khalid set and approved the unlawful practices complained of herein in his individual capacity and/or through his companies.

44.   Defendants are a "covered employer" within the meaning of the FLSA, 29 U.S.C. § 203(d), and Florida, California and Tennessee law, and are therefore liable for the unpaid wages and other damages sought herein.

## FACTUAL ALLEGATIONS

45.    Plaintiffs were formerly employed by Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC to perform work in the United States, Qatar, and any location to which Defendants conducted business.

46.    The job duties of Plaintiffs were primarily supporting Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, in some way or manner, in the car racing industry.

47.    Defendant Khalid entered into the car racing industry in the United States in 2007.

48.    At this time, Defendant Donald Greenbaum was working for the royal Al Thani family, including but not limited to, handling matters of importation and exportation within the United States, Qatar, and elsewhere.

49.    From at least 2007, Defendant Donald Greenbaum began working with Defendant Khalid and Defendants.

50.    In late 2007, Defendant Khalid traveled to the United States to attend several National Hot Rod Association (NHRA) races, and began building teams and cars to race in the United States and abroad in the Middle East. At this time, Defendant Khalid also began building the Qatar Race Club in Doha, Qatar.

51.    Throughout late 2007 and early 2008, two well-known and accomplished individuals in the racing world met with Defendant Khalid at various racing events in the United States and Dubai; they both began racing for Defendant Khalid in the Pro Modified ("Pro Mod") Division abroad in Dubai.

52.    In 2008, Defendant Khalid then hired an individual known in the racing world as the best "tuner," an industry stalwart, to head one of Defendants' racing teams. This individual then hired a team manager, a Top Fuel driver, and a Nitro Funny car driver.

53.    Thereafter, in the spring of 2008, at an American Drag Racing League (ADRL) race in Christiansburg, Virginia, Defendant Khalid met with Plaintiff Robert Von Smith and two other individuals, all who were previously recommended to Defendant Khalid as well-versed and respected individuals in the racing world, to discuss building a Supercharger Pro Mod team to compete in the United States and abroad.

54.    In 2008, Defendant Khalid established Awesome Al-Anabi Racing.

55.    Thereafter, Defendant Khalid established a multitude of entities to conduct business in the United States and abroad, including, but not limited to: Al Anabi Racing USA, LLC; Al Anabi Racing Limited; Speedtech, LLC; Al Anabi Cars, LLC; Awesome Al Anabi Motor Sports LLC; Awesome Motor Sports LLC; Awesome Motor Sports, Inc.; Awesome Motor Sports, Inc.; Speedtech Al Anabi

LLC; Atomic Performance; Awesome Properties Inc.; Awesome Properties II,

LLC; Al Anabi Alabama Property, LLC; Al Anabi – 165 Amboy Road LLC; Al

Anabi – 463 Southpoint LLC; Awesome Al-Anabi Racing; Al-Anabi Super

Charger, Inc.; AJR Al-Anabi Fuel Team; and Al Anabi Logistics, Co.

56.      Defendants' first race under the Al Anabi umbrella was in the United

States in August 2008.

57.      Defendants' first race took place in Indianapolis, Indiana, at the National

Hot Rod Association ("NHRA") United States Nationals, a race known as "The

Big Go." The Big Go is the pinnacle of NHRA racing.

58.      Defendants entered two Pro Mod cars, one Nitrous car and one

supercharger (blower) car. One car was driven by Plaintiff Robert Von Smith.

59.      In October of 2008, Defendants entered their second race, the "Shakedown

in Etown" in Englishtown, New Jersey and won. This was Al Anabi's first

United States-based win for Defendant Khalid. Plaintiff Robert Von Smith and

Plaintiff Terry Hope and other members of the team presented Defendant Khalid

with the winning trophy, which still stands in a place of prominence at the Qatar

Race Club in Doha, Qatar.

60.      In the first three years of racing and building teams, Defendant Khalid

spent in excess of $100,000,000.00 USD.

61.     Beginning in 2009, Defendants began competing in the American Drag Racing League, which Defendant Khalid was in the process of buying, and later finalized in 2010.

62.     In its infancy, Defendants' employees were paid by Defendant Khalid, who obtained funds from the Qatar Olympic Committee and the Ministry of Sports.

63.     Plaintiff Terry Hope assisted in preparing budgets that were routed to State of Qatar entities. When Plaintiff Terry Hope presented a final budget to Defendant Khalid for approval, Defendant Khalid would then ask Plaintiff Terry Hope to double, triple, or quadruple the budget, so as to "pad" the budget for personal items, such as a Bugatti Veyron, that Defendant Khalid wanted to purchase. After Defendant Khalid would approve the budgets, Defendant Khalid would route the approved budget to the State of Qatar, who would then approve the budget, and then provide the funding directly to Defendant Khalid.

64.     Employees of Defendants were paid by the Qatar Olympic Committee and the Ministry of Sports until, on or about, the Fédération Internationale de Football Association (FIFA) soccer cup scandal arose involving Qatar's bid for the 2022 FIFA World Cup.

65.     Thereafter, salaries were paid by Qatar Racing Club, which is owned by Defendant Khalid, via Al Anabi Supercharger, Inc., which was owned and funded by Defendant Khalid.

66.     Later, Defendants' employees were paid through various accounts including, but not limited to, Defendant Khalid's personal accounts, Defendant Donald Greenbaum's accounts, and Defendants' bank accounts.

67.     Employees were also paid by Defendants' employee, United States citizen Jason Sharpe.

68.      All of Defendants' Pro Mod cars come from the United States, including the parts, unless they are custom made in Qatar.

69.     Defendants test cars in Florida every year, from November to March, due to the good weather that allows for the cars to be run every day.

70.     Defendants test and race at Orlando Speedway, Bradenton Dragway, and West Palm Beach International Race Park.

71.     Defendants race cars in Florida, North Carolina, Tennessee, Virginia, New Jersey, Georgia, Pennsylvania, Texas, Kansas, Indiana, Illinois, Ohio, Nevada, Washington, California, Colorado, Minnesota, New Hampshire, Arizona, Michigan, and South Carolina.

72.     Defendant Khalid has complete control of Defendants and no major decisions are made without his approval.

73.     Defendant Khalid directs Defendant Donald Greenbaum to execute his decisions.

74.    Defendant Khalid forms and dissolves racing teams, personally hires his employees, determines final racing budgets, allocates funding, and dictates racing schedules and travel.

75.    Defendants have managers but Defendant Khalid makes all significant decisions.

76.    Defendant Khalid has availed himself to the protection of United States patent and trademark laws of the United.

77.    "KH," which stands for "Khalid Hamad," Defendant Khalid's name, is a trademark that Defendant Khalid utilizes.

78.    "KH" was a registered, active United States trademark from February 2011 to September 2017 and was owned/registered to "Al Anabi Racing Limited HH Sheikh Khalid Bin Hamad Al Thani, Qatar limited company (ltd.) CYPRUS 27 Pill Hill Lane C/O Al-Anabi Racing USA LLC Duxbury MASSACHUSETTS 02332" (registration number 3922968).

79.    "KH" is Defendant Khalid's brand, and is on practically everything that Defendants operate, employ, and own, including marketing materials, racecars, the clothing of the race car drivers and pit crews, medical staff and private security.

80.    The Pill Hill address is a business address used by Defendants and is also the personal residence of Defendant Donald Greenbaum.

81.   "Al-Anabi Racing" is an additional trademark that Defendant Khalid

utilizes.

82.   "Al-Anabi" translates to "the maroon" in Arabic; also, Defendant Khalid's

trademark filings note this translation.

83.   Maroon and white are the national colors of the country of Qatar.

84.   "Al-Anabi Racing" was an active, registered United States trademark from

August 2010 to February 2018 and was owned/registered to "Al Anabi Racing

Limited HH Sheikh Khalid Bin Hamad Al Thani, Qatar limited company (ltd.)

CYPRUS 27 Pill Hill Lane C/O Al-Anabi Racing USA LLC Duxbury

MASSACHUSETTS 02332" (registration number 3834260).

85.   The Pill Hill address is a business address used by Defendants and is also

the personal residence of Defendant Donald Greenbaum.

86.   "Al-Anabi" is a third trademark used by Defendant Khalid.

87.   It was an active, registered United States trademark from August 2010 to

February 2018 and was owned/registered to "Al Anabi Racing Limited HH

Sheikh Khalid Bin Hamad Al Thani, Qatar limited company (ltd.) CYPRUS 27

Pill Hill Lane C/O Al-Anabi Racing USA Duxbury MASSACHUSETTS

02332," (registration number 3834258).

88.   The Pill Hill address is a business address used by Defendants and is also

the personal residence of Defendant Donald Greenbaum.

89.    Upon information and belief, Defendant Khalid has also availed himself of the United States Patent registration process and owns a United States patent for the "KH Series V6," a 481X engine that Defendants' employees designed and developed in conjunction with American Alan Johnson and his company Alan Johnson Performance Engineering. Defendant Al Anabi Racing USA, LLC uses this engine in at least one of their cars.

90.    The State (Government) of Qatar, through the United States-Qatar Business Council, has publicly stated that Defendant Khalid is the owner of Defendant Al Anabi Racing USA, LLC.

91.    The United States-Qatar Business Council is the State of Qatar's organization that seeks to enhance relations between the United States and Qatar.

92.    Prior to Defendant Al Anabi Racing USA, LLC being named as a defendant in a different lawsuit than the one currently before this Honorable Court, the State of Qatar described Defendant Khalid as the owner of Al Anabi Racing, boasted of its success, and showcased it as an example of how the State of Qatar and the United States could work together in business.

93.    After the filing of an amended complaint against Defendant Khalid in the Middle District of Florida in November 2019, that then named Defendant Al Anabi Racing USA, LLC as a defendant, the State of Qatar edited, and then

deleted, the page showcasing Defendant Khalid's ownership of Defendant Al Anabi Racing USA, LLC.

94.     Employees of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC have publicly stated that Defendant Khalid owns these businesses.

95.     During the course of Plaintiffs employment, whenever Plaintiffs saw and heard Defendant Khalid introduced to anyone, he was always introduced as the owner of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and/or Speedtech, LLC.

96.     Throughout the course of Plaintiffs' employment, Defendant Khalid would boast and brag to those in the racing industry, commercial partners, vendors, individuals at social events, during employment-related meetings, to the media, to his paramours, and to potential employees that he sought to hire, that he was the owner of Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, and that he had hired the ultimate dream team in racing.

97.     Defendant Khalid has publicly represented that he owns Defendant Al-Anabi Racing USA, LLC.

98.     Defendant Khalid hand-selects the drivers of his cars and is the sole and final decision maker in deciding who is hired.

99.    Defendant Khalid consults with other team members as to who is the best fit for a team, and then seeks out the best in the industry for each class of race car.

100.   Defendant Khalid determines the appropriate salary and benefits.

101.   Defendants employ race car drivers from the United States, Qatar, Dubai, and Lebanon.

102.   Several employees live in Defendant Khalid's homes in Doha, Qatar.

103.   At the initial time of hiring, Defendant Khalid wooed Plaintiffs with certain luxuries such as higher-than-average salaries, designer watches, luxury travel arrangements, including hotel rooms, first class flights, high per diem, personal medical care, and private security.

104.   After initially being hired, Defendants did not pay Plaintiffs owed wages, and were not timely in paying any wages.

105.   When questioned by Plaintiffs as to the status of their compensation, Defendant Khalid would point out that they were being treated well in other ways, and "taken care of;" Defendants continuously engaged in a conspiracy to withhold wages so as not to have to pay Plaintiffs to continue building a racing empire that he could not financially afford.

106.   Defendant Khalid is hands-on in all aspects of how his teams perform.

107.   Defendant Khalid decides who does or does not drive his cars, who does and does not tune his cars, and the type of car each driver does or does not drive.

108.    Defendant Khalid has total control of the crew members who are a part of each team. He speaks with them personally, relaying his likes and dislikes for his cars and how they are driven and tuned.

109.    Defendant Khalid decides where his cars will race and test.

110.    Defendant Khalid personally hires and fires Defendants employees.

111.    Defendant Khalid sets the salaries and bonuses of Defendants employees.

112.    Defendant Khalid decides when an employee is to be paid.

113.    Defendant Khalid determines if an employee is to be reimbursed for expenses.

114.    Defendant Khalid directs Defendant Donald Greenbaum when and how to pay employees.

115.    Defendants Khalid decides when and where Defendants' employees will travel, to where they will travel, how they will travel, and the dates on which they will travel.

116.    Defendant Khalid owns and funds co-Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC.

117.    Defendant Khalid authorizes, directs, and formulates the policies of co-Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, and acts in concert with co-Defendant

Donald Greenbaum, and subjected Plaintiffs to the illegal and inappropriate conduct described herein.

118.   As the director, owner, and majority shareholder engaged in the operations and managing of co-Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC, acted in concert with Defendant Donald Greenbaum, and as a defendant himself, Defendant Khalid set and/or approved all the unlawful practices complained of herein in his individual capacity and/or through his companies.

119.   Defendant Khalid owns the Qatar Race Club.

120.   Qatar Race Club is a location in Doha, Qatar where Defendants test, repair and build cars, and import cars and parts for cars. It has a track, a full machine shop and paint and body shop where custom car parts are manufactured.

121. Defendants Khalid, Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC import and export, including but not limited to, cars, parts, and personal items to and from the United States to foreign countries, including but not limited to Qatar, via co-Defendant Donald Greenbaum.

**G. Donald Greenbaum**

122.   Defendant Donald Greenbaum is a United States citizen who is a legal resident of Massachusetts.

22

123.   Defendant Donald Greenbaum is the president of Defendant Al Anabi Racing USA, LLC.

124.   Defendant Donald Greenbaum is the Director of Defendant Al Anabi Racing Limited.

125.   Defendant Donald Greenbaum serves as the Organizer of Defendant Speedtech LLC.

126.   Defendant Donald Greenbaum serves as the Chief Executive Officer of Defendant Al Anabi Performance, LLC.

127.   Defendant Donald Greenbaum serves in many management roles and as a gatekeeper and conduit for Defendant Khalid's various companies worldwide.

128.   Defendant Donald Greenbaum's job duties are wide and varying. His job duties, as they relate to Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC are wide and varying, and essentially anything Defendant Khalid requests.

129.   Defendant Donald Greenbaum acts in concert with co-Defendant Khalid to determine if, when, and how Defendants' employees are to be paid and, at a level below Defendant Khalid, approves or disapproves the budgets of co-Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi Performance, LLC, and Speedtech, LLC.

130.   At Defendant Khalid's request, Defendant Donald Greenbaum wires funds to Defendants' employees, service providers, and any individual or company that Defendant Khalid requests.

131.   Defendant Donald Greenbaum sends funds via mail to co-Defendants' employees, service providers, and any individual or company that Defendant Khalid requests.

132.   Defendant Donald Greenbaum owns various companies.

133.   Defendant Donald Greenbaum owns Massachusetts company Aurum Computer Corporation.

134.   However, Defendant Donald Greenbaum does not operate the business under this name, and actually operates under the name of Aurum Telemedia Co., which is not registered with the Commonwealth of Massachusetts, despite the Massachusetts address that follows his company's name in electronic correspondence; this company claims to be an information technology services and computer repair company.

135.   Defendant Donald Greenbaum also operates Gulf Track Services, a company he states that is headquartered in the Commonwealth of Massachusetts, but is also not registered with the Commonwealth of Massachusetts.

136.   Defendant Donald Greenbaum utilized Gulf Track Services to build the Qatar Race Club for Defendant Khalid.

137.    Defendant Donald Greenbaum receives his direction and funding for various companies owned by Defendant Khalid from Defendant Khalid.

138.    Defendant Donald Greenbaum serves as the conduit for shipping and receiving items to and from the United States on behalf of Defendants, sometimes using the name Al Anabi Logistics, Co., which Defendant Khalid also owns.

139.    Defendant Donald Greenbaum imports and exports goods and items to and from, but not limited to, the United States, England, and Qatar, for the Royal Al Thani family, of which Defendant Khalid is a member.

140.    For compensation, Donald Greenbaum charges approximately three percent (3%) of the value of goods that he exports.

141.    Containers for exportation depart throughout the United States via maritime ports and airports including, but not limited to, JFK Airport, New York, Jacksonville, Florida, Baltimore, Maryland, Chicago, Illinois, and Houston, Texas.

**H. Plaintiffs Work for Defendants**

   **I. Plaintiff Robert Von Smith**

142.    Plaintiff Robert Von Smith ("Plaintiff Smith") was employed by Defendants from July 2008 to July 2016.

143.   Plaintiff Smith was employed by Defendants to perform work in the United States, Qatar, Bahrain, the United Arab Emirates (Abu Dhabi), and any location to which Defendants chose to conduct business and travel.

144.   At the beginning of his employment, Plaintiff Smith was promised an annual salary of $120,000.00 USD, a $10,000.00 USD bonus for each race won, and a bonus of $50,000.00 USD for each championship won.

145.   When working abroad, Plaintiff Smith was promised double pay and weekly per diem of 800 Qatari Rial (approximately $215.00 USD).

146.   Plaintiff Smith's second, two-year contract with Defendants, executed in March of 2016, promised Plaintiff Smith an annual salary of $75,000.00 USD, a $10,000 USD bonus for each race won, a bonus of $25,000.00 USD for each race championship won, and an end-of-the-season bonus of $25,000.00 USD.

147.   Plaintiff Smith and Defendant Khalid agreed that Plaintiff Smith would only be required to race in the United States.

148.   Plaintiff Smith entered into a full-time employment agreement whereby Plaintiff Smith was hired as a race car driver and industry consultant.

149.   Plaintiff Smith's employment agreement was crafted solely by Defendant Khalid.

150.   In deciding to accept the offer of employment with Defendants, Plaintiff Smith reasonably relied on the misrepresentation of Defendants that Plaintiff

Smith would be paid by Defendants for all hours worked at the applicable prevailing wage and overtime rates, and negotiated bonus structure and profit share of memorabilia, which as a direct result caused Plaintiff Smith to suffer serious financial and emotional damages.

151.   As part of his duties, Plaintiff Smith was required to accompany Defendants as they traveled to and from the United States and abroad, where Plaintiff Smith was subject to long working hours including several requirements to work overnight to accommodate Defendant Khalid's social schedule.

152.   The work hours were dictated by Defendants, the race schedule of Defendants, and changed at the whim of Defendants.

153.   Plaintiff Smith was personally hired by Defendant Khalid in May of 2008, and began racing for Defendants in July of 2008.

154.   At the time of Plaintiff Smith's hiring, Al Anabi Racing was known as "Awesome Al Anabi Racing."

155.   Throughout the duration of his employment, Plaintiff Smith did not have supervisory authority, nor did he exercise discretion or independent judgment with respect to matters of significance.

156.   Plaintiff Smith did not get to choose the races in which Defendants raced, nor those in which he drove.

157.   Throughout the course of his employment, Plaintiff Smith worked in excess of forty (40) hours per week but was not paid overtime.

158.   Plaintiff Smith began his employment by driving a Pro Mod car for Defendants.

159.   During the period of his employment with Defendants, Plaintiff Smith was on call 24/7 to immediately respond to Defendants needs and wants.

160.   In October of 2008, Plaintiff Smith won Defendants' first United States-based racing win at the "Shakedown in Etown" in Englishtown, New Jersey.

161.   Plaintiff Smith was paid a partial bonus for this race. Plaintiff Smith had to insist on even receiving a partial bonus, as another driver for Defendants tried to claim the bonus.

162.   Despite his contract, from July to November 2008, Plaintiff Smith did not receive a salary for the first five months of his employment.

163.   In November of 2008, Plaintiff Smith discussed his contract and owed backpay with Defendant Khalid.

164.   Defendant Khalid assured Plaintiff Smith that he would be paid and confirmed the terms of Plaintiff Smith's employment contract.

165.   In 2009, Plaintiff Smith won Defendants first Middle Eastern-based racing championship, which in the industry is known as the Gulf Coast Championship, an Arabian Drag Race League (ADRL) sanctioned race in Qatar.

166.    After the race, Defendant Khalid told Plaintiff Smith that, due to the win, he would never have to worry about finding another job again; and, that he would drive for Defendants as long as Plaintiff Smith wanted to drive for them.

167.    While in Bahrain, Plaintiff Smith won Defendants' first three races of the Arab Drag Racing League season.

168.    In January 2009, Plaintiff Smith won the first race at the newly-built Qatar Race Club ("QRC") track. Plaintiff Smith went on to win the second and third races hosted by QRC.

169.    In addition to the above 2009, Plaintiff Smith won eight races in Bahrain and Qatar and a championship in Qatar.

170.    In April of 2009, at the QRC, while driving, Plaintiff Smith's car suffered a mechanical mishap and the car's accelerator became stuck, forcing Plaintiff Smith to decide between crashing the into large boulders at the end of the QRC track or crashing the car into the wall of the QRC; Plaintiff Smith chose to crash into the wall. In doing so, the car Plaintiff Smith was driving was completely destroyed with the exception of the chair where Plaintiff Smith was seated. Plaintiff Smith escaped from the car as it became engulfed in flames.

171.    Unintentionally, Plaintiff Smith set a world record on behalf of Defendants for the speed in which the car raced a quarter mile, racing 5.74 at 256.05 mph.

172.    Plaintiff Smith was injured when the race car slammed into the wall at 256+ mph. At Defendant Khalid's order, Plaintiff Smith was taken to Al-Ahli hospital in Doha, Qatar.

173.    Defendant Khalid told Plaintiff Smith that he owned the hospital.

174.    Plaintiff Smith arrived at the hospital and did not receive medical attention from staff until Defendant Khalid appeared.

175.    Defendant Khalid dictated the medical care that Plaintiff Smith received.

176.    Plaintiff Smith had no say in his medical treatment despite being alert, awake, conscious and capable of making his own medical decisions.

177.    Plaintiff Smith was silenced by Defendant Khalid.

178.    Defendant Khalid instructed the hospital staff as to which testing to conduct.

179.    After two to three hours, Plaintiff Smith checked himself out of the hospital and returned to his living quarters.

180.    Plaintiff Smith suffered a pelvic bone bruise, and an inflamed and possibly dislocated finger.

181.    In 2009, Plaintiff Smith raced in numerous races in the NHRA and Arabian Drag Racing League, winning four.

182.    Throughout 2010, Plaintiff Smith raced in the NHRA and won three races. Additionally, Plaintiff Smith won the NHRA Championship.

183.    From November 2010 to March 2011, Plaintiff Smith raced in Qatar, where he won three races in the Arabian Drag Racing League.

184.    During this time period, Plaintiff Smith also assisted Defendant Khalid in fine tuning his personal car that Defendant Khalid wished to race for pleasure.

185.    From March 2011 to November 2011, Plaintiff Smith raced in the American Drag Racing League and won two races.

186.    In November of 2011, Plaintiff Smith returned to Qatar.

187.    On February 17, 2011, during the semi-final round of the Arabian Drag Racing League's Battle of the Belts Championship, Plaintiff Smith and a fellow employee of Defendants were competing in different cars on behalf of Defendants.

188.    Defendant Khalid asked Plaintiff Smith and co-Plaintiff Terry Hope to intentionally lose the race, so that their colleague would achieve an elevated ranking in the league, and increase the prestige of Defendants' racing teams.

189.    Plaintiff Smith and co-Plaintiff Terry Hope refused to throw the race and lose to the fellow driver of Defendants.

190.    Plaintiff Smith and co-Plaintiff Terry Hope won the semi-final round and then went on to win the championship.

191.    In 2012, Plaintiff Smith raced in the NHRA and American Drag Racing League.

192.   In 2012, Defendant Khalid again asked Plaintiff Smith to intentionally lose a race. Plaintiff Smith refused to intentionally lose the race.

193.   Thereafter, Plaintiff Smith won three races on behalf of the Defendants.

194.   In November of 2012, Plaintiff Smith returned to Qatar.

195.   He raced in the Arabian Drag Racing League and won three races.

196.   In 2013, Plaintiff Smith raced in the NHRA and the American Drag Racing League.

197.   He won an NHRA race and two American Drag Racing League races including the Battle of the Belt Championship for Defendants.

198.   Plaintiff Smith returned to Qatar in November of 2013, where he won three races.

199.   In 2014, Plaintiff Smith raced in the NHRA and won three races.

200.   At the conclusion of the 2014 racing season, Defendant Khalid disbanded Defendants racing teams.

201.   Prior to disbanding the teams, Plaintiff Smith and co-Plaintiff Terry Hope were told by Defendant Khalid that they would be permitted to have a large, expensive racing rig that Defendants had purchased, so that Plaintiff Smith and co-Plaintiff Terry Hope could continue racing; they would only need to find a sponsor to pay for the expenses of racing.

202.    However, despite being told by Defendant Khalid that Plaintiff Smith and co-plaintiff Terry Hope would be able to keep the equipment, on or about October, Defendant Donald Greenbaum appeared and took all of the racing equipment, including the race rig, that Defendant Khalid had promised Plaintiff Smith and co-plaintiff Terry Hope.

203.    In 2016, Defendants entered back into the racing business.

204.    Plaintiff Smith entered into a new contract with Defendants. Plaintiff Smith was promised an annual salary of $75,000.00 USD, a $10,000.00 USD bonus for each race won, and a bonus of $25,000.00 USD for each race championship won.

205.    Plaintiff Smith and Defendants agreed that Plaintiff Smith would not be expected to work abroad and would only race in the United States.

206.    However, after beginning to race for Defendants, Defendants changed their mind and decided to pay Plaintiff Smith only $40,000.00 USD.

207.    Despite Plaintiff Smith's insistence, Defendants would not pay Plaintiff Smith more than $40,000.00 USD.

208.    In 2016, Plaintiff Smith raced for Defendants in the NHRA and won one race.

209. Defendants did not allow Plaintiff Smith to race in two additional races in which he was scheduled to compete.

210.    At the conclusion of the 2016 season, Defendants requested that Plaintiff Smith travel to Qatar, to race in the Arabian Drag Racing League over the fall and winter. Defendant Khalid stated to Plaintiff Smith that he did not want other drivers driving his car in Qatar for the season, and repeatedly asked Plaintiff Smith to fly to Qatar and "drive my car."

211.    Plaintiff Smith stated to Defendant Khalid that, per their contract, he was only hired to race in the United States, and that due to Plaintiff Smith's personal business obligations, he would not be able to race abroad unless a new contract, specifically including an increase in salary due to the increase in expectations and required travel abroad, was executed.

212.    Defendant Khalid threatened Plaintiff Smith and told him that if he did not travel to Qatar to drive for him, he would cancel Plaintiff Smith's current contract.

213.    Plaintiff Smith again reiterated the current contract terms, and reminded him that they did not require travel to Qatar.

214.    In response, Defendant Khalid responded, "Nice knowing you motherf*cker."

215.    Defendants breached Plaintiff Smith's contract.

216.    At the time of Defendant Khalid's statements to Plaintiff Smith, and breach of his contract, Plaintiff Terry Hope was in Qatar, and seated next to Defendant Khalid.

217.    In addition to physically racing cars for Defendants, when not racing Plaintiff Smith was required to be available to Defendant Khalid upon his request.

218.    Defendant Khalid required Plaintiff Smith to purchase a Blackberry cellular phone so that Defendant Khalid could reach Plaintiff Smith at any time he requested.

219.    Despite being told he would be reimbursed, and Plaintiff Smith requesting reimbursement, Plaintiff Smith was not reimbursed.

220.    Plaintiff Smith was required to answer and respond to any communications from Defendant Khalid, whether or not it was related to racing.

221.    Defendant Khalid contacted Plaintiff Smith frequently, expecting him to be available 24/7 when he called. For example, on or about February 2010, in Doha, Qatar, Defendant Khalid requested Plaintiff Smith accompany him at 1:30 a.m. to follow Defendant Khalid while he street-raced cars in downtown Doha.

222. On another occasion, on or about June 2010, Defendant Khalid requested that Plaintiff Smith fly to California. Upon arrival, Plaintiff Smith learned that

Defendant Khalid did not have any racing duties for Plaintiff Smith but wanted Plaintiff Smith to socialize and play video games with him.

223.   Throughout his employment with Defendants, Plaintiff Smith was not timely compensated for his hours worked nor was he compensated at all for his overtime hours, foreign pay, the first five months of his employment, and with the exception of one partial bonus at his very first race, Plaintiff Smith did not receive bonuses for any of the races won, including two championships.

224.   Plaintiff Smith was told on numerous occasions by Defendant Donald Greenbaum that Defendant Khalid had not yet provided him with the funds for the bonuses that Plaintiff Smith had earned, and on one occasion, actually requested that Plaintiff Smith return a $500.00 USD race bonus earned by Plaintiff Smith from an outside sponsor, "because the team needed it."

225.   When Plaintiff Smith questioned Defendants regarding the status of bonuses and his non-race compensation, Defendant Khalid would make statements such as, "You know I will take care of you. I take care of you, don't I?" "I will make sure the next one is doubled," and "Don is handling that. Talk to Don."

226.   When Plaintiff Smith would approach Defendant Donald Greenbaum, he would make statements such as, "Khalid hasn't given me the money yet," or "Khalid hasn't even paid me. I can't pay you if he hasn't even paid me."

Defendant Greenbaum stated that Plaintiff Smith would be paid once he had received the proper funds from Defendant Khalid.

227.   On one particular occasion, in October of 2013, Defendant Donald Greenbaum even went as far to publicly state after a Battle of the Belts race in the United States, that Defendant Al-Anabi Racing USA, LLC had paid it's Al-Anabi Racing teams directly for sums that they had earned as a result of their placement in the race.

228.   Plaintiff Smith was part of the Al-Anabi Racing team and won the Battle of the Belts.

229.   As a result of the win, Plaintiff Smith earned $50,000.00 USD in prize money; despite Defendant Donald Greenbaum's public assertion that Plaintiff Smith had been paid, and that another racing organization was engaging in fraudulent behavior by failing to meet its financial obligations as part of the Battle of the Belts Race, Plaintiff Smith was never paid by Defendants for his $50,000.000 USD win, and it was Defendant Donald Greenbaum that was engaging in fraudulent behavior by failing to pay Plaintiff Smith.

230.   On or about August 8, 2019, Defendants' employee Mustafa Atat contacted Plaintiff Smith via telephone, almost immediately after Plaintiff Smith posted on social media about litigation, pending at the time, involving Defendants conduct of not paying employees.

231.   Mustafa Atat harassed, threatened and intimidated Plaintiff Smith, telling

him that he needed to take down the social media posting about Defendants.

Mustafa Atat replaced Plaintiff Smith as Defendants' race car driver upon

Defendants' breach of Plaintiff Smith's contract.

### II. Plaintiff Terry Hope

232.   Plaintiff Terry Hope ("Plaintiff Hope") was employed by Defendants from

July 2008 to July 2018.

233.   Plaintiff Hope was employed by Defendants to perform work in the United

States, Qatar, Kingdom of Bahrain, the United Arab Emirates (Abu Dhabi), and

any location to which Defendants chose to conduct business and travel.

234.   At the beginning of his employment, Plaintiff Hope was promised an

annual salary of $62,000.00 USD and bonuses in exchange for working regular

40-hour weeks.

235.   When working abroad, Plaintiff Hope was promised double pay and

weekly per diem of 800 Qatari Rial (approximately $215.00 USD).

236.   As his employment progressed, Plaintiff Hope was promised an increase in

annual salary to $96,000.00 USD plus bonuses and weekly per diem.

237.   After traveling abroad to Qatar work for Defendants, Defendants changed

their mind and decided to pay Plaintiff Hope only $72,000.00 USD.

238.    Despite Plaintiff Hope's insistence, Defendants would not pay Plaintiff Hope more than $72,000.00 USD.

239.    Additionally, Defendants promised Plaintiff Hope 25% percent of sales from the Qatar Race Club snack bar that Plaintiff Hope established for Defendants; despite demands, Defendants failed to ever pay Plaintiff Hope any percentage of sales.

240.    Plaintiff Hope entered into a full-time employment agreement whereby Plaintiff Hope was requested to be on duty for five days with two days off.

241.    Plaintiff Hope's employment agreement was crafted solely by Defendant Khalid.

242.    In deciding to accept the offer of employment with Defendants, Plaintiff Hope reasonably relied on the misrepresentation of Defendants that Plaintiff Hope would be paid by Defendants for all hours worked at the applicable prevailing wage and overtime rates, which as a direct result caused Plaintiff Hope to suffer serious financial and emotional damages.

243.    Throughout the duration of his employment, Plaintiff Hope did not have any supervisory authority nor did he exercise discretion or independent judgment with respect to matters of significance.

244.    As part of his duties, Plaintiff Hope was required to accompany Defendants as they traveled to and from, and in the United States and abroad,

where Plaintiff Hope was subject to long working hours, ranging from fifty (50) to one hundred (100) hours per week.

245. The work hours were dictated by Defendants and changed at the whim of Defendants.

246. Plaintiff Hope was hired in July 2008 by a tuner/crew chief in Oak Ridge, Tennessee, who at the time, was building a team for Defendants.

247. Plaintiff Hope had previously worked directly for this tuner/crew chief.

248. At the time of hiring, Defendant Khalid was building international racing teams that would include Top Fuel dragsters (the quickest accelerating race cars in the race car world), Funny Car (similar to Top Fuel but with a shorter wheelbase and a carbon-fiber body), Professional Stock motorcycles, and Pro Mod race cars.

249. Plaintiff Hope was hired under the auspices that the Pro Mods would race in the United States and overseas in Bahrain and Qatar.

250. Plaintiff Hope was hired under the auspices that other classes of car would begin racing in 2009 and race in the National Hot Rod Association (NHRA) series in the United States.

251. Plaintiff Hope was hired to work for Defendants to help Defendant Khalid build his teams.

252. The tuner/crew chief built two teams for Defendants.

253.   One team consisted of Plaintiff Terry Hope, Plaintiff, driver Robert Von Smith, and other crew members including a car chief, a motor and suspension specialist, and two additional crewmembers that assisted the team.

254.   At the time of Plaintiff Hope's hiring, Defendants were known as "Awesome Al Anabi Racing."

255.   At the time of Plaintiff Hope's hiring, Defendant Khalid owned two Pro Mod teams; a supercharger car team that was driven by Plaintiff Smith and tuned by the crew chief that had hired Plaintiff Hope; and a Nitrous car that was driven and tuned by two other employees of Defendants.

256.   At the beginning of Plaintiff Hope's employment, Plaintiff Hope had minimal interaction with Defendant Khalid and received his job duties from the tuner/crew chief who hired him as part of the supercharger (blower) team.

257.   Plaintiff Hope's job duties at this time included driving the transporters, which are large vehicles that move the race cars from one location to another, data and video acquisition, coordinating logistics for the crews and the cars, bookkeeping including payroll, and cooking for the team at the various tracks.

258.   Plaintiff Hope was first introduced to Defendant Khalid in October of 2008 by his tuner/crew chief at a car race in Englishtown, New Jersey, called "Shakedown at Etown." As previously mentioned, this race was Defendants' first racing win in the United States.

259.    Defendant Khalid was introduced to Plaintiff Hope at Shakedown as the owner of Al Anabi Racing.

260.    During Plaintiff Hope's initial meeting with Defendant Khalid, Defendant Khalid talked about the objectives of building teams for Defendants, racing in the Middle East, and his new racetrack in Qatar that would be finished by the end of 2008.

261.    Defendant Khalid told Plaintiff Hope that he was excited to have Plaintiff Hope be a part of his team.

262.    After approximately six months of employment, Plaintiff Hope was given more responsibility by Defendant Khalid and Plaintiff Hope's job duties changed.

263.    Plaintiff Hope continued to work in his previous job duties, but Plaintiff Hope was also asked to build and establish the concession stand at the Qatar Race Club, create promotional videos for the Qatar Race Club, and maintain Defendants' racing rigs.

264.    Throughout the duration of his employment, Plaintiff Hope did not have supervisory authority nor did he exercise discretion or independent judgment with respect to matters of significance.

265.    During the period of his employment with Defendants, Plaintiff Hope worked an average of eighty (80) hours per week, was not permitted any time off, and was on call 24/7 to immediately respond to Defendants' needs and wants.

266.   The work hours were dictated by Defendants.

267.   Beginning in 2010, in Doha, Qatar, and later again in Tennessee, Virginia, and North Carolina, Defendant Khalid solicited Plaintiff Hope to murder an owner of a racing league.

268.   Defendant Khalid simultaneously asked Plaintiff Hope to also kill the wife of the owner of the racing league.

269.   Defendant Khalid told Plaintiff Hope that he and the owner of the racing league had previously had a falling out and that he didn't want the owner to "breathe another day."

270.   Defendant Khalid asked Plaintiff Hope on at least four separate occasions, from 2010 to 2012, murder these two individuals.

271.   Defendant Khalid told Plaintiff Hope that Plaintiff Hope would be financially "set up" for the rest of his life, and told Plaintiff Hope that he needed to show Defendant Khalid that he was "loyal" to Defendant Khalid.

272.   Defendant Khalid told Plaintiff Hope how to make the killings look like a murder and suicide.

273.   Plaintiff Hope refused to murder the two individuals for Defendant Khalid.

274.   Defendant Khalid's unlawful request inflicted emotional harm and distress.

275.   In November of 2016, Defendant Khalid solicited Plaintiff Hope to engage in murdering an employee.

43

276.   Plaintiff Hope was working with Defendant Khalid in Defendant Khalid's personal residence when Defendant Khalid berated the chauffeur of his wife.

277.   After Defendant Khalid berated the chauffeur, a man of Indian descent, Plaintiff Hope observed Defendant Khalid grab a pistol and told Plaintiff Hope, "Come on. We need to take a ride."

278.   Plaintiff Hope informed Defendant Khalid that he did not want to go with him.

279.   Defendant Khalid replied, "This isn't for you," and forced Plaintiff Hope to ride with him as he drove to the Al Thani Royal Family desert camp compound, outside of Doha, Qatar.

280.   Upon arrival, Defendant Khalid instructed Plaintiff Hope to get out of the car and, referring to the chauffeur said, "It's time to teach this piece of sh*t a lesson."

281.   Defendant Khalid got out of the car and walked up to the chauffeur, who was being held by a security guard. Defendant Khalid punched the chauffeur in the face.

282.   Over the course of several minutes, Plaintiff Hope was forced to watch Defendant Khalid and his security guards physically beat the chauffer. Defendant Khalid and his guards would beat the chauffer until he fell to the ground, and then raise the man to his feet, and beat him again until he fell again. Plaintiff

Hope observed the chauffeur plead with Defendant Khalid to stop; the more that the chauffeur pleaded, the more aggressive Defendant Khalid beat him.

283.   Plaintiff Hope observed Defendant Khalid pull out his pistol, grab the chauffeur by the back of the head, place the pistol in the chauffeur's mouth, and say something that Plaintiff Hope could not hear.

284.   Plaintiff Hope observed Defendant Khalid to then strike chauffeur in the back of the head, observed the chauffeur to fall limp, observed the chauffeur's chest to cease rising, and the chauffeur to eventually become lifeless.

285.   Plaintiff Hope was unable to physically move due to the extreme emotional distress and fear he experienced, believing that if he moved, he would become the target of Defendant Khalid and his security guards.

286.   Defendant Khalid and his security guards were standing over the chauffeur when Defendant Khalid turned to Plaintiff Hope and asked Plaintiff Hope, "Do you want to shoot him?"

287.   Plaintiff Hope was shocked.

288.   Plaintiff Hope was eventually able to respond to Defendant Khalid, and stated to him, "I think he learned his lesson."

289.   Plaintiff Hope experienced extreme emotional trauma, felt helpless, and felt ashamed that he did not come to the defense of the chauffeur.

290.   Plaintiff Hope observed the chauffeur's lifeless body be loaded into the back of a vehicle with the assistance of the Amiri Guard, from the State of Qatar.

291.   As the body was loaded, Defendant Khalid told Plaintiff Hope, "This is what happens when you cross me. This is my world."

292.   Defendant Khalid then ordered Plaintiff Hope to get in the car.

293.   During the drive back to Defendant Khalid's palace, Defendant Khalid called Plaintiff Hope a "p*ssy," and told him that he could not understand why Plaintiff Hope would not cross "that line" for him.

294.   Defendant Khalid made statements including, "Everyone has their breaking point. I'll find yours," and "If you ever want to get into my inner circle, you will have to show your loyalty."

295.    Defendant Khalid instructed Plaintiff Hope to never discuss what he had observed "now that you know what I am capable of." Defendant Khalid told Plaintiff Hope that he saw a killer in Plaintiff Hope, and "was going to bring it out."

296.   Plaintiff Hope continues to experience emotional distress and anguish from the events that he observed and from his inability to assist and defend the chauffeur.

297.   On or about November 4, 2017, Defendant Khalid solicited Plaintiff Hope for murder again.

298.    Defendant Khalid requested that Plaintiff Hope work a race in Las Vegas, Nevada.

299.    In Las Vegas, Defendant Khalid advised Plaintiff Hope that he was beginning to have problems with employees of his, and he needed Plaintiff Hope to "take care" of them.

300.    Defendant Khalid again told Plaintiff Hope that he needed to show his loyalty and that Plaintiff Hope was going to be Defendant Khalid's "hit man."

301.    Plaintiff Hope informed Defendant Khalid that he could not kill anyone.

302.    Defendant Khalid replied that Plaintiff Hope had little faith in himself, and that life would be "financially easy" for him if he complied with Defendant Khalid's request.

303.    Defendant Khalid stated that if Plaintiff Hope was going to continue working for him, Plaintiff Hope would have to "show his loyalty."

304.    Plaintiff Hope refused to murder and was terminated from Defendants' employment shortly thereafter.

305.    Prior to his termination, in late October of 2016, Plaintiff Hope was ordered by Defendant Khalid to attend a party after a car race at Defendant Khalid's palace.

306.    Plaintiff Hope did not have the ability to protest as if he did not accede to Defendant Khalid's demands, he would be fired.

307.   While at Defendant Khalid's palace, Plaintiff Hope attempted to leave three times but was told by Defendant Khalid and Defendants' employees that Plaintiff Hope was required to stay.

308.   During this particular party, several employees and Defendant Khalid were distinctly raucous.

309.   Plaintiff Hope felt extremely uncomfortable to the point where he requested to leave several times.

310.   Plaintiff Hope attempted to leave multiple times but was stopped by Defendants' security guards.

311.   Plaintiff Hope even tried to spend the evening in a separate room from the party but was told to return to the location of the party.

312.   Plaintiff Hope was forced to watch Defendant Khalid, Jason Sharpe who is one of Defendants employees, and a friend of Defendant Khalid's commit an act of sodomy against a male prostitute with a billiard stick.

313.   Fearing that the situation would escalate, and not wanting to be involved either as an observer or participant, Plaintiff Hope again attempted to depart the palace.

314.   As Plaintiff Hope was attempting to exit on a lower level of the palace, Defendant Khalid saw and stopped him, and told Plaintiff Hope, "You don't leave until I tell you to leave."

315.   Plaintiff Hope again asked if he could leave the palace.

316.   Defendant stated that Plaintiff Hope was not permitted to leave and "to get his ass back upstairs."

317.   Plaintiff Hope was forced to go back upstairs.

318.   Approximately ninety minutes later, Plaintiff Hope used the bathroom. As Plaintiff Hope exited the bathroom, he encountered Defendant Khalid's security guard. The security guard asked Plaintiff Hope what he was doing, to which Plaintiff Hope replied that he was using the restroom.

319.   Defendant Khalid then shot at Plaintiff Hope twice with a pistol.

320.   Defendant Khalid missed Plaintiff Hope and hit the wall directly beside Plaintiff Hope.

321.   Plaintiff Hope was immediately in shock and fear for his life.

322.   Seeing Plaintiff Hope in a state of emotional distress, Defendant Khalid stated to Plaintiff Hope, "I told you, you can't leave. I just want to make sure that I have your attention. No one leaves until I tell them."

323.   Plaintiff Hope and others present at the party were eventually able to leave the palace approximately two hours later.

324.   As Plaintiff Hope departed, he was once again stopped by one of Defendant Khalid's security guards who told Plaintiff Hope he was not able to leave the palace until Defendant Khalid had been informed.

325.   Plaintiff Hope, beginning to feel extremely anxious, told the guard that Defendant Khalid had asked him to take his dog to the Qatar Race Club.

326.   Plaintiff Hope then departed.

327.   As a result of Defendant Khalid's actions, Plaintiff Hope suffered anxiety and became extremely apprehensive. Defendant Khalid's actions created a hostile, intimidating work environment.

328.   Throughout Plaintiff Hope's employment, Defendants would confiscate Plaintiff Hope's passport for months at a time, while in Qatar, forcing Plaintiff Hope to remain in Qatar.

329.   On at least one occasion, Defendant Khalid told Plaintiff Hope that he would not return his passport and issue an exit visa until Plaintiff Hope had arranged for a drone to be shipped to Defendant Khalid.

330.   Plaintiff Hope was forced to arrange the shipment of a drone to Qatar, and even then, Defendant Khalid refused to release Plaintiff Hope's passport to Plaintiff Hope nor would he issue an exit visa for an additional two months, until Defendant Khalid felt, in his opinion, Plaintiff Hope had "behaved enough."

331.   Throughout Plaintiff Hope's employment, Defendant Khalid made frequent requests of Plaintiff Hope for Defendant Khalid's personal benefit.

332.   For example, Defendant Khalid asked Plaintiff Hope to obtain three drones, wireless camera detection systems, and a white noise box.

333.   In March 2010, Defendant Khalid requested that Plaintiff Hope return to Qatar, who had just returned to the United States after the conclusion of the Qatar racing season, to assist Defendant Khalid with debugging his personal residence; Defendant Khalid believed his brother, Sheikh Tamim bin Hamad Al Thani, the Deputy Emir of Qatar at the time, was watching him or listening to his conversations.

334.   In 2017, Defendant Khalid sought to use one drone for what Plaintiff Hope later learned was for nefarious purposes, asking Plaintiff Hope to modify and weaponize a three-foot drone with six 14" propellers with a .50 caliber or a M-4 firearm.

335.   Defendant Khalid told Plaintiff Hope that he wanted to be able to "fly it around and shoot people."

336.   Upon learning of Defendant's criminal intent, Plaintiff Hope intentionally crashed the drone and traveled with it back to the United States.

337.   On another occasion, Plaintiff Hope was asked by Defendant Khalid to help protect Defendants business websites from hacking and intruders and to investigate an employee suspected of stealing.

338.   Defendant Khalid then began pressuring Plaintiff Hope to utilize the same tactics and software to attempt, and actually obtain, improper access to his brother, the Deputy Emir of Qatar at the time; one royal family member of the

Kingdom of Bahrain; a private citizen of the Kingdom of Bahrain; a royal family member of Dubai, who was the deputy Amir of Dubai at the time; and two private citizens of Dubai.

339.   One of the royal Bahraini family members is a competitor in the car racing industry.

340.   Plaintiff Hope experienced mental distress and emotional anguish as a result of Defendant Khalid's requests and expectations to assist him in actions that could have harmed the lives of others or offended the government of the State of Qatar.

341.   On January 31, 2013, Plaintiff Hope complained to Defendant Khalid that he was not feeling well. Upon hearing Plaintiff Hope's complaints, Defendant Khalid gave Plaintiff Hope three to four long, encapsulated powder pills and instructed him to take them.

342.   Plaintiff Hope asked from where the pills had originated, and Defendant Khalid told him that one of the Defendants nurses had them, and that they were essentially a high dosage of aspirin.

343.   Defendant Khalid assured Plaintiff Hope the pills were harmless.

344.   Plaintiff Hope, relying on Defendant Khalid's assertions and believing the pills to have originated from Defendants private medical staff, took the medication.

345.   Plaintiff Hope fell ill and was rushed to a hospital by an ambulance.

346.   While he was in the initial stages of observation, Defendants private medical staff appeared at the hospital, forced their way into Plaintiff Hope's hospital room, and advised the hospital staff that Plaintiff Hope was having a heart attack.

347.   Plaintiff Hope had not yet told Defendants private medical staff of his symptoms.

348.   Defendants staff demanded Plaintiff Hope be moved to a second hospital.

349.   Plaintiff Hope had not yet undergone any testing at the hospital including even basic laboratory testing.

350.   At the demand of Defendant Khalid, Plaintiff Hope was moved to a second hospital.

351.   Plaintiff Hope had no say in the matter, despite being alert, awake, conscious and capable of making his own medical decisions; Plaintiff Hope was silenced by Defendants staff and unable to make any medical decisions regarding his care.

352.   Defendant Khalid instructed Plaintiff Hope not to tell anyone that he had taken the pills and to tell everyone that he was having a heart attack, rendering Plaintiff Hope to obtain objective medical care.

353.   After being transferred to a second hospital, Plaintiff Hope underwent medical testing.

354.   The next morning, Plaintiff Hope was awakened by medical staff shaving his testicles, causing Plaintiff Hope to experience extreme distress.

355.   In the corner of his hospital room was one of Defendant Khalid's private security guards, who refused to respond to Plaintiff Hope's multiple requests asking who he was and why he was in Plaintiff Hope's room.

356.   Plaintiff Hope was forced to remain hospitalized from February 1-4, 2013, at Defendant Khalid's request.

357.   During this time period, one of Defendant Khalid's guards remained in the hospital room at all times and refused to respond to Plaintiff Hope.

358.   Plaintiff Hope was permitted to talk to his wife on three or four occasions, and even asked her, moving a FaceTime camera to directly point at the security guard, if she was able to see the guard or if he was hallucinating.  Plaintiff Hope's wife confirmed she was able to see the guard and that Plaintiff Hope was not imagining his presence.

359.   Plaintiff Hope imminently feared that he would be punished in some way for being hospitalized and feared that Defendant Khalid may seek retaliation if Plaintiff Hope was truthful in his medical history regarding how he had come to experience his symptoms.

360.    On the third day that he was hospitalized, Plaintiff Hope began to believe his organs were going to be harvested against his will.

361.    Fearing that he would be harmed, on the fourth day of hospitalization Plaintiff Hope left the hospital.

362.    Plaintiff Hope was not permitted by Defendants to work for two days after he departed from the hospital, and was told to wait until Defendants instructed him to return to work.

363.    Defendant Khalid again told Plaintiff Hope that he was not to tell anyone that Defendant Khalid had given Plaintiff Hope any pills, and that Plaintiff Hope must tell everyone that he had suffered a heart attack.

364.    During his medical emergency and subsequent hospitalizations, Plaintiff Hope had no control over making medical decisions and was held against his will for three days by Defendants.

365.    Defendants also prevented Plaintiff Hope from leaving the country of Qatar for two months after Plaintiff Hope's hospitalization and forced Plaintiff Hope to remain in Qatar.

### III. Plaintiff Ramez Tohme

366.    Plaintiff Ramez Tohme ("Plaintiff Tohme") was introduced to Defendant Khalid in 2008 at the Beverly Wilshire Hotel through one of Defendant Khalid's cousins.

367.   From 2008 to 2017, Plaintiff Tohme and Defendant Khalid were friends.

When Defendant Khalid would travel to Los Angeles, California, he and Plaintiff

Tohme would socialize together, with Plaintiff Tohme arranging social events on

behalf of Defendant Khalid.

368.   In June of 2017, Plaintiff Tohme was hired directly by Defendant Khalid at

the Peninsula Hotel in Beverly Hills, California.

369.   Plaintiff Tohme was employed by Defendants from June of 2017 to June

30, 2018.

370.   Plaintiff Tohme began his employment with Defendants in California.

371.    Plaintiff Tohme worked for Defendants in the United States, Qatar and

England.

372.   In the United States, Plaintiff Tohme worked in Los Angeles, California,

and throughout the United States in numerous states at the various racing

locations of Defendants. In England, Plaintiff Tohme worked at Defendant

Khalid's mother's home in London, England. In Qatar, Plaintiff Tohme worked

at the Qatar Race Club, the offices of K.H. Holding, and the residences of

Defendant Khalid.

373.   Plaintiff Tohme was initially hired by Defendants to provided personal

services to benefit Defendants and Defendant Khalid's immediate family.

Plaintiff Tohme's job duties included arranging transportation, restaurant

reservations, social activities, and real estate services.  Thereafter, Plaintiff Tohme served as a business advisor to Defendants.

374.   Plaintiff Tohme was required to travel with Defendants for work purposes and Defendant Khalid's personal purposes.

375.   In July of 2017, while Defendants were traveling and competing in the race industry in the United States, Defendant Khalid tasked Plaintiff Tohme with securing a home for him in the Los Angeles area; Defendant Khalid stated that he no longer wanted to stay at the Peninsula Hotel and told Plaintiff Tohme to do "whatever it takes" to secure a home for him.

376.   At Defendant Khalid's insistence, Plaintiff Tohme signed a lease on behalf of Defendant Khalid. However, Defendant Khalid refused to honor the lease contract and, several months later, Plaintiff Tohme was sued in a California court for $175,000.00 USD; final judgment was entered against Plaintiff Tohme while he was out of the country, working in Qatar for Defendants.

377.   As a result of Defendant Khalid's actions, Plaintiff Tohme's business relationships were severely damaged, and he was terminated from his position with a real estate firm.

378.   In December of 2017, Plaintiff Tohme accompanied Defendant Khalid to Doha, Qatar to serve as Defendants business advisor.

379.   Plaintiff Tohme was issued an employment visa and work permit, with his employer listed as Sheikh Khalid bin Hamad bin Khalifa Al Thani.

380.   Plaintiff Tohme was initially compensated through business referrals and business contacts that Defendants provided, or directed, to Plaintiff Tohme's businesses. On or about December of 2017, and thereafter, Plaintiff Tohme was promised housing, travel, and a salary.

381.   While working for Defendants, Plaintiff Tohme worked seven days per week, averaging approximately 18 hours per day.

382.   There were periods of time, on at least five occasions, where Plaintiff Tohme worked for 20 to 36 hours straight, with no opportunity for sleep.

383.   Plaintiff Tohme's exact schedule varied from day to day to meet the personal demands Defendant Khalid required on behalf of Defendants.

384.    When Plaintiff Tohme was requested to accompany Defendants on trips or vacations, he was required to work seven days per week and 12 or more hours per day.

385.   From December 17, 2017, to July 2018, on at least ten occasions, Defendant Khalid held Plaintiff Tohme against his will.

386.   While being held in Defendant Khalid's personal residences, Plaintiff Tohme was locked into the home, and the entrances and exits to Defendant Khalid's properties were guarded by Defendants staff.

387.   Plaintiff Tohme was not permitted outside.

388.   Plaintiff Tohme was prohibited from interacting with others without Defendant Khalid's permission.

389.   On at least two occasions, including, but not limited to, December 17, 2017, and April 2, 2018, Plaintiff Tohme's cellular phone was seized and held by Defendant Khalid.

390.   Plaintiff Tohme was unable to contact the United States Embassy, emergency points of contact, or his family to request help and assistance.

391.   Plaintiff Tohme asked Defendant Khalid on multiple occasions to leave the palace.

392.   Defendant Khalid refused all of Plaintiff's Tohme's requests to leave his residences.

393.   While refusing requests, Defendant Khalid would brandish a firearm, point the firearm at Plaintiff Tohme, and/or threaten to kill Plaintiff Tohme and his family if Plaintiff Tohme attempted to leave the palace.

394.   At times, Defendant Khalid would threaten to bring criminal charges against Plaintiff Tohme in Qatar and the United States, stating, "This can go on as long as you want."

395.   During one refusal of Plaintiff Tohme's requests to leave the palace, Defendant Khalid began discussing vehicle wheels he wanted for one of his

vehicles in Qatar. Plaintiff Tohme had arranged for the wheels to be purchased in California and shipped to Defendants in Qatar. At that point in time, the wheels were being held in storage in California. Defendant Khalid told Plaintiff Tohme, "Get me those wheels in the next few days, or you can call your father and tell him that you are going to be buried in the desert."

396.    In June of 2019, during the fifth time that he was held in Defendant Khalid's palace, Plaintiff Tohme was able to escape, and reach the United States Embassy in Doha, Qatar.

397.    There, he sought counsel from the United States Embassy's Regional Security Officer regarding how he could obtain permission to safely leave the country.

398.    At this point in time, Qatar's exit requirements required an employer to sponsor an exit visa. Without an employer-endorsed exit visa, Plaintiff Tohme was trapped inside.

399.    At the United States Embassy, Plaintiff Tohme described to United States government officials the course of events that he had survived over the past several months, detailing the unpredictable behavior of Defendant Khalid and the willingness of Defendant Khalid's family, friends, and Defendants employees' to obey orders to imprison Plaintiff Tohme in Defendant Khalid's palace.

400.    Plaintiff Tohme described to United States government officials the living

conditions he had suffered, the constant fear for his safety, and his grave concerns

regarding remaining safe within Qatar.

401.    The United States Embassy advised that they would work to obtain the

proper authorization for him to depart the country, and that this process would be

handled via diplomatic channels.

402.    Plaintiff Tohme, having no living arrangements available to him in Doha,

was forced to return to Defendant Khalid's home while he awaited an exit visa to

safely depart Qatar.

403.     On or about July 6, 2018, events against escalated to the point where

Plaintiff Tohme against sought to escape the palace and was physically held in

confinement by Defendant Khalid.

404.    Defendant Khalid confiscated Plaintiff's Tohme's personal cellular phone,

prohibiting and preventing him from contacting anyone outside of the palace,

including the United States Embassy.

405.    Plaintiff Tohme was confined to private quarters under the watch of one of

Defendant Khalid's security guards. At some point, Plaintiff Tohme was able to

leave the room and utilize a cellular phone that he borrowed from another

individual within the palace. Plaintiff Tohme called Plaintiff Pittard for

assistance.

406.   Plaintiff Pittard advised Plaintiff Tohme of his recommended course of action, which included Plaintiff Tohme attempting to reach the safety and security of the United States Embassy in Doha.

407.   Plaintiff Pittard contacted Plaintiff Tohme's family in the United States to advise them of the situation and to advise law enforcement at the United States Department of State in Washington, D.C.

408.   At approximately 3:00 a.m., Plaintiff Tohme was able to escape from the palace, through beach access at the rear of the property.

409.   Plaintiff Tohme met Plaintiff Pittard at a location well away from the palace, and notified the United States Embassy of the latest event.

410.   The next day, upon learning that Plaintiff Tohme had escaped from the palace, Defendant Khalid and Defendants employees began a relentless pursuit of Plaintiff Tohme.

411.   Defendant Khalid, and Defendants employees, including Jason Sharpe, contacted Plaintiff Pittard numerous times, and threatened Plaintiff Pittard that if he did not comply with providing information regarding Plaintiff Tohme, that Plaintiff Pittard "would pay the price." Defendants continually asked for the whereabouts of Plaintiff Tohme, and demanded that Plaintiff Tohme return to the palace.

412.   At this point in time, in fear for his life and of retaliation, Plaintiff Tohme, with the assistance of Plaintiff Pittard, did not remain in one static location in Doha, Qatar for long.

413.   For the next three days, while Plaintiff Tohme awaited clearance from the United States Embassy to leave Qatar, Plaintiff Tohme and Plaintiff Pittard moved from one hotel or residence to another, actively concealing their physical locations from Defendants for their own protection.

414.   On or about July 9th, 2018, at the request of Defendant Khalid, Plaintiff Tohme reluctantly agreed to meet Defendant Khalid in the lobby of a hotel to get the proper authorization to leave the country of Qatar; Defendant Khalid told Plaintiff Tohme that he "just wanted to talk" and would then give Plaintiff Tohme his exit permit. However, instead of "just talking," Defendant Khalid's Qatari employees kidnapped Plaintiff Tohme, forced him into a vehicle, and physically forced him back into his palace.

415.   Over the course of the next several hours, at the direction of Defendant Khalid, Plaintiff Tohme was held in confinement and verbally and physically threatened.

416.   During his false imprisonment, Plaintiff Tohme observed Defendant Khalid to be high on narcotics and brandish a firearm.

417.   Plaintiff Tohme tried to escape once, via the main gate of Defendant

Khalid's home. However, Defendant Khalid's Amiri guard and private Qatari

security employees physically prevented his exit.

418.   At some point during his false imprisonment, one of Defendant Khalid's

employees contacted Plaintiff Pittard, asking for assistance on behalf of Plaintiff

Tohme.

419.   Plaintiff Pittard contacted the United States Embassy, and a United States

security plan was enacted. Plaintiff Pittard was given specific instructions to

follow, which included contacting Qatari police. Plaintiff Pittard contacted Qatari

police.

420. When Qatari police arrived at Defendant Khalid's palace, at Defendant

Khalid's direction Plaintiff Tohme was arrested for assault and intoxication.

421.   Plaintiff Tohme was placed in handcuffs, with his hands in front of him. At

Defendant Khalid's direction, Defendant Khalid's private Qatari security guards

re-handcuffed Plaintiff Tohme with his hands behind his back.  As Plaintiff

Tohme, who was handcuffed, was being placed in the police vehicle, Defendant

Khalid struck Plaintiff Tohme in the back of the head with a closed fist.

422.   Defendant Khalid seized Plaintiff Tohme's phone. Upon reading his

messages, and discovering that Plaintiff Pittard was assisting Plaintiff Tohme,

Defendant Khalid called Plaintiff Pittard and told him that he would murder

Plaintiff Pittard.

423.   To Plaintiff Pittard, Defendant Khalid stated, "You motherf*cker! You

back-stabbing piece of sh*t! How dare you do this to me? You know who I am

and what I can do to you? I will bury you in the desert! F*ck your family, and I

will f*ck you!"

424.   Plaintiff Tohme was unlawfully transported to the Onaiza Police Station

and not permitted any welfare checks by visitors. Plaintiff Pittard attempted to

assist Plaintiff Tohme and was told that if he involved himself in any way, such as

serving as a third-party custodian, he too would be arrested.

425.   During his overnight detainment, Plaintiff Tohme was forced to provide a

blood sample by non-medical trained staff who did not clean his arm nor did they

use a clean needle.

426.   Upon information and belief, at the direction of Defendant Khalid the

blood sample was tampered with; however, the individual who tampered with the

sample was inept, as the laboratory analysis of the tampered blood showed there

to be so much alcohol present within Plaintiff Tohme's blood sample, Plaintiff

Tohme was clinically dead.

427.   Plaintiff Tohme spent the evening in Qatari jail. In the morning, he was

arraigned before a magistrate judge, who brought Plaintiff Tohme back into

chambers and stated, "Ramez, don't worry. We are all aware of Khalid's actions and the things he does. I will release you but I don't want to hear anything bad about my country."

428.    Plaintiff Tohme was returned to the Onaiza Police Station for release processing, where Defendant Khalid again ordered that Plaintiff Tohme be arrested and charged with new criminal conduct.

429.    The Onaiza Police Station advised Plaintiff Tohme that Defendant Khalid was in route to the station to encourage the prosecution of Plaintiff Tohme.

430.    While attempting to conduct a welfare check on Plaintiff Tohme and pending the arrival of staff of the United States Embassy, Plaintiff Pittard was told by the police to return to his residence, and that if he failed to leave the police station, he himself would be arrested.

431.    The United States Qatari Consulate in Los Angeles, California, was contacted. Ambassador H.E. Sheikh Meshal bin Hamad Al Thani and the Qatari military attaché to the United Nations, aided in the release of Plaintiff Tohme.

432.    Approximately eight hours after he was arrested for the second time, Plaintiff Tohme was released.

433.    Upon his release, Plaintiff Tohme was met by Plaintiff Pittard and transported to an undisclosed location where a member of the Qatari government personally escorted Plaintiff Tohme out of the country.

434.   Plaintiff Tohme has suffered severe and permanent injuries as a result of Defendants' actions.

### IV. Plaintiff Matthew Pittard

435.   Plaintiff Pittard was employed by Defendants from September 17, 2017 to July 10, 2018.

436.   Plaintiff Pittard was hired by Defendants at the recommendation of a Qatari Sheikh that Plaintiff Pittard had previously worked for in Doha, Qatar in 2013 and 2014.

437.   Over the course of his employment, Plaintiff Pittard worked as a Director of Security and then as a Senior Defense Consultant, conducting advanced counter-assault training at the Police Training Institute in Doha, Qatar and Zakreet, Qatar.

438.   Plaintiff Pittard was hired to perform work in the United States, Qatar, England, and any location to which Defendants chose to conduct business and travel.

439.   At the beginning of his employment, Plaintiff Pittard was promised an annual salary of $102,000.00 USD, plus an end-of-the-year bonus in exchange for working regular 40-hour weeks.

440.   As his employment progressed, Plaintiff Pittard was additionally promised a percentage of sales and a share of ownership of Geo Strategic Defense

Solutions, LLC, a company owned by Defendant Khalid, on the basis that he was jointly developing the company.

441.   As part of his duties, Plaintiff Pittard was subject to long working hours, ranging from sixty (60) to ninety-six (96) hours per week.

442.   The work hours were dictated by Defendant Khalid and changed at the whim of Defendants.

443.   Plaintiff Pittard was not permitted any time off; Plaintiff Pittard was on call 24/7 and expected to immediately respond to Defendants.

444.   Plaintiff Pittard entered into a full-time employment agreement whereby Plaintiff Pittard was requested to be on duty for five days with two days off.

445.   Plaintiff Pittard's employment agreement included, in addition to monthly compensation, thirty days of paid leave per calendar year, two yearly flight allowances, transportation, and accommodations.

446.   In deciding to accept the offer of employment with Defendants, Plaintiff Pittard reasonably relied on the misrepresentation of Defendants that Plaintiff Pittard would be paid by Defendants for all hours worked at the applicable prevailing wage and overtime rates—none of which were paid—causing Plaintiff Pittard to suffer serious financial and emotional damages.

447.   Plaintiff Pittard's illegal employment agreement was crafted solely by Defendants and Plaintiff Pittard was required to accept its terms or else forfeit his job.

448.   Throughout the duration of his employment, Plaintiff Pittard did not have supervisory authority nor did he exercise discretion or independent judgment with respect to matters of significance.

449.   Throughout the course of his employment, Plaintiff Pittard consistently worked in excess of forty (40) hours per week but was not paid overtime.

450.   Defendant Khalid was persistent in his requests that Plaintiff Pittard come work for Defendants, placing numerous phone calls over the course of several months and repeatedly asking Plaintiff Pittard to leave his current employment for employment with Defendants.

451.   Plaintiff Pittard was personally hired by Defendant Khalid and immediately began employment in Los Angeles, California.

452.   Plaintiff Pittard utilized his personal experience as a prior United States Marine, private military contractor, and anti-terrorism officer to help Defendant Khalid jointly establish, build, and begin the operation of Defendant Geo Strategic Defense Solutions, LLC.

453.   Additionally, Plaintiff Pittard's job duties throughout his term of employment included ensuring the safety and security of Defendants employees

and Defendant Khalid while Defendants raced cars throughout the United States and abroad.

454.    Plaintiff Pittard developed and instituted security protocols and procedures to advance the security initiatives of Defendants at various locations including racetracks, private residences, hotels, business meetings and during travel.

455.    In addition to these job duties, while in Qatar, Plaintiff Pittard conducted advanced counter-assault training and provided law enforcement instruction and weapons training.

456.    During his employment, Plaintiff Pittard was solicited by Defendant Khalid for the murder of two individuals in Los Angeles, California.

457.    In approximately late September of 2017 and November of 2017, in Los Angeles, California, Defendant Khalid asked Pittard to murder a male and female who Defendant Khalid viewed as threats to his social reputation and personal security. Pittard refused to execute these unlawful requests.

458.    During Plaintiff Pittard's period of employment, from approximately July 7-10, 2018, Defendants held an American citizen, Plaintiff Tohme, against his will on at least two occasions in one of Defendant Khalid's personal residences.

459.    Plaintiff Pittard came to the aide of Plaintiff Tohme and helped him reach a point of safety, eventually departing from the country of Qatar.

460.   On July 7, 2018, Defendant Khalid learned that Plaintiff Pittard had assisted Plaintiff Tohme in securing safety.

461.   Defendants began harassing and threatening Plaintiff Pittard. Defendant Khalid, and individuals at the direction of Defendant Khalid, including employees of Defendants, demanded that Plaintiff Pittard return Plaintiff Tohme and provide information their whereabouts to Defendant Khalid or Plaintiff Pittard "would pay the price."

462.   Defendants Khalid's threats to, and requests of, Plaintiff Pittard continued to escalate; Defendant Khalid directly told Plaintiff Pittard that he would kill him, bury his body in the desert, and kill Plaintiff Pittard's family.

463.   On July 10, 2018, Plaintiff Pittard was held against his will by Defendant Khalid, family members of Defendant Khalid, Defendant's private Qatari security staff, and employees of Defendants.

464.   Plaintiff Pittard was threatened with bodily harm and his work equipment, electronics, personal belongings, and medication were stolen and/or destroyed, and Plaintiff Pittard was terminated from Defendants' employment.

465.   Plaintiff Pittard was forced, under duress, with Defendant Khalid brandishing a firearm, which he tapped repeatedly during his exchange with Plaintiff Pittard, to execute new employment documents.

466.    After executing new employment documents, Plaintiff Pittard was taken by armed guards back to his personal residence and forced to surrender the majority of his personal belongings.

467.    Plaintiff Pittard refused multiple times.

468.    Plaintiff Pittard was then told by Defendants that if he did not comply, he would be arrested by Qatari law enforcement at Defendant Khalid's request.

469.    While being threatened, private security guards and local law enforcement in the room physically intimidated Plaintiff Pittard.

470.    Plaintiff Pittard was then brought back by force to Defendants offices, and through the use of physical intimidation and multiple threats of arrest, Defendants forced Plaintiff Pittard to provide access to his personal and business electronics and records.

471.    Fearing for his life, and firmly believing that he would be killed by Defendant Khalid if he did not comply, Plaintiff Pittard provided access to his personal and business electronics and records.

472.    While held, Plaintiff Pittard did not have access to his cellular telephone and Defendants did not allow Plaintiff Pittard to contact anyone, including the United States Embassy, for over eighteen hours.

473.    Through the theft of his electronics and hard-copy work documents, and to his detriment, Plaintiff Pittard suffered the loss of approximately seventeen years

of personal and business records and data, documents, contractual documents, proprietary data, and personal and professional contacts as well as personal pictures.

474.   Defendant Khalid later showed the stolen information to co-Plaintiff Jason Mollenbrink.

475.   When showing Plaintiff Pittard's stolen laptop to co-Plaintiff Jason Mollenbrink, Defendant Khalid laughed and told co-Plaintiff Jason Mollenbrink that he had sequestered Plaintiff Pittard, taken his electronics and medication, and buried Plaintiff Pittard in the desert.

476.   Over the course of eighteen hours, Plaintiff Pittard was stripped of almost all personal and business belongings by Defendants and others, at the direction of Defendant Khalid.

477.   Plaintiff Pittard was taken to the airport and upon arrival, sought to make a report regarding the incident before his departure but was told by Qatari law enforcement that he would be further detained in the country of Qatar if he chose to move forward with making a report.

478.   Wanting to safely exit the country, Plaintiff Pittard declined to make a law enforcement report.

479.    After his return to the United States, from July 2018 to August 2018,

Plaintiff Pittard repeatedly requested, through communications with Defendants

employees, that Defendants return his equipment and belongings.

480.    Plaintiff Pittard's requests were met with hollow responses and later,

Plaintiff Pittard received a cease and desist letter dated July 23, 2018, from an

Ohio-based law firm representing Defendant Khalid's holding company, KH

Holding, LLC, that Plaintiff Pittard was in violation of the employment

documents that he was forced to execute under duress, at gunpoint, and that if he

continued to contact Defendants, they would file suit against Plaintiff Pittard.

The letter stated:

> It has come to our attention that you recently engaged in a series of actions
> in direct contravention with the Confidentiality Agreement (the
> "Agreement") you signed on July 10, 2018. As you are aware, the
> Agreement provides in Section II(2) that you are "[n]ot to communicate in
> anyway with any of the individuals/employees working with any of the
> Related Parties." Your recent communication and attempted
> communications with individuals associated with the "Related Parties" are
> in violation of the Agreement, serve no legitimate purpose, and are
> completely unacceptable.
>
> The purpose of this letter is to inform you that the violation of the
> Agreement must immediately cease, or legal action will be initiated, as the
> facts and circumstances dictate. In any such legal action, K.H. Holding will
> seek all legal remedies available to it, including injunctive relief, damages,
> punitive damages, costs, and attorney's fees, as available under the
> Agreement and applicable law. While K.H. Holding would be well within
> its rights to initiate legal action at this juncture, K.H. Holding is generously
> providing you with an opportunity to rectify your behavior and comply
> with the Agreement.

> In the event you fail to comply with this demand and the provisions of the Agreement, K.H. Holding will not communicate with you further prior to initiating legal action against yourself, your agents, and other related entities engaged in the above-described conduct.

481.   Plaintiff Pittard sustained economic and non-economic damages as a result of retaliation by Defendants.

482.   After Plaintiff Pittard was terminated, Defendant Khalid stole and misused Plaintiff Pittard's business information to further Defendants' business interests.

483.   Defendant Khalid took Plaintiff Pittard's business information and sought to further Defendant Khalid's interests in the professional and private security industry.

484.   For example, Defendant Khalid interfered with a security, law enforcement, and arms brokerage contract that Plaintiff Pittard had negotiated with the Police Training Institute in Doha, Qatar.

485.   Plaintiff Pittard was forced to close his privately-owned consulting firm and take multiple pro-active steps to protect the security of his financial and personal information taken by Defendants.

486.   Further, Plaintiff Pittard was required to re-draft hundreds of templates and contracts and seek legal advice and review of documents and contracts that he had previously used for numerous years.

487.   Additionally, Defendants sought to improperly conduct business with Plaintiff Pittard's United States business contacts.

488.    Defendants, using Plaintiff Pittard's stolen electronics, documents, and laptop, contacted business contacts cultivated by Plaintiff Pittard before his employment with Defendants, and attempted to misappropriate business contracts that would normally have only been contracted by, and with, Plaintiff Pittard.

489.    Defendants actions, threats, and requests during and after Plaintiff Pittard's employment created an environment of fear and intimidation.

490.    Defendants extreme and outrageous behavior has gone beyond a term of employment and intentionally extended into Plaintiff Pittard's business, personal and professional life.

491.    Plaintiff Pittard is unable to work in the country of Qatar, where he previously had lucrative security contracts to provide training and security.

492.    Plaintiff Pittard is unable to work in Turkey, where Defendants frequently travel and conduct business; safety concerns and Defendants' threats and actions have made safely doing business in Turkey, and other Middle Eastern countries, extremely difficult if not impossible.

493.    Plaintiff Pittard is unable to conduct business meetings and provide training services in some Middle Eastern countries, as he once did, due to Defendants' ability, through financial resources, to inflict limitless harm.

## V. Plaintiff Matthew Allende

494.   Plaintiff Matthew Allende ("Plaintiff Allende") was employed as a paramedic by Defendants from approximately October 15, 2017, to February 4, 2018.

495.   Plaintiff Allende began his employment with Defendants in Los Angeles, California.

496.    Plaintiff Allende worked for Defendants in the United States and Qatar.

497.   As part of his employment duties, Plaintiff Allende provided immediate emergency medical care, vital sign monitoring, and mobile medical emergency services to the employees of Defendants, to Defendant Khalid, and on a handful of occasions, to Defendant Khalid's family members.

498.   Plaintiff Allende was required to travel with Defendants for work purposes and Defendant Khalid's personal purposes.

499.   On approximately December 5, 2017, Plaintiff Allende accompanied Defendant Khalid to Doha, Qatar.

500.   Plaintiff Allende was compensated at a rate of $500 USD per day, with a salary range of $14,000-$15,500 USD per month. When working outside of the United States, Plaintiff Allende was promised premium foreign pay.

501.   While working for Defendants, Plaintiff Allende worked seven days per week, approximately 12 hours per day, with minimal meal breaks.

502.    There were periods of time, particularly at the beginning of his employment, where Plaintiff Allende worked for 20 to 36 hours straight, with minimal meal breaks and no opportunity for sleep.

503.    Plaintiff Allende's exact schedule varied from day to day to meet the medical needs of Defendants' employees and Defendant Khalid.

504.     When Plaintiff Allende was requested to accompany Defendants on trips or vacations, he was required to work seven days per week and 12 or more hours per day.

505.    Plaintiff Allende was required to be on duty to monitor Defendant Khalid's vital signs and administer aid as needed; and to provide medical care of Defendants employees at the Qatar Race Club.

506.    Accordingly, Plaintiff Allende worked approximately 84 hours per week, exclusive of the numerous occasions where he worked for 20 to 36 hours straight.

507.    On several occasions over the course of Plaintiff Allende's employment, Defendants refused Plaintiff Allende's request to leave Defendant Khalid's palace for normal breaks, personal needs, and personal respite after Plaintiff Allende had completed his requested shift.

508.    On or about December 17, 2017, after approximately three straight weeks of work and a 36-hour sleepless binge by Defendant Khalid, Plaintiff Allende requested a day off, to which Defendant Khalid agreed.

509.   During this 36-hour sleepless binge, Plaintiff Allende was forced to stay awake with Defendant Khalid.

510.   Plaintiff Allende left the palace for the evening. Thereafter, he returned to the palace, and was leaving a second time with Plaintiff Tohme. As both were leaving the palace, Plaintiff Allende was stopped by Defendant Khalid's assigned security Amiri Guard at the exit of the palace.

511.   Plaintiff Allende was told that, at the direction of Defendant Khalid, he was not allowed to leave the palace.

512.   Plaintiff Allende stated that he had asked for a day off from Defendants and that Defendant Khalid had granted his request.

513.   Defendant Khalid's guard, armed with a pistol, stated that Defendant Khalid had changed his mind and that Plaintiff Allende was no longer able to leave the premises.

514.    Plaintiff Allende informed the guard he was leaving with or without the guard's permission, to which the guard replied "No, you are not leaving," and directed Plaintiff Allende to immediately return to the palace.

515.   Instead of returning to the palace, and fearing for his life, Plaintiff Allende escaped the confines of the premises of the palace by jumping over a five-foot rod-iron fence, and then using a security guard dog's kennel to scale over an eighteen-foot perimeter wall.

516.    Plaintiff Allende, knowing the risk that he may sustain serious injuries in his efforts to maintain personal security and safety, and while escaping from the dangerous and threatening situation created by Defendant Khalid, jumped from the top of the palace perimeter wall to the concrete walkway and fell approximately eighteen feet.

517.    Plaintiff Allende sustained serious injuries and required immediate medical attention and surgery in Doha, Qatar.

518.    Thereafter, on or about February 4, 2018, once he was healthy enough to travel, though still on crutches, Plaintiff Allende was terminated from employment by Defendants.

519.    As a result of his injury, Plaintiff Allende suffered severe and permanent injuries.

520.    Despite numerous attempts, Plaintiff Allende has been unable to return to his regular employment.

521.    Despite undergoing physical therapy and rehabilitation, Plaintiff Allende is permanently disabled.

**VI. Jason Mollenbrink**

522.    Plaintiff Jason Mollenbrink ("Plaintiff Mollenbrink") was employed as a licensed, registered nurse by Defendants from approximately May 2018 to March 2019.

523.    Plaintiff Mollenbrink was hired after meeting Defendant Khalid at the
Beverly Wilshire Hotel in the spring of 2018.

524.    Plaintiff Mollenbrink was employed by Defendants to perform work in the
United States, Qatar, Turkey and any location to which Defendants chose to
conduct business and travel.

525.    Plaintiff Mollenbrink was compensated at a rate of $25,000.00 USD per
month.

526.    As part of his duties, Plaintiff Mollenbrink was required to accompany
Defendants as they traveled to, from, and in the United States, Qatar, and
Turkey, where he was subject to long working hours, ranging from 56 to 84 hours
per week.

527.    The work hours were dictated by Defendants and changed at the whim of
Defendants.

528.    Plaintiff Mollenbrink entered into a full-time, three-year employment
agreement whereby Defendants requested Plaintiff Mollenbrink to work seven
eight-hour shifts per week, for a total of 56 hours per week, with days off only
when Plaintiff Mollenbrink requested time off directly from Defendant Khalid.

529.    This illegal agreement was crafted solely by Defendant Khalid and Plaintiff
Mollenbrink was required to accept its terms, or else forfeit his job.

530.    In deciding to accept the offer of employment with Defendants, Plaintiff Mollenbrink reasonably relied on the misrepresentation of Defendants that Plaintiff Mollenbrink would be paid by Defendants for all hours worked at the applicable prevailing wage and overtime rates, which as a direct result caused Plaintiff Mollenbrink to suffer serious financial and emotional damages.

531.    As part of his employment duties, Plaintiff Mollenbrink provided immediate emergency medical care, vital sign monitoring, medication administration, and medical emergency services. Plaintiff Mollenbrink would see to any need, ailment, or minor injury (cut, bruise, or strain) sustained by any employees of Defendants, Defendant Khalid or family members of Defendant Khalid.

532.    Plaintiff Mollenbrink was required to frequently travel with Defendants for work and Defendant Khalid's personal purposes.

533.    Plaintiff Mollenbrink worked at the Qatar Race Club, business locations of Defendants, and the personal residences of Defendant Khalid.

534.    Throughout the duration of his employment, Plaintiff Mollenbrink did not have supervisory authority nor did he exercise discretion or independent judgment with respect to matters of significance.

535.   Throughout the course of his employment, Plaintiff Mollenbrink consistently worked in excess of forty (40) hours per week but was not paid overtime.

536.   While working for Defendants, Plaintiff Mollenbrink worked seven days per week, approximately 12 hours per day, with minimal meal and bathroom breaks.

537.   Meal breaks were required to be taken at Defendant Khalid's side; that is, Plaintiff Mollenbrink was required to eat directly next to Defendant Khalid while on a meal break.

538.   Besides meal breaks, Plaintiff Mollenbrink was only permitted quick bathroom breaks with the permission of Defendant Khalid.

539.   There were periods of time where Plaintiff Mollenbrink worked for 20 hours straight and did not have an opportunity for sleep.

540.   His exact schedule varied from day to day to meet the needs of Defendants, often fluctuating with the Qatar Race Club schedule, business meetings, and business and personal travel of Defendants.

541.   Accordingly, Plaintiff Mollenbrink worked approximately 84 hours per week, exclusive of the numerous occasions where he worked for 12-20 hours straight.

542.   Over the course of employment, at the conclusion of Plaintiff Mollenbrink's shifts, and as Plaintiff Mollenbrink observed, at the conclusion of other employees' shifts, Defendant Khalid would routinely continue tasking employees, including Plaintiff Mollenbrink, to remind employees of the control he exerted.

543.   Plaintiff Mollenbrink would be required to complete whatever last-minute tasking Defendant Khalid demanded before Plaintiff Mollenbrink was permitted to leave These tasks went beyond his scheduled shift and were the type of job duties that could have been completed earlier in the shift.

544.   For example, Defendant Khalid would state that Plaintiff Mollenbrink's shift ended at 9:00 p.m. but then Defendant Khalid would repeatedly ask Plaintiff Mollenbrink to extend his schedule to meet Defendant Khalid's personal needs, such as requiring Plaintiff Mollenbrink to sit next to him while he finished an episode of a television show, or conduct inventory of medical supplies for the second or third time that day.

545.   When Plaintiff Mollenbrink was scheduled for routine days off, Defendant Khalid would change his mind and cancel Plaintiff Mollenbrink's day off.

546.   Over the course of his employment, Plaintiff Mollenbrink was deprived of all routine days off.

547.   On various occasions, Defendants physically intimidated Plaintiff Mollenbrink.

548.   When Plaintiff Mollenbrink was on duty, Defendant Khalid would demand Plaintiff Mollenbrink's cellular phone and review messages that Plaintiff Mollenbrink had sent to family, friends, and colleagues.

549.   Defendant Khalid had an armed security detail that was always close to Defendant Khalid and he utilized his personal security to intimidate Plaintiff Mollenbrink into succumbing to Defendant's demands.

550.   During the occasions that Defendant Khalid demanded Plaintiff Mollenbrink's phone, Plaintiff Mollenbrink felt threatened, experiencing emotional anguish and distress.

551.   On various occasions, Defendants physically beat Plaintiff Mollenbrink.

552.   For example, on or about April 4, 2018, Defendant Khalid became very angry that Plaintiff Mollenbrink was texting a fellow employee, a butler who worked for Defendant Khalid.

553.   Defendant Khalid began harassing Plaintiff Mollenbrink about his communications with the butler.

554.   Plaintiff Mollenbrink assured Defendant Khalid that the communications between he and the butler were not disparaging.

555.    The next day, on April 5, 2018, Defendant Khalid became irate over the prior communications between Plaintiff Mollenbrink and the butler, though no additional communications had occurred in the last 24 hours.

556.    Defendant Khalid once again began harassing and berating Plaintiff Mollenbrink over the communications and told Plaintiff Mollenbrink that he was going to punch him in the face. After making that statement, Defendant Khalid then called the butler and Defendant's personal security into Defendant Khalid's bedroom. Defendant Khalid then ordered Plaintiff Mollenbrink to close his eyes, and Defendant Khalid proceeded to punch Plaintiff Mollenbrink in the face. In a state of fear, shock, and intimidation, Plaintiff Mollenbrink tried to minimize his reaction to avoid further conflict.

557.    The next day, on April 6, 2018, while Plaintiff Mollenbrink was organizing three large suitcases of medical supplies, Defendant Khalid walked by Plaintiff Mollenbrink and intentionally kicked all of the supplies, forcing Plaintiff Mollenbrink to reorganize and reorder everything. Defendant Khalid did not apologize, and Plaintiff Mollenbrink had to reorganize the medical supplies before the conclusion of his shift, working over the scheduled time.

558.    Two days later, on April 8, 2018, in Defendant Khalid's palace living room, while Plaintiff Mollenbrink was working a shift for Defendants, Defendant

Khalid seized Plaintiff Mollenbrink's phone from him by physically grabbing it from Plaintiff Mollenbrink's hand.

559.   Plaintiff Mollenbrink grabbed the phone back from Defendant Khalid.

560.   Defendant Khalid then physically grabbed Plaintiff Mollenbrink by his shirt collar and shoved him onto a sofa that was approximately three feet away.

561.   Defendant Khalid then began sparring like a boxer, preparing to strike Plaintiff Mollenbrink.

562.   Plaintiff Mollenbrink questioned Defendant Khalid as to what he was planning to do. Defendant Khalid responded by calling his personal security, asking them to bring two nurses who were also part of Defendants medical team.

563.   When the requested medical staff appeared, Defendant Khalid directed the employees to tell Plaintiff Mollenbrink that he was an "awful employee."

564.   Over the course of the next hour, Defendant Khalid forced the employees to make fabricated statements about Plaintiff Mollenbrink, instructing the employees to inform Plaintiff Mollenbrink "why he was a bad nurse." In an attempt to appease Defendant Khalid, the nurses would make fabricated statements; Defendant Khalid would then object to their statements and say, "No! No! That's not why he is a bad nurse! Tell him why he is a bad nurse!"

565.    The employees would then attempt to make a different type of fabricated statement about Plaintiff Mollenbrink. Defendant Khalid would again state, "No! That's not why! Tell him why!"

566.    At one point, Defendant Khalid became so furious at the nurses that he had instructed to make false statements about Plaintiff Mollenbrink, he threatened to throw hot coffee on one of the nurses unless they "told Jason the real reason why he was a bad nurse."

567.    Defendant Khalid eventually became exhausted with his own game and allowed the nurses and Plaintiff Mollenbrink to leave the living room.

568.    On or about April 27, 2018, Defendant Khalid became irate at a medical decision made by Plaintiff Mollenbrink that Defendant Khalid disagreed with.

569.    Defendant Khalid, in response to Plaintiff Mollenbrink's medical decision, physically ripped Plaintiff Mollenbrink off of the sofa on which Plaintiff Mollenbrink was seated.

570.    Defendant Khalid then picked up and threw a crystal ashtray at Plaintiff Mollenbrink, striking Plaintiff Mollenbrink in his genitals.

571.    After striking Plaintiff Mollenbrink, Defendant Khalid demanded that Plaintiff Mollenbrink re-consider his medical decision.

572.    Plaintiff Mollenbrink refused to change his previously made medical decision, believing it to be an appropriate decision.

573.   Defendant Khalid's actions caused Plaintiff Mollenbrink to suffer physical injury and extreme emotional distress.

574.   In June of 2018, Defendant Khalid exposed his penis to Plaintiff Mollenbrink and demanded that Plaintiff Mollenbrink show Defendant Khalid his penis.

575.   Plaintiff Mollenbrink felt pressured, incredibly uncomfortable and violated.

576.   Plaintiff Mollenbrink suffered severe emotional distress as a result of Defendant Khalid's request.

577.   In July of 2018, Defendant Khalid held Plaintiff Tohme against his will in one of his homes. Plaintiff Mollenbrink worked for Defendant Khalid at the time, and was in the home when and where Plaintiff Tohme was held, taken, arrested, held a second time, and when Defendants sought to find Plaintiff Tohme and Plaintiff Pittard.

578.   At one point during Plaintiff Tohme's false imprisonment, when Defendants were unable to find Plaintiff Tohme and Plaintiff Pittard,  Plaintiff Mollenbrink and Defendant Khalid were in the locked bathroom of Defendant Khalid's bedroom.

579.   In what Plaintiff Mollenbrink perceived as apparent anger at not having control over Plaintiff Tohme and Plaintiff Pittard, Defendant Khalid yelled angrily to Plaintiff Mollenbrink that he "wanted to skull f*ck someone," and

Defendant Khalid grabbed his erect penis through his underwear and waved it at Plaintiff Mollenbrink.

580.   Plaintiff Mollenbrink looked away in embarrassment, was speechless, and felt like Defendant Khalid's actions were a sexual proposition.

581.   Defendant continued to appear angry regarding the situation involving Plaintiff Tohme and Plaintiff Pittard.

582.   Plaintiff Mollenbrink ignored Defendant Khalid's sexual proposition, and eventually Defendant Khalid unlocked the bathroom door and left.

583.   Plaintiff Mollenbrink continued to work for Defendants from July to September 2018.

584.   With the permission of Defendant Khalid, Plaintiff Mollenbrink returned to the United States for the month of October 2018.

585.   Before departing from Qatar for the United States, Defendant Khalid called Plaintiff Matthew Allende, a paramedic that had previously worked for Defendants, to fill Plaintiff Mollenbrink's temporary absence. During this phone call, Defendant Khalid introduced Plaintiff Mollenbrink to Plaintiff Allende and described Plaintiff Mollenbrink as Defendants Director of Medical Services.

586.   Defendant Khalid asked Plaintiff Allende if he would return to work for Defendants, stating, "Matt, get you're a*s back here. . .  And you better not try that escape attempt bullshit again like last time, Spiderman."

587.   Plaintiff Mollenbrink contemplated several times as to whether he should return to Qatar to work for Defendants. With the continued salary of $25,000.00 USD which was assisting Plaintiff Mollenbrink in becoming financially stable, Plaintiff Mollenbrink ultimately decided to return to Qatar.

588.   Immediately upon returning to the employment of Defendants, Plaintiff Mollenbrink regretted his decision to return to work for Defendants and realized he had made a grave mistake.

589.   Defendant Khalid believed that Plaintiff Mollenbrink had been contacted by the United States Central Intelligence Agency (CIA) when Plaintiff Mollenbrink had returned home to the United States, and was now working for the CIA.

590.   Thereafter, on several occasions, in an effort to intimidate Plaintiff Mollenbrink, Defendant Khalid would call his armed security while Defendant Khalid and Plaintiff Mollenbrink were together, and also when Plaintiff Mollenbrink had completed his work shifts and was alone in his own bedroom.

591.   Defendant Khalid, with his guards standing alongside, questioned Plaintiff Mollenbrink regarding his supposed interactions with CIA and who he "really" worked for.

592.   Plaintiff Mollenbrink was intimidated by Defendant Khalid's actions.

593.    Defendant Khalid's belief that Plaintiff Mollenbrink worked for CIA exponentially increased when Defendant Khalid was under the influence of substances, creating an unsafe and hostile work environment for Plaintiff Mollenbrink.

594.    Throughout Plaintiff Mollenbrink's work shifts, Defendant Khalid, while both sober and intoxicated, would point his pistol at Plaintiff Mollenbrink and make statements such as "I think you are working for someone else."

595.    Defendant Khalid's egregious actions continued from October 2018 to March 2019.

596.    During this time period, Defendant Khalid essentially launched a campaign of workplace hostility and violence.

597.    Based on Plaintiff Mollenbrink's helpless reaction to Defendant Khalid's prior physical assaults and verbal threats, Defendant Khalid frequently harassed and intimidated Plaintiff Mollenbrink.

598.    During Plaintiff Mollenbrink's work shifts, Defendant Khalid would point his pistol at Plaintiff Mollenbrink, and remind Plaintiff Mollenbrink that he "controlled" Plaintiff Mollenbrink, and that he had previously punched Plaintiff Mollenbrink in the face.

599.    During Plaintiff Mollenbrink's shifts, Defendant would refer to Plaintiff Mollenbrink as a "b*tch," "c*nt," and "f*g."

600.    Defendant Khalid began requiring Plaintiff Mollenbrink to stand at attention before him, and state, "Yes, sir," and "No, sir," as if Defendant Khalid was a military commander and Plaintiff Mollenbrink was a subordinate in his chain of command.

601.    When providing medical care to Defendant Khalid, Defendant Khalid would intentionally make it difficult for Plaintiff Mollenbrink to properly perform his job.

602.    For example, on several occasions Defendant Khalid would not allow Plaintiff Mollenbrink to puncture a vein in Defendant Khalid's arm to provide medical treatment. Plaintiff Mollenbrink would attempt to remain calm and would carefully attempt to repeat the procedure; Defendant Khalid would again move his arm and call Plaintiff Mollenbrink a derogatory term.

603.    Defendant Khalid would physically grab and twist Plaintiff Mollenbrink's fingers and arms, and grasp Plaintiff Mollenbrink's forearms and twist his hands in the opposite direction to inflict pain and the sensation of a burn, while Plaintiff Mollenbrink attempted to provide medical care to Defendant Khalid.

604.    As a result of Defendant Khalid's conduct, Plaintiff Mollenbrink developed a stress-induced tremor and began losing weight, ultimately losing 10 pounds.

605.    During the last few months of Plaintiff Mollenbrink's employment, Defendant Khalid would make a sport of Plaintiff Mollenbrink's attempts to care

for Defendant Khalid—intentionally causing Plaintiff Mollenbrink severe emotional distress.

606.   On one occasion, when Defendant Khalid was behaving outrageously, Plaintiff Mollenbrink advised Defendant Khalid that he was quitting the employment of Defendants.

607.   The next day, Plaintiff Mollenbrink again reiterated to Defendant Khalid that he would no longer work for Defendants.

608.   Defendant Khalid replied that Plaintiff Mollenbrink was not allowed to quit but that he would allow Plaintiff Mollenbrink to switch shifts with another employee, and work the overnight shift.

609.   Plaintiff Mollenbrink sought to leave the employment of Defendants three times; each time Defendant Khalid refused his resignation and sometimes would apologize to Plaintiff Mollenbrink.

610.   Plaintiff Mollenbrink knew that, based on his prior experience when departing for the United States, he would need an employee-sponsored exit visa to depart the country of Qatar.

611.   As Defendant Khalid's demands escalated, Plaintiff Mollenbrink was not only threatened, intimidated, and abused by Defendant Khalid, he was held against his will by the country of Qatar's exit procedures.

612.    On or about March 5, 2019, Defendant Khalid, in a fit of rage, held a firearm to the head of a nurse that Plaintiff Mollenbrink worked alongside.

613.    Defendant Khalid, for reasons unknown to Plaintiff Mollenbrink, was irate and upset. Defendant Khalid grabbed the nurse, placed the nurse in a headlock and repeatedly placed a pistol to the nurse's forehead. Defendant Khalid fired two rounds of shots into the bedroom wall. Defendant Khalid's security staff responded but seeing the red laser sight from Defendant Khalid's pistol moving haphazardly around the room, feared they would be shot and were unwilling to assist. One of the nurses on duty began urgently requesting that Defendant Khalid's wife assist and disarm Defendant Khalid, and assist in defusing the situation; Defendant Khalid's wife refused to leave her bedroom.

614.    Eventually, Defendant Khalid fell unconscious and approximately four hours after the incident, staff members of the Emir of Qatar, Sheikh Tamim bin Hamad Al Thani, unsuccessfully attempted to remove Defendant Khalid from the palace. Thereafter, Defendant Khalid's Qatari employees arrived at the palace, bringing firearms, including two pistols and two rifles.

615.    A few hours after the staff of the Emir had departed, Defendant Khalid, while sitting on a sofa next to Plaintiff Mollenbrink, told Plaintiff Mollenbrink that if it had been Plaintiff Mollenbrink's head he had held a gun to, he would have pulled the trigger.

616.    Plaintiff Mollenbrink suffered emotional distress as a result of the
statement made by Defendant Khalid, and Plaintiff Mollenbrink began to fear
that his life was in imminent danger.

617.    Later that evening, Plaintiff Mollenbrink and Defendant Khalid were in the
main, central living room of Defendant Khalid's palace. Defendant Khalid
appeared to Plaintiff Mollenbrink to have recovered from the various incidents of
the day and evening. However, Plaintiff Mollenbrink had not.

618.    Plaintiff Mollenbrink remained in extreme fear for his life, was anxious,
apprehensive, and distraught.

619.    While Defendant Khalid and Plaintiff Mollenbrink were in the living
room, Defendant Khalid's wife, who had previously left the palace with their
young children, returned to the palace, walked directly towards Defendant
Khalid, pulled out a pistol and pointed it at Defendant Khalid's forehead.

620.    Plaintiff Mollenbrink watched Defendant Khalid's wife yell at Defendant
Khalid in Arabic and Defendant Khalid respond by placing his hands in front of
him, spread his hands up and then move them over his head, and said in English
to her, "Shoot me."

621.    Plaintiff Mollenbrink observed the confrontation while seated next to
Defendant Khalid.

622.    Plaintiff experienced extreme emotional distress.

623.   Plaintiff Mollenbrink was eventually able to safely exit the room while Defendant Khalid and his wife argued.

624.   Approximately twenty hours after the staff of the Emir initially came to retrieve Defendant Khalid, they returned and removed Defendant Khalid from the palace.

625.   From March 6 to at least March 16, 2019, Plaintiff Mollenbrink and other employees remained on standby to care for Defendant Khalid, who had not yet returned to the palace.

626.   On March 16, 2019, Plaintiff Mollenbrink and other employees were advised by Defendants' employees that they would no longer be employed by Defendants and were terminated.

627.   Plaintiff Mollenbrink and other employees were issued exit visas and plane tickets to the United States, and were flown back to the United States.

628.   Despite multiple requests, Plaintiff Mollenbrink did not receive his outstanding pay.

**Defendants' Unlawful Employment and Labor Practices**

629.   At all relevant times, Defendants were an employer of Plaintiffs within the meaning of the FLSA, and Florida, California, and Tennessee state law.

630.   At all times material, Defendants knew that Plaintiffs were owed wages and other compensation.

631.    Defendants repeatedly suffered or permitted Plaintiffs to work in excess of forty (40) hours per week without paying them the appropriate overtime pay.

632.    Throughout their employment with Defendants, despite demands, Plaintiffs were not timely compensated for their hours worked nor were they compensated at all for their overtime hours.

633.    During the entire course of their employment, despite demands, Plaintiffs never received wage statements or any other type of records outlining the number of hours they worked for Defendants, and the amounts owed to them.

634.    Defendants willfully disregarded and purposefully evaded recordkeeping requirements of the FLSA and state law by failing to maintain accurate and complete timesheets and payroll records. Defendants did not implement any procedure to keep track of Plaintiffs hours of work or due compensation.

635.    While Defendants employed Plaintiffs, they failed to post notices explaining the minimum and overtime wage rights of employees under the FLSA and failed to inform Plaintiffs of such rights.

636.    Plaintiffs were not provided with proper wage notices at the time of hire or at any time thereafter.

637.    At all relevant times, Defendants acted in concert and conspiracy to unlawfully deny Plaintiffs their wages and compensation.

638.    Defendant Khalid and Defendant Donald Greenbaum's conduct raises to the level of knowingly and willingly committing racketeering activity and participating in the affairs of a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise.

639.    Defendants embarked in a conspiracy to deceive the Plaintiffs by fraudulent means to continue to work for Defendants while knowing that they had no intention to pay the wages owed to Plaintiffs.

640.    Defendants created an environment of hostility and intimidation, actively instilled fear in Defendants employees, and cultivated emotional distress in Plaintiffs.

641.    Defendants solicitated Plaintiff Hope and Plaintiff Pittard in eight separate murder-for-hire plots; completely controlled Plaintiffs' freedom of movement; proscribed travel in and out of Qatar; dictated health care decisions; and constrained Plaintiffs through the fraudulent, willful withholding of wages in order to shape the wants and desires of Defendants.

642.    Defendants' actions, threats, requests, and their unlawful conduct have severely and grievously damaged Plaintiffs. Defendants' extreme and outrageous behavior has gone beyond a term of employment and intentionally extended into Plaintiffs' personal and professional lives.

643.   Plaintiffs were falsely imprisoned, improperly arrested, assaulted and battered, solicited for murder, suffered personal injury, emotional distress, and continue to suffer from post-traumatic stress disorder, anxiety, and depression as a result of their employment with Defendants.

644.   Additionally, Plaintiffs sustained economic and non-economic damages as a result of Defendants' failure to timely compensate Plaintiffs.

### FIRST CAUSE OF ACTION
### Fair Labor Standards Act – Unpaid Overtime Wages

645.   Plaintiffs reallege and incorporate by reference all allegations made in all preceding paragraphs.

646.   Defendants failed to pay Plaintiffs overtime wages for all hours worked above 40 hours per week thereby violating the FLSA, 29 U.S.C. § 207(a)(1).

647.   Defendants unlawful conduct, as described in this Complaint, was willful and intentional. Defendants were aware, or should have been aware, that the practices described in this Complaint were, and are, unlawful. Accordingly, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255(a).

648.   As a result of the Defendants violations of the FLSA, Plaintiffs have been deprived of overtime compensation and other wages in amounts to be determined at trial, and is thus entitled to recovery of such amounts, liquidated damages, attorney's fees and costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## SECOND CAUSE OF ACTION
### Florida Labor Law– Unpaid Overtime Wages
### (Brought only on behalf of Plaintiff Pittard)

649.   Plaintiff Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

650.   Defendants failed to pay Plaintiff Pittard overtime wages for all hours worked above ten (10) hours per day, thereby violating FLL § 448.01.

651.   Due to Defendants' violations of the FLL, Plaintiff Pittard is entitled to recovery of his unpaid wages, and reasonable attorney's fees, pursuant to FLL § 448.04.

## THIRD CAUSE OF ACTION
### California Labor Law– Unpaid Overtime Wages
### (Brought only on behalf of Plaintiffs Tohme, Allende, and Mollenbrink)

652.   Plaintiffs allege and incorporate by reference all allegations in all preceding paragraphs.

653.   Defendants failed to pay Plaintiffs overtime wages for all hours worked in excess of eight hours in one workday and work above forty (40) hours per week, thereby violating CLC § 510.

654.   Defendants' failure to pay Plaintiffs their overtime compensation lacked a good faith basis within meaning of CLC § 13520.

655.   Due to Defendants' violations of the CLC, Plaintiffs are entitled to recovery of their unpaid overtime wages, reasonable attorney's fees and costs of

the action, and pre-judgment and post-judgment interest, pursuant to CLC §

1194.

### FOURTH CAUSE OF ACTION
### Fair Labor Standards Act – Prohibited Retaliation
### (Brought only on behalf of Plaintiffs Hope, Pittard, and Allende)

656.    Plaintiffs reallege and incorporate by reference all allegations in all

preceding paragraphs.

657.    Defendants retaliated against Plaintiffs by terminating their employment

after Plaintiffs refused to engage in conduct against public policy, in violation of

29 U.S.C.A. § 215(a)(3).

658.    Due to Defendants' unlawful retaliation against Plaintiffs, Plaintiffs have

suffered harm and are entitled to recovery of back wages, front wages, liquidated

damages, damages for emotional distress, punitive damages, attorney's fees,

costs, and other such damages of an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Florida Law – Prohibited Retaliation
### (Brought only on behalf of Plaintiff Pittard)

659.    Plaintiff realleges and incorporates by reference all allegations in all

preceding paragraphs.

660.    Defendants retaliated against Plaintiff Pittard by wrongfully terminating

his employment after Pittard refused to engage in criminal activity at the request

of Defendant Khalid, in violation of FLL § 448.102.

661.   Due to Defendants' unlawful retaliation against Plaintiff Pittard, he has

suffered great hardship and is entitled to recovery of lost wages, benefits,

reasonable attorney's fees, court costs, and other such damages of an amount to

be determined at trial.

**SIXTH CAUSE OF ACTION**
**California Labor Code– Prohibited Retaliation**
**(Brought only on behalf of Plaintiff Allende)**

662.   Plaintiff Allende realleges and incorporates by reference all allegations in

all preceding paragraphs.

663.   Defendants retaliated against Plaintiff Allende by wrongfully terminating

his employment after Plaintiff Allende requested and was granted respite from

work, and attempted to depart Defendant Khalid's personal residence after three

straight weeks of work, and a 36-hour shift, in violation of CLC § 1102.5.

664.   Due to Defendants' unlawful retaliation against Plaintiff Allende, he has

suffered harm and is entitled to recovery of back wages, front wages, liquidated

damages, damages for emotional distress, punitive damages, attorney's fees, costs,

and other such damages of an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Tennessee Law- Prohibited Retaliation
### (Brought only on behalf of Plaintiff Hope)

665.   Plaintiff Hope realleges and incorporates by reference all allegations in all

preceding paragraphs.

666.   Defendants retaliated against Plaintiff Hope by wrongfully terminating

Plaintiff Hope's employment after Plaintiff Hope refused to engage in criminal

activity in violation of public policy at the request of Defendant Khalid, in

violation of TN § 50-1-304.

667.   Due to Defendants' unlawful retaliation against Plaintiff Hope, he has

suffered great hardship and is entitled to recovery of future pecuniary losses,

emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of

life, reasonable attorney's fees, costs, and other such damages of an amount to be

determined at trial.

## EIGHTH CAUSE OF ACTION
### Tennessee Law- Breach of Employment Contract
### (Brought only on behalf of Plaintiff Smith)

668.   Plaintiff Smith realleges and incorporates by reference all allegations in all

preceding paragraphs.

669.   Defendants retaliated against Plaintiff Smith by wrongfully terminating

and breaching Plaintiff Smith's employment contract with Defendants after

Plaintiff Smith refused to engage in job duties outside of his employment contract.

670.   Due to Defendants' unlawful retaliation and breach of employment contract, Plaintiff Smith has suffered great hardship and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

## NINTH CAUSE OF ACTION
### California Law- Breach of Employment Contract
### (Brought only on behalf of Plaintiff Tohme)

671.   Plaintiff Tohme realleges and incorporates by reference all allegations in all preceding paragraphs.

672.   Defendants wrongfully breached Plaintiff Tohme's employment contract with Defendants after Defendant Khalid lured Plaintiff Tohme to Qatar under the auspices that he would be paid for his employment, he was falsely imprisoned on at least six occasions, improperly arrested twice, and assaulted and battered.

673.   Due to Defendants' breach of employment contract, and the manner in which it was breached, Plaintiff Tohme has suffered great hardship and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**California Law- Breach of Employment Contract**
**(Brought only on behalf of Plaintiff Mollenbrink)**

674.   Plaintiff Mollenbrink realleges and incorporates by reference all allegations

in all preceding paragraphs.

675.   Defendants wrongfully breached Plaintiff Mollenbrink's employment

contract with Defendants after Defendant Khalid hired Plaintiff Mollenbrink

under the auspices that he would be paid for his employment, he was falsely

imprisoned, Defendant Khalid exposed his penis, and Plaintiff Mollenbrink was

assaulted and battered.

676.   Due to Defendants' breach of employment contract, and the manner in

which it was breached, Plaintiff Mollenbrink has suffered great hardship and is

entitled to recovery of future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's

fees, costs, and other such damages of an amount to be determined at trial.

**ELEVENTH CAUSE OF ACTION**
**Florida Deceptive and Unfair Trade Practices Act**
**Tortious Interference with Business Contract**
**(Brought only on behalf of Plaintiff Pittard)**

677.   Plaintiff Pittard realleges and incorporates by reference all allegations in all

preceding paragraphs.

678.   Defendant Khalid retaliated against Pittard by misusing his business

information. For example, Defendant Khalid intentionally interfered and

disrupted a contract between Plaintiff Pittard and the Police Training Institute, in

violation of FL Stat § 501.204. Defendant Khalid knew of the contract and

intentionally acted to disrupt the contract to harm Plaintiff Pittard.

679.    Due to Defendant Khalid's tortious interference, Plaintiff Pittard is entitled

to loss of business and profit, attorney's fees, costs, and other such damages of an

amount to be determined at trial.

680.    Plaintiff Pittard also requests from the Court an order of permanent

injunction preventing Defendants from utilizing Plaintiff Pittard's personal and

business information.

**TWELTH CAUSE OF ACTION**
**Florida Deceptive and Unfair Trade Practices Act**
**Tortious Interference with Business Relationship**
**(Brought only on behalf of Plaintiff Pittard)**

681.    Plaintiff Pittard realleges and incorporates by reference all allegations in all

preceding paragraphs.

682.    Defendant Khalid retaliated against Plaintiff Pittard by intentionally

interfering and disrupting a business relationship with the Police Training

Institute, in violation of FL Stat § 501.204. Defendant Khalid knew of the

relationship and intentionally acted to disrupt the relationship to harm Plaintiff.

683.    Due to Defendant Khalid's tortious interference, Plaintiff Pittard is entitled

to loss of business and profit, attorney's fees, costs, and other such damages of an

amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION
### California Law – Personal Injury
### (Brought only on behalf of Plaintiff Allende)

684.   Plaintiff Allende realleges and incorporates by reference all allegations in all preceding paragraphs.

685.   As a direct and proximate cause of Defendants' actions, Plaintiff Allende suffered severe and permanent physical injuries.

686.   Due to Defendants' actions and omissions, Plaintiff Allende has suffered general and special, incidental and consequential damages. These damages include, but are not limited to: damages for general pain and suffering; permanent physical injury; damages for loss of enjoyment of life, both past and future; travel and travel-related expenses, past and future; emotional distress, and future emotional distress; pharmaceutical expenses, past and future; related wage and loss earning capacity damages; and, all other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances.

## FOURTEENTH CAUSE OF ACTION
### California Labor Code – Failure to Provide Wage Statements
### (Brought only on behalf of Plaintiffs Tohme, Allende and Mollenbrink)

687.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

688.    Defendants failed to provide Plaintiffs with wage statements listing the

number of hours worked each week of employment with Defendants and the rate

received for such hours, in violation of CLC § 226.

689.    Due to Defendants' violations of the CLC, Plaintiffs are entitled to recover

from Defendants statutory damages of Fifty Dollars ($50.00 USD) for the initial

pay period violation, and One Hundred Dollars ($100.00 USD) for each violation

in a subsequent pay period, up to a maximum of Four Thousand Dollars

($4,000.00 USD), reasonable attorney's fees and costs of the action, pursuant to

CLC § 226.

## FIFTEENTH CAUSE OF ACTION
### Misrepresentation

690.    Plaintiffs reallege and incorporate by reference all allegations in all

preceding paragraphs.

691.    Defendants made the express promise and representation that if Plaintiffs

performed their job duties they would receive compensation and be paid as

discussed.

692.    Plaintiffs believed and relied upon the representations of Defendants.

693.    Defendants failed to disclose that the Defendants never intended to

compensate Plaintiffs as agreed upon.  Defendants' representations were false and

made with the express intent to induce Plaintiffs to work for Defendants.

694.   As a direct and proximate result, Plaintiffs have suffered severe damage.

The actions of Defendants were:

      a. misrepresentation of material facts;

      b. were made with the intention to induce Plaintiffs to act upon it;

      c. were made with knowledge of its untruth;

      d. were intended that it should be acted upon by Plaintiffs, as it was; and

      e. damage directly resulted therefrom.

695.   Due to Defendants' acts, Plaintiffs are entitled to attorney's fees, costs, and

other such damages of an amount to be determined at trial.

### SIXTEENTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
**Tennessee Law - (Brought only on behalf of Plaintiff Smith and Plaintiff Hope)**
**California Law - (Brought only on behalf of Plaintiffs Tohme, Allende,**
**Mollenbrink)**

696.   Plaintiffs reallege and incorporate by reference all allegations in all

preceding paragraphs.

697.   Defendants knowingly, willingly, and intentionally inflicted mental and

emotional distress upon Plaintiffs by and through their actions.

698.   Plaintiffs suffered emotional distress from Defendants' intentional conduct.

699.   Defendants' conduct was extreme and outrageous, beyond all possible

bounds of decency and utterly intolerable in a civilized community.

700.   Plaintiffs were damaged by Defendants' conduct and suffered irreparable

injury in the form of extreme emotional distress, emotional pain, mental anguish,

depression, insomnia, general physical illness, humiliation, loss of dignity, loss of

enjoyment of life, and past and future medical expenses.

701.   Defendants actions were the cause of Plaintiffs' severe distress and of a

nature that no reasonable person could be expected to endure.

702.   Due to Defendants' intentional acts, Plaintiffs are entitled to compensatory

damages, restitution damages, punitive damages, and reasonable attorney's fees,

costs, and other such damages of an amount to be determined at trial.

703.   Plaintiffs also request from the Court an order of permanent injunction

preventing Defendants from any contact with Plaintiffs, their families, and their

businesses.

### SEVENTEENTH CAUSE OF ACTION
#### Negligent Infliction of Emotional Distress
**Tennessee Law - (Brought only on behalf of Plaintiff Smith and Plaintiff Hope)
California Law - (Brought only on behalf of Plaintiffs Tohme, Allende and
Mollenbrink)**

704.   Plaintiffs reallege and incorporate by reference all allegations in all

preceding paragraphs.

705.   Defendants negligently inflicted mental and emotional distress upon

Plaintiffs by and through their actions.

706.   Plaintiffs suffered emotional distress from Defendants' negligent conduct.

707.   Defendants' conduct was extreme and outrageous, beyond all possible

bounds of decency and utterly intolerable in a civilized community.

708.    Plaintiffs were damaged by Defendants' conduct and suffered irreparable injury in the form of extreme emotional distress, emotional pain, mental anguish, depression, insomnia, general physical illness, humiliation, loss of dignity, loss of enjoyment of life, and past and future medical expenses.

709.    The actions of Defendants were the cause of Plaintiffs' severe distress and of a nature that no reasonable person could be expected to endure.

710.    Due to Defendants' acts, Plaintiffs are entitled to compensatory damages, restitution damages, punitive damages, and reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

711.    Plaintiffs also request from the Court an order of permanent injunction preventing Defendants from any contact with Plaintiffs, their families, and their businesses.

**EIGHTEENTH CAUSE OF ACTION**
**False Imprisonment**
**(Brought only on behalf of Plaintiff Hope)**

712.    Plaintiff Hope realleges and incorporates by reference all allegations in all preceding paragraphs.

713.    Defendants intentionally confined and restrained Plaintiff Hope in Defendants' home, Defendants' businesses, a Qatari hospital, and at the Al Thani Royal Family desert camp compound against Plaintiff Hope's will by use of threats and violence.

714.   Defendants' intentional actions constitute false imprisonment.

715.   Plaintiff Hope is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## NINETEENTH CAUSE OF ACTION
### False Imprisonment
### (Brought only on behalf of Plaintiff Tohme)

716.   Plaintiff Tohme realleges and incorporates by reference all allegations in all preceding paragraphs.

717.   Defendants intentionally confined and restrained Plaintiff Tohme in Defendants' home against Plaintiff Tohme's will by use of threats and violence.

718.   Defendants' intentional actions constitute false imprisonment.

719.   Plaintiff Tohme is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTIETH CAUSE OF ACTION
### False Imprisonment
### (Brought only on behalf of Plaintiff Pittard)

720.   Plaintiff Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

721.   Defendants intentionally confined and restrained Plaintiff Pittard in Defendants' businesses, in Plaintiff Pittard's place of residence in Qatar, and as Defendants and Plaintiff Pittard traveled between Defendants' businesses and

Plaintiff Pittard's place of residence in Qatar, against Plaintiff Pittard's will by use of threats, physical abuse, and violence.

722.  Defendants' intentional actions constitute false imprisonment.

723.  Plaintiff Pittard is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

**TWENTY-FIRST CAUSE OF ACTION**
**False Imprisonment**
**(Brought only on behalf of Plaintiff Allende)**

724.  Plaintiff Allende realleges and incorporates by reference all allegations in all preceding paragraphs.

725.  Defendants intentionally confined and restrained Plaintiff Allende in Defendants' home against Plaintiff Allende's will by use of threats, and violence.

726.  Defendants' intentional actions constitute false imprisonment.

727.  Plaintiff Allende is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

**TWENTY-SECOND CAUSE OF ACTION**
**False Imprisonment**
**(Brought only on behalf of Plaintiff Mollenbrink)**

728.  Plaintiff Mollenbrink realleges and incorporates by reference all allegations in all preceding paragraphs.

114

729.    Defendants intentionally confined and restrained Plaintiff Mollenbrink in Defendants' home against Plaintiff Mollenbrink's will by use of threats, physical abuse, and violence.

730.    Defendants' intentional actions constitute false imprisonment.

731.    Plaintiff Mollenbrink is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-THIRD CAUSE OF ACTION
### Assault and Battery
### (Brought only on behalf of Plaintiff Hope)

732.    Plaintiff Hope realleges and incorporates by reference all allegations in all preceding paragraphs.

733.    Defendants intentionally placed Plaintiff Hope in apprehension of imminent harm or oppressive contact.

734.    Defendants' intentional acts constitute assault, and Plaintiff Hope suffered serious injury as a result.

735.    Plaintiff Hope is entitled to compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-FOURTH CAUSE OF ACTION
### Assault and Battery
### (Brought only on behalf of Plaintiff Tohme)

736.    Plaintiff Tohme realleges and incorporates by reference all allegations in all preceding paragraphs.

737.   Defendants intentionally placed Plaintiff Tohme in apprehension of imminent harm or oppressive contact.

738.   Defendants' intentional acts constitute assault, and Plaintiff Tohme suffered serious injury as a result.

739.   Plaintiff Tohme is entitled to compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-FIFTH CAUSE OF ACTION
### Assault and Battery
### (Brought only on behalf of Plaintiff Pittard)

740.   Plaintiff Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

741.   Defendants intentionally placed Plaintiff Pittard in apprehension of imminent harm or oppressive contact.

742.   Defendants' intentional acts constitute assault, and Plaintiff Pittard suffered serious injury as a result.

743.   Plaintiff Pittard is entitled to compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-SIXTH CAUSE OF ACTION
### Assault and Battery
### (Brought only on behalf of Plaintiff Allende)

744.   Plaintiff Allende realleges and incorporates by reference all allegations in all preceding paragraphs.

745.   Defendants intentionally placed Plaintiff Allende in apprehension of imminent harm or oppressive contact.

746.   Defendants' intentional acts constitute assault, and Plaintiff Allende suffered serious injury as a result.

747.   Plaintiff Allende is entitled to compensatory and punitive damages to be determined, reasonable attorneys' fees, and costs.

**TWENTY-SEVENTH CAUSE OF ACTION**
**Assault and Battery**
**(Brought only on behalf of Plaintiff Mollenbrink)**

748.   Plaintiff Mollenbrink realleges and incorporates by reference all allegations in all preceding paragraphs.

749.   Defendants intentionally placed Plaintiff Mollenbrink in apprehension of imminent harm or oppressive contact.

750.   Defendants' intentional acts constitute assault and battery, and Plaintiff Mollenbrink suffered serious injury as a result.

751.   Plaintiff Mollenbrink is entitled to compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

**TWENTY-EIGHTH AND TWENTY-NINTH CAUSES OF ACTION**
**Federal Racketeer Influenced and Corrupt Organizations Act**
18 U.S.C. §1962

752.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

753.   Plaintiffs' claims under the Racketeer Influenced and Corrupt

Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against

Defendant Khalid and Defendant Donald Greenbaum.

754.   Each Plaintiff is a "person" with standing to sue within the meaning of 18

U.S.C. § 1964(c).

755.   Defendant Khalid and Defendant Donald Greenbaum are a "RICO

person" within the meaning of 18 U.S.C. § 1961(3).

756.   Defendant Khalid is an individual, owns multiple entities, including

Defendants Al Anabi Racing USA, LLC, Al Anabi Racing Limited, Al Anabi

Performance, Speedtech LLC, as well as other entities, and constitutes an

enterprise (each a "RICO Enterprise") within the meaning of 18 U.S.C. § 1961(4).

757.   Defendant Donald Greenbaum is an individual, owns multiple entities,

including Aurum Telemedia Co., and Aurum, Inc., and constitutes an enterprise

(each a "RICO Enterprise") within the meaning of 18 U.S.C. § 1961(4).

**Predicate Acts**

758.   Defendant Khalid knowingly and willfully committed the following

predicate acts of racketeering activity under 18 U.S.C. § 1961(1)(A), and

conspired to conduct or participate in the affairs of a RICO enterprise through a

pattern of numerous acts racketeering activity:

      a.    California Penal Code § 653f – Solicitation of murder;

      b.      Nevada Code NRS 200.030, 193.330, Attempted murder;

      c.      Tennessee Code § 39-11-117, First degree murder;

      d.      Virginia § 18.2-29 Criminal solicitation; penalty;

      e.      North Carolina Gen. Stat. § 14-17, Murder in the first and second degree;

      f.      18 U.S.C. § 373 Solicitation to commit a crime of violence.

759. Defendant Khalid and Defendant Donald Greenbaum knowingly and willfully committed the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1)(B), and conspired to conduct or participate in the affairs of a RICO enterprise through a pattern of numerous acts racketeering activity:

      a.      Wire fraud in violation in 18 U.S.C. § 1343.

### Pattern of Related Racketeering Acts

760. Defendant Khalid and Defendant Donald Greenbaum committed these numerous predicate acts repeatedly and continuously over a period of thirteen years.

761. Defendants forced Plaintiffs to work long hours and overnight shifts, in order to accommodate Defendant Khalid's social and personal schedule. Defendant Khalid dictated Plaintiffs' work schedules, subject to change at the whim of Defendant Khalid.

762. Throughout their employment, Plaintiffs worked in excess of forty (40) hours per week for Defendants. Plaintiffs were on-call 24/7 to immediately

respond to Defendant Khalid's needs and wants, regardless of their contractually agreed upon duties..

763.   Defendants breached contracts with Plaintiffs, underpaying and overworking them.

764.   Defendants did not compensate Plaintiffs for overtime work, bonuses, or continual success in contracted endeavors such as races.

765.   These lost regular, overtime, and bonus wages constitute an injury to business or property under 18 U.S.C § 1964(c).

766.   These lost wages are a direct result of the Defendants fraudulent assertions that Plaintiffs would be paid for their employment.

767.   Additionally, Defendant Khalid repeatedly solicited Defendants employees for murder-for-hire plots, and made these requests actual job duties and a condition of employment with Defendants.

768.   Defendants' actions were related to each other, directed towards the same victims, had the same results, had the same participants, and were committed for the same or similar purposes: to obtain Plaintiffs services in racing, for a period of thirteen (13) years, without adequate pay. Defendants' actions thus demonstrate an extended continuous period of criminal activity and a threat of continued criminal activity.

769.   Defendants actions thus constitute a pattern of racketeering activity under 18 U.S.C §1961(5).

**RICO Enterprise I**

770.   Defendant Khalid, along with his American and Qatari employees, including but not limited to Donald Greenbaum, Jason Sharpe and Mustafa Atat, and through Defendants, functioned as a continuous unit by working together to unlawfully procure the daily and continuous services of Plaintiffs, and they are thus a part of an association-in-fact enterprise.

771.   Defendant Khalid and Defendant Donald Greenbaum, along with Defendant Khalid's American and Qatari employees, including but not limited to Donald Greenbaum, Jason Sharpe and Mustafa Atat, and through Defendants, procured Plaintiffs' daily services by continuous threats, emotional abuse, and financial manipulation.

772.   Defendant Khalid and Defendant Donald Greenbaum, along with Defendant Khalid's American and Qatari employees and through Defendants, placed Plaintiffs in a state of complete dependence due to living in Defendant Khalid's Qatar homes, traveling with Defendants, Defendant Khalid and Defendant Donald Greenbaum's complete financial control over them, Defendant Khalid's control over Plaintiffs' medical care, and through threats to the well-being of the Plaintiffs and their families. Defendant Khalid withheld

adequate medical care, sleep, and meal breaks; Defendant Khalid and Defendant Donald Greenbaum repeatedly both withheld pay from Plaintiffs.

773.   Defendant Khalid, along with his personal staff members and through Defendants, cooperated in carrying out the various activities of the enterprise, which included transporting Plaintiffs across the United States and Middle East, ordering Plaintiffs to comply with duties outside of their previously agreed upon contractual obligations to the Defendants, and soliciting murder.

774.   The Defendants enterprise had the following structure: Defendants generally worked together as a unit to obtain services from Plaintiffs, beginning through contractual relationships for agreed upon services, and then later by threats, fiscal control, mental/emotional abuse, and in some cases, physical abuse. Defendant Khalid was responsible for soliciting the employment of Plaintiffs for business endeavors, including, but not limited to, negotiating employment length, salary, and initial duties with the Plaintiffs. Defendant Donald Greenbaum then acted as the conduit for dispersing funds. Defendant Khalid would then make threats, withhold finances, commandeer any needed medical assistance and treatment arising out of the Plaintiffs' job duties, and physically, emotionally, and mentally abuse Plaintiffs for the time that they were under his employment.

775.   Defendant Khalid and Defendant Donald Greenbaum's abuses were continuous and systemic.

776.   Defendant Khalid required Plaintiff Smith to work long hours and overnight shifts in order to accommodate Defendant Khalid's social schedule. Defendant Khalid dictated Plaintiff Smith's work hours and racing schedule, which was subject to change at the whim of Defendant Khalid. Plaintiff Smith did not get to choose the races that he drove in, nor those which Defendant Khalid chose to compete in. Throughout Plaintiff Smith's employment, Plaintiff Smith was only paid a partial bonus for winning a race, was not paid for the first five months of his contract with Defendants despite winning multiple races for Defendants and discussing backpay due by Defendants with Defendant Khalid. This pattern repeated itself throughout Plaintiff Smith's employment. When Plaintiff Smith attempted to address this with Defendant Khalid, Plaintiff Smith was told "Nice knowing you motherf*cker," by Defendant Khalid and terminated from employment. Further, after Plaintiff Smith was terminated, Defendant Khalid, through employee Mustafa Atat, threatened Plaintiff Smith when Plaintiff Smith posted on social media about litigation involving Defendant Khalid, intimidating Plaintiff Smith.

777.   Defendant Khalid and Defendant Greenbaum inflicted similar financial and additional physical and mental distress upon Plaintiff Hope. Defendant

Khalid required Plaintiff Hope to work long hours, ranging from fifty (50) to one

hundred (100) hours per week. The hours were dictated by Defendant Khalid and

changed at the Defendant's whim. Plaintiff Hope was not compensated for

overtime, bonuses, and was not allowed any time off. Defendant Khalid further

asked Plaintiff Hope to kill the owner and the wife of the owner of the racing

league, additionally telling him that he did not want the owner to "breathe

another day." Defendant Khalid asked Plaintiff Hope on at least four separate

occasions to kill these individuals, detailing how Plaintiff Hope could make it

look like a murder and a suicide. On a separate occasion, Defendant Khalid

became irate with the chauffer of his wife and told Plaintiff Hope that they

needed to "take a ride," and although Plaintiff Hope voiced his objections, he was

forced to accompany Defendant Khalid and watch Defendant Khalid and his

security guards physically abuse the chauffer, beating him and putting a loaded

pistol in his mouth. Defendant Khalid hit the chauffer in the back of the head,

causing his body to fall limp, and asked Plaintiff Hope if he wanted to shoot the

chauffer. Plaintiff Hope refused to shoot the chauffer. As a result of Plaintiff

Hope's refusal, Defendant Khalid verbally berated him, calling him a "p*ssy,"

and telling Plaintiff Hope to remain silent about Defendant Khalid's actions "now

you know what I am capable of." After this, Defendant Khalid attempted to

124

solicit Plaintiff Hope for murder again. Plaintiff Hope refused and was shortly thereafter terminated from his employment.

778.    During his employment, Defendant Khalid ordered Plaintiff Hope to stay at a party despite his requests to leave. At this party, Plaintiff Hope was forced to watch Defendant  Khalid, Defendants employee Jason Sharpe, and another individual commit an act of sodomy against a male prostitute with a billiard stick and was shot at twice with a pistol. Defendant Khalid would additionally confiscate Defendant Hope's passport for months at a time, forcing him to remain with Defendant Khalid in Qatar. Defendant Khalid additionally asked Plaintiff Hope to obtain drones so that he could "fly it around and shoot people." After learning of the intent behind procuring the drone, Plaintiff Hope crashed it. Defendant Khalid then attempted to use Plaintiff Hope's knowledge of software to obtain access to the files of Defendant Khalid's brother, who is now the Emir of Qatar but was the Deputy Emir of Qatar at the time, royal family members of Dubai and Bahrain, and private citizens of Dubai and Bahrain. Plaintiff Hope refused.

779.    Defendant Khalid, upon learning one day that Plaintiff Hope was not feeling well, gave him three to four long encapsulated pills, and Plaintiff Hope was told that these were higher doses of aspirin. After taking these pills, Plaintiff Hope was rushed to the hospital, where he was then removed to another at

Defendant Khalid's demands, and was not offered any testing or a chance to explain his symptoms. Defendant Khalid instructed Plaintiff Hope not to tell anyone that he had taken the pills and to say that he was suffering from a heart attack instead. The next morning, Plaintiff Hope was awakened to medical staff shaving his testicles. A private security officer of Defendant Khalid's would not speak to Plaintiff Hope or answer any questions. Plaintiff Hope became fearful on the fourth day of hospitalization that his organs would be harvested and left. Plaintiff Hope was not permitted to work for two days and was again told by Defendant Khalid that he was to say that he was suffering a heart attack. Defendant Khalid, during this medical emergency and subsequent hospitalizations, would not allow Plaintiff Hope to make any medical decisions. Defendant Khalid barred Plaintiff Hope from leaving the country for two months after this incident.

780.   Defendant Khalid's continued and systemic abuses of Plaintiff Tohme reflect those seen in Plaintiffs Hope and Smith. Over the course of approximately one year, Defendant Khalid held Plaintiff Tohme against his will on six occasions; physically assaulted and battered Plaintiff Tohme; and ordered him arrested and held in jail twice.

781.   Defendant Khalid's intimidation and violence as it relates to Plaintiff Pittard mirror those of other Plaintiffs. Defendant Khalid, after targeting Plaintiff

Pittard and pressuring him to leave his previous employment, required Plaintiff

Pittard to work long hours, ranging between sixty (60) and ninety-six (96) hours

per week. Defendant Khalid did not permit Plaintiff Pittard any time off and

required him to be on-call 24/7. During his employment, Defendant Khalid

attempted to solicit Plaintiff Pittard for the murder of two individuals that

threatened Defendant Khalid's social reputation. Plaintiff Pittard refused these

requests. Defendant Khalid then harbored Plaintiff Tohme, jailing him twice

upon his request. Plaintiff Pittard, along with the United States Embassy, assisted

Plaintiff Tohme in his safe return to the United States. Defendant Khalid learned

of this and began to demand the whereabouts of Plaintiff Tohme and Plaintiff

Pittard. Upon Plaintiff Pittard's refusal to release any information about Plaintiff

Tohme, Defendant Khalid began to threaten him, saying that he would kill

Plaintiff Pittard as well as Plaintiff Pittard's family, and bury his body in the

desert.

782.    Defendant Khalid then held Plaintiff Pittard against his will, threatened

him with bodily harm and damaged and stole his personal belongings,

medication, and work equipment. Defendant Khalid terminated Plaintiff Pittard's

employment agreement, and threatened Plaintiff Pittard with a firearm in order to

execute new employment documents. Defendant Khalid, upon having the new

employment agreement, stripped Plaintiff Pittard of his personal belongings and

physically threatened him. Plaintiff Pittard, fearing for his life, granted access to his personal and business electronic records. Through this, Defendant Khalid took seventeen years of business equipment and records from Plaintiff Pittard, and later laughed and bragged about it to Plaintiff Mollenbrink. Defendant Khalid, through his own actions and through those of his employees, forced Plaintiff Pittard to close his privately-owned consulting firm and lose business in the Middle East. Additionally, Defendant Khalid, through the use of Plaintiff Pittard's personal documents, contacted business contacts that had been cultivated by Plaintiff Pittard and attempted to misuse Plaintiff Pittard's business contracts and information for his own personal gain.

783.    Defendant Khalid's physical intimidation and infliction of emotional distress continues with Plaintiff Allende. Defendant Khalid required Plaintiff Allende to work seven (7) days a week, working twelve (12) hour days. Defendant Khalid, through use of threat and physical force, would require Plaintiff Allende to stay awake for periods up to thirty-six (36) hours at a time and then deny Plaintiff Allende time off. This drove Plaintiff Allende to attempt to escape the confines of Defendant Khalid's home, permanently injuring himself in the process. Defendant Khalid terminated Plaintiff Allende from his employment. Plaintiff Allende is permanently disabled due to his attempt to escape from Defendant Khalid.

784.   Defendant Khalid inflicted severe abuse upon Defendant Mollenbrink. Defendant Khalid required Defendant Mollenbrink to work fifty-six (56) to eighty-four (84) hours a week without overtime pay or proper compensation. Defendant Khalid would allow minimal bathroom and work breaks, as well as require meal breaks to be taken by Defendant Khalid's side. Defendant Khalid would force Plaintiff Mollenbrink to stay awake for 20-hour periods and cancelled all of Plaintiff Mollenbrink's days off. Defendant Khalid invaded Plaintiff Mollenbrink's privacy, taking his phone and going through his private text messages. In one instance, Defendant Khalid became agitated by these texts, and beat Plaintiff Mollenbrink, punching him in the face. Additionally, Defendant Khalid recruited staff members to verbally insult Plaintiff Mollenbrink. On a separate instance, Defendant Khalid threw a crystal ashtray at Plaintiff Mollenbrink because of a medical decision made by Plaintiff Mollenbrink with which Defendant Khalid disagreed. This caused Plaintiff Mollenbrink to sustain physical injuries. On a separate instance, Defendant Khalid exposed his penis to Plaintiff Mollenbrink and intimidated Plaintiff Mollenbrink. During a situation in which Plaintiff Pittard helped Plaintiff Tohme escape from Defendant Khalid's order of arrest, Defendant Khalid became irate. During the incident, Defendant Khalid told Plaintiff Mollenbrink that he wanted to "skull f*ck someone," while grabbing his erect penis. Plaintiff Mollenbrink was embarrassed and afraid.

Shortly after, Plaintiff Mollenbrink returned to the United States for a period of time before returning back to the Defendant's employment. Defendant Khalid threatened Plaintiff Mollenbrink on several occasions with a pistol, accusing Plaintiff Mollenbrink of working for the CIA. Defendant Khalid further verbally abused Plaintiff Mollenbrink, calling him a "c*nt, b*tch, and f*g," and physically abused him by twisting his arm, causing a burning feeling. In a final outburst, Defendant Khalid held a pistol to a nurse's head in front of Plaintiff Mollenbrink, later stating that if the gun had been to Plaintiff Mollenbrink's head, Defendant Khalid would have pulled the trigger. Plaintiff Mollenbrink was forced to watch an exchange between Defendant Khalid and his wife, where Defendant Khalid's wife pointed a pistol at Defendant Khalid and Defendant Khalid responded by telling her to shoot him. After Defendant Khalid was extracted from his home by the Emir of Qatar's staff, Plaintiff Mollenbrink was terminated from Defendant Khalid's employment and was not compensated for outstanding pay.

785.    Throughout the employment of Plaintiffs, Defendant Khalid intimidated through violence. Defendant Khalid and Defendant Greenbaum received benefits from the patterns of racketeering activity, which included continuous and virtually free services and labor from Plaintiffs.

## RICO Enterprise II

786.    Plaintiffs reallege the paragraphs contained within RICO Enterprise I.

787.   Defendant Khalid and Defendant Greenbaum's business structure consisted of contracts and services fraudulently negotiated by Defendant Khalid through which Defendant Greenbaum was the conduit for payment and business organization.

788.   By repeatedly committing wire fraud in violation of 18 U.S.C. § 1343 through their knowingly fraudulent emails, telephone calls, and electronic communications to Plaintiffs and other employees, from at least on or about 2007 to on or about 2019, Defendant Khalid and Defendant Greenbaum advanced their personal and business interests, received the value of services by Plaintiffs and others without paying them the compensation they were owed for those services and exposed Plaintiffs and others to a precipitous loss of employment.

789.   Defendant Donald Greenbaum was the United States nexus of the predicate acts of racketeering activity. As the gatekeeper of funds for Defendants, Defendant Greenbaum knew that Defendants had no intention of timely compensating employees – or compensating them at all- for the job duties for which Plaintiffs were hired by Defendants.

790.   Defendant Khalid and Defendant Donald Greenbaum actively and intentionally made false statements to Plaintiffs, and other employees of Defendants, to induce employees, including Plaintiffs, to continue working for

Defendants, with full knowledge, understanding, and intent, to defraud Plaintiffs of their wages and compensation.

791.   Defendant Donald Greenbaum and Defendant Khalid's fraudulent statements were made face-to-face, via electronic mail, via phone, via written instruments, via postings in online racing public forums, and via social media.

792.   Plaintiffs were indeed harmed by Defendant Khalid and Defendant Donald Greenbaum's actions when they continued to work for Defendants without proper compensation.

793.   For example, in one instance, in October of 2013, Defendant Greenbaum made written, electronically published fraudulent statements that Plaintiff Smith was paid for a championship race by Defendants, although Plaintiff Smith had not received compensation.

794.   From 2007 to at least 2019, Defendant Greenbaum told Plaintiffs and other employees of Defendants repeatedly and continuously throughout their employment with Defendants, that they would be paid when Defendant Khalid had paid him, claiming that he was unable to pay Plaintiff Smith because "Khalid [hadn't] given [Defendant Greenbaum] the money yet." Defendant Donald Greenbaum would assure Defendants employees they would be paid.

795.   Defendant Donald Greenbaum actively engaged in fraud, utilizing Defendants employees to bankroll Defendant Khalid and Defendant Donald

Greenbaum's conspiracy of fraud. For example, Defendant Greenbaum requested that Plaintiff Smith return a $500.00 bonus payment earned by Plaintiff Smith because "the team needed it."

796.   On numerous occasions, Defendant Khalid told Plaintiff Smith and Plaintiff Hope to contact Defendant Donald Greenbaum regarding payment for salary, knowing that Defendants had no intention of paying Plaintiffs. Defendant Donald Greenbaum would then make fraudulent statements about paying Plaintiffs to buy time and allow Defendant Khalid and Defendant Donald Greenbaum to continue working in the racing industry, and bankrolling their other business interests to the detriment of Plaintiffs.

797.   In another instance, Defendant Khalid made promises to Plaintiff Smith and Plaintiff Hope that they would be given a racing rig to allow them to continue in the racing business. Plaintiffs relied on Defendant Khalid's statement, and remained employed by Defendants, knowing they would receive the racing rig. Thereafter, Defendant Donald Greenbaum seized the racing rig from Plaintiff Smith and Plaintiff Hope.

798.   These activities constitute the normal and regular way of conducting Defendants' business. Defendant Khalid hires employees of Defendants and makes fraudulent statements to induce them into employment with Defendants. Thereafter, Defendant Khalid continues to make fraudulent statements regarding

employment and defers matters, including compensation, to Defendant Donald

Greenbaum, who then affirms and reiterates fraudulent statements regarding

compensation, engaging in wire fraud to conduct business in any manner they see

fit.

799.    The business enterprise as constructed by Defendant Khalid and Defendant

Donald Greenbaum received benefits from the patterns of racketeering activity,

which included continuous and virtually free services and labor from Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief:

A. Issuance of a declaratory judgment that the practices and actions complained of in this complaint are unlawful under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, and Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and Florida, California, and Tennessee law;

B. Unpaid overtime wages under the FLSA and an additional and equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b) and the supporting United States Department of Labor regulations;

C. Unpaid overtime wages under Florida and California law, reasonable attorney's fees and costs of this action, and pre-judgment and post-judgment interest;

D. Civil penalties of One Thousand One Hundred Dollars ($1,100.00) for each of Defendants' willful and repeated violations of the FLSA pursuant to 29 U.S.C. § 216(b);

E. If liquidated damages pursuant to FLSA, 29 U.S.C. § 216(b) are not awarded, an award of pre-judgment interest pursuant to 28 U.S.C. § 1961;

F. Treble damages, reasonable attorney fees, and costs pursuant to RICO, 18 U.S.C. § 1964 (c);

G. An award of back wages, front wages, damages for emotional distress, punitive damages, attorney's fees, costs, and other such damages as appropriate for the Defendants prohibited retaliation against Plaintiff pursuant to federal, Florida, California, and Tennessee law;

H. An award of damages for general pain and suffering; damages for loss of enjoyment of life, both past and future; travel and travel-related expenses, past and future; emotional distress, and future emotional distress; pharmaceutical expenses, past and future; related wage and loss earning capacity damages; and, all other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances for Defendants' conduct that directly and proximately caused injury to Plaintiffs;

I. An award of pre-judgment and post-judgment interest pursuant to Florida § 55.03; ten percent (10%) pursuant to California Code 685.010; and ten percent (10%) pursuant to Tennessee Code Annotated § 47-14-121;

J. A permanent injunction preventing Defendant Khalid from contacting Plaintiffs, their families, and their businesses;

K. A permanent injunction preventing Defendant Khalid from utilizing Plaintiff Pittard's personal and business information;

L. Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

The Plaintiffs claim and demand a jury trial on all causes of action herein.

Respectfully submitted
Attorney for Plaintiffs,

*/s/Rebecca L. Castaneda*
Rebecca L. Castaneda
Massachusetts Bar No. 676527
rc@attorneyrebeccacastaneda.com
The Castaneda Law Firm
506 N. Armenia Avenue
Tampa, Florida 33609-1703
(813) 694-7780