**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION**

ROBERT VON SMITH,                                    Case No. 20-11143
TERRY HOPE,
RAMEZ TOHME,
MATTHEW PITTARD,
MATTHEW ALLENDE,
JASON MOLLENBRINK,

                Plaintiffs,           **JURY TRIAL DEMANDED**

   v.

HE SHEIKH KHALID BIN HAMAD BIN KHALIFA AL THANI;
    a/k/a
HE SHEIKH KHALID BIN HAMAD BIN KHALIFA AL-THANI;
HH SHEIKH KHALID BIN HAMAD AL THANI;
HH SHEIKH KHALID BIN HAMAD AL-THANI;
SHEIKH KHALID BIN HAMAD AL THANI;
SHEIKH KHALID BIN HAMAD AL-THANI;
SHEIKH KHALID AL THANI;
SHEIKH KHALID AL-THANI;
KHALID AL THANI;
KHALID AL-THANI;
KHALID HAMID AL THANI;
KHALID HAMAD AL-THANI;
KHALID BIN HAMID AL THANI;
KHALID BIN HAMAD AL-THANI;
KHALID BIN HAMAD;
KHALID BIN HAMAD BIN KHALIFA AL THANI;
KHALID BIN HAMAD BIN KHALIFA AL-THANI; and
DONALD GREENBAUM;
AL ANABI RACING USA, LLC;
AL ANABI RACING LIMITED;
AL ANABI PERFORMANCE, LLC;
SPEEDTECH, LLC;
    d/b/a
AL ANABI,
Al-ANABI,
Al ANABI CARS LLC,
AL-ANABI CARS LLC,
AL ANABI DRAG RACING LLC,
AL-ANABI DRAG RACING LLC,
AL ANABI AWESOME SPEEDTECH LLC,
AL-ANABI AWESOME SPEEDTECH LLC,
AL ANABI RACING,
AL-ANABI RACING,

AL ANABI RACING, LLC
AL-ANABI RACING, LLC,
AL ANABI PERFORMANCE,
AL-ANABI PERFORMANCE,
Al ANABI RACING TEAM,
AL-ANABI RACING TEAM,
AL-ANABI RACING USA, LLC,
AL ANABI RACING USA,
AL-ANABI RACING USA,
AL ANABI PERFORMANCE,
AL-ANABI PERFORMANCE,
AURUM,
AURUM COMPUTER CORP.,
AURUM TELEMEDIA CO., and
GULF TRACK SERVICES.
                                        Defendants.

_____/

## COMPLAINT

Plaintiffs, ROBERT VON SMITH ("Smith"), TERRY HOPE ("Hope"), RAMEZ
TOHME ("Tohme"), MATTHEW PITTARD ("Pittard"), MATTHEW ALLENDE
("Allende"), and JASON MOLLENBRINK ("Mollenbrink"), (collectively, "Plaintiffs"), by
and through counsel and pursuant to Fed. R. Civ. P. 4, sue Defendants SHEIKH KHALID
BIN HAMAD BIN KHALIFA AL THANI ("Al Thani"), DONALD GREENBAUM
("Greenbaum"), AL ANABI RACING USA, LLC, ("Al Anabi Racing"), AL ANABI
RACING LIMITED ("Racing Limited"), "AL ANABI PERFORMANCE, LLC ("AAP"),
and SPEEDTECH, LLC ("Speedtech"), and allege:

### PARTIES, JURISDICTION, AND VENUE

1. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §
   1331, based upon 29 U.S.C. §§ 201 *et seq.,* 18 U.S.C. §§ 1961-1968.

2. This Court has supplemental jurisdiction over Plaintiffs' state and common law
   claims under 28 U.S.C. § 1367(a).

3. Smith is an American citizen residing in the State of Tennessee, County of Roane.

4.  Hope is an American citizen residing in the State of Tennessee, County of Anderson.

5.  Tohme is an American citizen residing in the State of California, County of Los Angeles.

6.  Pittard is an American citizen residing in the State of Florida, County of Pasco.

7.  Allende is an American citizen residing in the State of California, County of Los Angeles.

8.  Mollenbrink is an American citizen residing in the State of California, County of Los Angeles.

9.  Al Thani is a Qatari citizen doing business within this district, this state and/or the United States of America.

10. Greenbaum is an American citizen and Massachusetts resident doing business within this district, this state, and/or the United States of America.

11. Al Anabi Racing is a Massachusetts corporation, managed by a Massachusetts resident, doing business within this district, this state and/or the United States of America. On information and belief, Al Anabi Racing has and controls bank accounts and real property from this district.

12. Racing Limited is a Republic of Cyprus corporation, organized under the laws of the Republic of Cyprus, managed by a Massachusetts resident, doing business within this district, this state and/or the United States of America. On information and belief, Racing Limited has and controls bank accounts and real property from this district.

13. AAP is a North Carolina corporation, managed by a Massachusetts resident, doing business within this district, with its principal office in Duxbury, Massachusetts, this state and/or the United States of America. AAP has a bank account within this district.

14. Speedtech is an Alabama corporation, managed by a Massachusetts resident, doing business within this district, this state and/or the United States of America. On information and belief, Speedtech has a bank account within this district.

15. Greenbaum is the manager and corporate officer of Al Anabi Racing; Director of Racing Limited; the Chief Executive Officer of AAP; and the organizer of Speedtech.

16. Al Thani is the owner, operator and majority shareholder engaged in the operations of Al Anabi Racing, Racing Limited, AAP, and Speedtech, operating the corporate defendants as alter egos of each other and Al Thani, as discussed further herein.

17. Venue is proper in this district because the scheme of organized fraud set forth herein was formulated and executed utilizing corporations doing business in and from the district, the corporations that employed plaintiffs are managed by a Massachusetts resident, Greenbaum is a resident of this district, Al Thani conducts business in this district, and many of the funds which enabled Al Thani and Greenbaum's scheme to operate either originated or passed through this district. 28 U.S.C. §§ 1391.

## GENERAL ALLEGATIONS

### a. Al Thani Racing in the United States

18. Al Thani entered into the car racing industry in the United States in or about 2007.

19. At this time, Greenbaum was working for the Qatari royal Al Thani family, including but not limited to, handling matters of importation and exportation within the United States and Qatar.

20. From in or about 2007, Greenbaum worked for Al Thani handling importation, exportation and logistics for Al Thani's race car teams.

21. From in or about 2007-2008, Al Thani built his personal race track, the Qatar Race Club, in Doha, Qatar.

22. Greenbaum continued to work to support Al Thani's United States-based racing as well as Al Thani's Qatar-based racing teams and operations.

23. From in or about 2007 to present, Al Thani built and ordered race cars and parts from the United States; hired employees in the United States; created racing teams in the United States; and raced in the United States.

24. Greenbaum's job duties expanded over time to include ordering and shipping Al Thani's cars throughout the United States and Qatar; ordering, shipping, and receiving cars and car parts; and frequently paying for Al Thani's race teams employees' salaries, wages, and expenses. An example of some of the shipping, logistics, payments, and invoices organized by Greenbaum on behalf of Al Thani is attached hereto and incorporated herein by reference as **<u>Exhibit 1</u>**.

25. Greenbaum organizes and manages corporations on behalf of Al Thani.

### b.  <u>Al Thani's Corporate and Business Structure</u>

26. In 2008, Al Thani established his first racing team, Awesome Al Anabi Motor Sports. On April 10, 2008, Al Thani created a formal corporation for his team. Corporate documentation reflecting same is attached hereto and incorporated herein by reference as **<u>Exhibit 2</u>**.

27. Al Thani utilized one of his race car drivers, Michael Castellana ("Castellana"), to serve as his corporation's point of contact. A National Hot Rod Association profile reflecting same is attached hereto and incorporated herein by reference as **<u>Exhibit 3</u>**.

28. Thereafter, over the course of approximately ten years, Al Thani established at least seventeen additional United States corporations that he utilized to conduct business in the car racing industry, including the four defendant corporations. A corporate diagram of these companies, created by an investigator, reflecting same is attached hereto and incorporated herein by reference as **<u>Exhibit 4</u>**. Corporate documentation

for the four corporate defendants that are a party to this action is attached hereto and incorporated herein by reference as composite **Exhibit 5**.

29. On December 4, 2009, Al Thani filed and registered two United States Patent and Trademark Office trademarks for his use in the car racing industry in the United States. Trademark documentation stating same is attached hereto and incorporated herein by reference as **Exhibit 6**.

30. On December 7, 2010, Al Thani filed and registered a third United States Patent and Trademark Office trademark for his use in in the car racing industry. Trademark documentation stating same is attached hereto and incorporated herein by reference as **Exhibit 7**.

31. Al Thani has four of his United States corporations involved in this suit: Al Anabi Racing, Racing Limited, AAP, and Speedtech.

### *Al Anabi Racing*

32. Al Anabi Racing is one of Al Thani's race car teams. Information reflecting same is attached hereto and incorporated hereto by reference as composite **Exhibit 8.**

33. Also, Al Anabi Racing is utilized by Al Thani to frequently build and ship his cars, purchase car parts, ship his personal goods, and pay his employees.

### *Racing Limited*

34. Racing Limited is the holding company for Al Anabi Racing and, until August 12, 2020, was the holding company for another Al Thani corporation. (**Exhibit 5**)

35. Racing Limited is one of the corporate mechanisms through which Al Thani and Greenbaum transfer money internationally between Al Thani's business entities, and on at least one occasion was used to directly pay a plaintiff (Hope). An IRS-1099 furnished to Hope is attached hereto and incorporated herein by reference as **Exhibit 9**.

36. Racing Limited's address for United States Internal Revenue Service purposes is Greenbaum's personal residence. (**Exhibit 9**)

37. Racing Limited's address with the United States Patent and Trademark Office is Greenbaum's personal residence. (**Exhibits 6,7**)

*AAP*

38. AAP is one of Al Thani's race car teams.  (**Exhibit 9)**.

39. Also, AAP builds out and customizes Al Thani's race cars.

40. AAP's garage in the United States is in Brownsburg, Indiana.

41. AAP's garage is run for Al Thani by one of Al Thani's race car team crew chiefs, Frank Manzo.

42. AAP's Middle East garage is at Al Thani's Qatar Race Club.

43. AAP's mailing address is Greenbaum's personal residence. **(Exhibit 5)**

44. AAP's public telephone number is the same publicly listed phone number for three of Greenbaum's businesses operating in Massachusetts. Documentation stating same is attached hereto and incorporated herein by reference as **Exhibit 10.**

45. AAP's sole corporate member is Al Anabi Racing.

*Speedtech*

46. Speedtech is one of Al Thani's race car teams. Documentation stating same is attached hereto and incorporated herein by reference as **Exhibit 11**.

47. Also, Speedtech builds out and customizes Al Thani's race cars with nitrous systems.

48. Speedtech's garage in the United States is in Tuscaloosa, Alabama.

49. AAP's Middle East garage is at Al Thani's Qatar Race Club.

50. Al Anabi Racing is the president of Speedtech. (**Exhibit 5)**

51. Shannon Jenkins ("Jenkins") is the Chief Executive Officer of Speedtech.

52. In or about 2016, Al Thani bought Speedtech from Jenkins and Castellana.

*Corporate Officers*

53. Greenbaum is the corporate organizer and manager of at least seven of Al Thani's companies, including Al Anabi Racing, Racing Limited, AAP, and Speedtech. (**Exhibit 4**)

54. Castellana is utilized by Al Thani as a non-functioning corporate officer for at least five corporations for Al Thani.

55. Jenkins is the Chief Executive Officer of Speedtech but is a non-functioning corporate officer with no decision-making capability. Speedtech's bank account is located in Massachusetts; its sole member is Al Anabi Racing; Greenbaum is the organizer; and the president of Speedtech is co-defendant Al Anabi Racing, also managed by Greenbaum.

56. Jenkins is a corporate officer or chief executive officer of two (previously three) of Al Thani's companies, and is utilized by Al Thani in a similar corporate manner as a corporate front just as Castellana. (**Exhibit 5**)

c. **Funding of Race Teams and Employees**

57. In his racing infancy, Al Thani paid his employees through funds obtained through the Qatar Olympic Committee and the Ministry of Sports.

58. Thereafter, employees were then paid by Qatar Racing Club.

59. Then, employees were also paid via cash, credit card and bank wires from Al Thani's personal and company accounts.

d. **Al Thani's Employment of Plaintiffs**

60. Plaintiffs were employed by Al Thani, and "covered employees" within the mean of the FLSA, and Florida, California, and Tennessee law. 29 U.S.C. § 203(e).

61. Plaintiffs were employees engaged in commerce since a substantial part of their job requirements were to accompany and work for Al Thani throughout the United and foreign countries in order to perform their job functions. 29 U.S.C. § 203 (c).

62. Plaintiffs have previously consented in writing to being parties in case with causes of action under the Fair Labor Standards Act. 29 U.S.C. § 216(b). [ECF No. 1, Exhibit #3]

63. Defendants are "covered employers" within the meaning of the Fair Labor Standards Act and Florida, California, and Tennessee law. 29 U.S.C. § 203(d).

64. Al Thani is the owner, operator, and majority shareholder of the corporate defendants.

65. Greenbaum actively participates to a substantial degree in the business operations of Al Thani's corporations, and acted in concert with Al Thani, such that he can be deemed to be liable to the same extent as the corporate defendants and Al Thani.

66. Plaintiffs reasonably relied on the misrepresentation of Al Thani that plaintiffs would be paid by Al Thani for all hours worked at the applicable prevailing wage and overtime rates, and negotiated bonus structures, profit shares, and benefits, which as a direct result caused plaintiffs to suffer serious financial and/or emotional damages.

67. Plaintiffs were subject to long working hours, in excess of forty (40) hours per week, dictated by Al Thani.

68. Plaintiffs were trafficked for free labor by Al Thani and Greenbaum.

69. Plaintiffs were falsely imprisoned, assaulted, battered, threatened, and arrested by Al Thani.

70. Plaintiffs did not have supervisory authority nor did they exercise discretion or independent judgment with respect to matters of significance.

71. Plaintiffs did not receive proper wages, overtime wages, bonuses, and profit shares and benefits.

**e.   Alter Ego**

72. Al Thani is the owner, operator and majority shareholder engaged in the operations of Al Anabi Racing, Racing Limited, AAP, and Speedtech.

73. Al Thani has disregarded the corporate forms of his business, treating them as one, swapping employees, paying employees from multiple sources, disregarding corporate formalities, and siphoning away corporate assets.

74. Al Thani has intentionally hid his ownership yet has pervasive control of Al Anabi Racing, Racing Limited, AAP, and Speedtech such that he can be deemed liable to the same extent as the companies themselves.

75. Al Thani's nonobservance of corporate formalities, the absence of corporate records, and non-functioning officers and directors further demonstrate that Al Thani is the alter ego of his companies.

*Al Thani's Common Ownership*

76. Al Thani owns Al Anabi Racing, Racing Limited, AAP, and Speedtech.

77. The State of Qatar has publicly stated that Al Thani owns Al Anabi Racing, using it as an example of how Qatari companies can work in partnership with American companies. (**Exhibit 8**)

78. Arabic newspapers owned by the State of Qatar have published Al Thani as the owner of Al Anabi Racing. Documentation reflecting same is attached hereto and incorporated therein by reference as **Exhibit 12**. This Exhibit has been translated by an interpreter.

79. Al Thani frequently uses the terms "Awesome," "Al Anabi," and "Speedtech," in his corporate names. ( **Exhibit 5**)

80. Al Thani owned the U.S. trademarks of "Al-Anabi Racing," "Al-Anabi," and "KH" to utilize in "advertising services, namely, providing advertising space on <u>automobiles participating in racing events;</u>" and "<u>participating in professional automobile races;</u>" and "entertainment services in the nature of <u>motor vehicle racing and exhibitions</u>." (**Exhibits 6, 7**)

81. The U.S. trademark applications show "*HH Sheikh Khalid bin Hamad Al Thani,*" and "*Al Anabi Racing Limited*, [*Qatar* limited company (ltd.) CYPRUS] and utilize Greenbaum's personal address, noted as "C/O *Al-Anabi Racing USA* LLC Duxbury MASSACHUSETTS 02332." *(***Exhibits 6, 7***)*

82. "KH," "Al Anabi," and "Al Anabi Racing" are utilized on Al Thani's race cars, race car driver suits, and his employee's apparel. (**Exhibit 8**)

83. Upon information and belief, Al Thani owns a United States patent for the "KH Series V6," a 481X engine that Al Thani's employees designed and developed in conjunction with American Alan Johnson. A copy detailing same and discussing Al Thani's ownership of AAP is attached hereto and incorporated herein by reference as **Exhibit 13**.

84. Al Thani openly owns the Qatar Race Club located in Doha, Qatar. Qatar Race Club is the Middle East location where Al Thani tests, repairs and builds out his cars, and imports and exports parts for cars.

85. Al Thani openly operates his Middle East Speedtech garage at the Qatar Race Club.

86. Al Thani openly operates his Middle East AAP garage at the Qatar Race Club.

87. Several employees, including race car drivers, live in Al Thani's residence in Doha, Qatar.

88. Al Thani has issued at least one legal statement, through counsel, as the owner of Al Anabi Racing. A copy of the statement issued by Al Thani is attached hereto and incorporated herein by reference as **Exhibit 14**.

89. Al Thani's car racing employees have publicly stated that Al Thani owns Al Anabi, Speedtech, etc. (**Exhibit 8**).

90. Promotional materials prepared by Hope, whose job duties included creating promotional material, show Al Thani as the owner of the corporate defendants. (**Exhibit 8**)

91. At Al Thani's personal request, Tohme assisted Al Thani in working with a designer to create apparel for AAP. Documentation reflecting same is attached hereto and incorporated herein as **Exhibit 15**.

92. At Al Thani's personal request, Hope assisted Al Thani in designing "hero cards" for Al Thani and the Al Anabi Racing team. (**Exhibit 8**)

93. Al Thani titles his vehicles under AAP and Al Anabi Racing. Plaintiffs further detail the car registration in their wire fraud claims, and in as reflected in **Exhibit 35**.

### *Al Thani's Pervasive Control*

94. Al Thani had the discretionary power to create and enforce personnel decisions including, but not limited to: hiring and terminating employee; setting and authorizing issues of wages; maintaining employee records; setting employee schedules; instructing and supervising employees; dictating physical movement of employees; health decisions and medical treatment; and controlled the terms and conditions of employment of employees. Documentation reflecting Al Thani setting salaries is attached hereto and incorporated herein as (**Exhibit 16**).

95. Al Thani decides where his cars will race and test, including when they race in the United States and the Middle East. Al Thani is hands-on with his crews and teams,

meeting with them personally to discuss his likes and dislikes, and goals for his companies.

96. Al Thani requires non-disclosures from most of his employees. For example, Smith's non-disclosure agreement describes Al Thani as the owner of AAP. Documentation stating same is attached hereto and incorporated therein as **Exhibit 17**.

*Confused Intermingling of Business Activity Assets, or Management*

97. Al Thani's companies are intertwined and act as alter egos to each other.

98. The corporate structure of Al Anabi Racing, Racing Limited, AAP, and Speedtech is so intertwined that it is difficult to decipher.

99. For example, Speedtech's Articles of Incorporation record the initial manager of Speedtech as Donald Greenbaum with a mailing address of 27 Pill Hill Lane. Then, their 2014 Annual Report shows "Al Anabi Racing Limited" as the President. Thereafter, their 2015 Annual Report shows "Awesome Al Anabi Motorsports" as the President. Finally, their 2016, 2017, 2018, and 2020 Annual Reports show "Al Anabi Racing, USA, LLC" as the President. **(Exhibit 5)**

100.    The address of 5200 Whigham Circle, Tuscaloosa, Alabama, 35405, noted on Speedtech's 2014 Annual Report is the same address that Racing Limited used in Speedtech's 2014 Annual Report and the same address that Al Anabi Racing is reported as having in Speedtech's Annual Reports in 2016, 2017, and 2018. (**Exhibit 5**)

101.    Al Thani's companies share products, goods, services, assets, employees, management, legal counsel, consultants, security services, medical services, housing, information technology, financial and accounting services, travel services, and bank accounts.

102.     Greenbaum holds a corporate role in every entity that is a party to this litigation.  (**Exhibit 5**)

103.     Aman Shahani is Al Thani's Chairman Advisor and serves in a role similar to a Chief Financial Officer. Plaintiffs have corresponded with him in regards to pay issues.

104.     Mona Atat arranges travel for Al Thani's employees. Plaintiffs have corresponded with her in regards to their travel.

105.     Joumana Younis serves as counsel for Al Thani. Some of the plaintiffs have corresponded with her in regards to contractual issues

106.     Payments for wages come from various sources. For example, Tohme was paid by Al Thani's Chairman Advisor, Aman Shahani. Mollenbrink has received payment from Al Anabi Racing, Bin Omran, and Al Thani's private accounts. Documentation reflecting same is attached hereto and incorporated herein as **Exhibit 18.**

107.     Additionally, Hope was paid by Racing Limited for work on behalf of Speedtech. (**Exhibit 9**)

*Nonobservance of Corporate Formalities*

108.     Al Anabi Racing, AAP and Speedtech do not have a bookkeeping system or a payroll system.

109.     There is no manner in which employees of Al Thani and the corporate defendants formally record their hours within a system organized by Al Thani or Greenbaum.

110.     Despite employees earning over $600.00 USD, Al Anabi Racing, Racing Limited, AAP, and Speedtech, with one notable exception, do not follow

employment practices such as issuing weekly or bi-weekly paychecks, IRS-1099s, and/or wage and earning statements (W-2s).

*Non-functioning officers and directors*

111.     Castellana is a race car driver for Al Thani and serves as a non-functioning officer in five of Al Thani's corporations. (**Exhibit 4**)

112.     Jenkins used to own Speedtech and sold it to Al Thani, and serves as a non-functioning officer in two of Al Thani's corporations, including Speedtech. (**Exhibit 5**)     *Use of corporation for transactions of dominant shareholders*

113.     Hope prepared the budgets of Al Thani's racing teams for almost a decade. When Hope prepared the budgets, they then reviewed by Al Thani, and then routed to the State of Qatar's Olympic Committee for approval and funding, which was then provided to Al Thani via his Qatar Race Club.

114.     In the preparation of the budgets to be formally presented to the Olympic Committee, Al Thani routinely instructed Hope to triple or quadruple the budget, to pad Al Thani's personal accounts.

115.     Hope maintained the books for Al Thani's racing teams, and personally observed Al Thani squander millions of dollars allocated to their racing budgets on supercars for himself, including but not limited to a carbon-fire Bugatti Veyron, Rolls Royce Phantoms, Ferraris, a GT 40, several Maybachs ,a Mercedes Benz Mclaurin, a black ZR1 Corvette, several Porches, a custom-made diamond bezel watch, a pair of $1,000,000.00 USD "KH" logo cufflinks, and designer shoes, and leave nothing to his employees.

116.     Al Thani utilizes his corporations for his personal use. For example, he shipped two of his private cars not used for racing, a Porsche 918 and a Porsche GTF, using Al Anabi Racing USA, LLC. Greenbaum assisted in the coordination.

Documentation reflecting same is attached hereto and incorporated therein as **Exhibit 19**.

*Use of corporation in promotion of fraud*

117.   Al Thani has four corporations that are involved in litigation.

118.   Al Thani's corporate structure, with Donald Greenbaum as his corporate name, allows him to hire employees in the United States and abroad, yet shield himself from United States liability.

119.   Qatar is not a party to the Hague Convention, and different avenues are necessary for service of process in litigation should legal issues arise related to Al Thani.

120.   As a resident of Qatar, with United States businesses that he structured in a manner to hide his identity and true nature of his corporate involvement, Al Thani moves freely throughout the racing world with limited accountability for his actions.

121.   Put simply, Al Thani has hid himself.

122.   Al Thani is not mentioned in any of his companies' corporate documents with the exception of his U.S. trademark filings.

123.   Al Thani does not, despite multiple requests of plaintiffs, provide a mutually signed contract that he had or has with plaintiffs.

124.   Greenbaum did not initially organize AAP but, instead, Al Thani hired legal counsel to organize the corporation. Corporation documentation of AAP, and the bar registration of the attorney who registered the corporation for Al Thani is attached hereto and incorporated herein by reference as **Exhibit 20.**

125.   The law firm that organized AAP for Al Thani is the same law firm that sent Pittard a cease-and-desist letter from Al Thani's KH Holding company after Pittard

attempted to resolve matters between he and Al Thani after Pittard was terminated. (**Exhibit 20**)

126.     Additionally, Al Thani has previously ceased racing, in or around March of 2015 due to lack of financing and debt associated with racing. After his return to racing, he raced under the Speedtech name for approximately two years before he began racing under the AAP. (**Exhibit 5**)

*Manifest Injustice*

127.     Plaintiffs cannot file and pursue claims in Qatar as they have no appropriate, unbiased venue of due process.

128.     Plaintiffs cannot file and pursue claims in Qatar as they are likely to be arrested, harmed or killed if they enter the country.

129.     Plaintiffs have been held against their will in the country of Qatar by Al Thani.

130.     Plaintiffs have been held against their will in the country of Qatar by Qatari's customs and immigration procedures.

131.     Al Thani has the ability to manipulate the customs and immigration procedures of Qatar, preventing Plaintiffs from leaving the country of Qatar.

132.     At Al Thani's direction, medical treatment was withheld from Hope and Smith.

133.     With the assistance of Qatari law enforcement, Al Thani has intimidated Plaintiffs, threatened to kill Pittard, threatened to kill Tohme, and physically beat his employees.

134.     Tohme was twice arrested by Qatari law enforcement at Al Thani's request.

135.     Tohme was twice arrested without a warrant, denying him information regarding the basis of his arrest and detention.

136.     Tohme's right to be promptly informed of the charges against him was violated.

137.     The first time that Tohme was arrested, he was physically assaulted by Al Thani while handcuffed and in the custody of Qatari law enforcement.

138.     The first time that Tohme was arrested and detained, he was forcefully required to provide a blood sample, which was drawn in unsterile conditions by untrained Qatari law enforcement.

139.     Tohme's blood sample was later doctored to show an inaccurate result.

140.     Tohme was unable to obtain private legal representation despite multiple attempts due to the fear of retaliation by Al Thani expressed by the prospective attorneys.

141.     Despite his repeated in-court requests for legal representation, Tohme was denied access to a lawyer.

142.     Tohme's subsequent legal proceeding was conducted in Arabic; Tohme is not fluent in Arabic. Tohme advised the court he does not fluently speak Arabic and yet a real-time interpreter was not provided nor were the proceedings held in a manner that he could understand.

143.     Tohme's first release from custody was conditioned upon the judge's requirement that Tohme not speak "badly" about the country of Qatar.

144.     Tohme was arrested a second time at Al Thani's request, after Al Thani learned that Tohme had been released.

145.     Al Thani ordered that Tohme be charged with new criminal conduct.

146.     Tohme was held for an additional eight hours before being released a second time.

147.     Tohme required the assistance of the Qatari Embassy of the United States, the

Qatari Ministry of Foreign Affairs, and the Director of PR Permanent Mission of the

State of Qatar to the UN, to safely exit the country.

148.     Tohme's legal proceedings failed to meet the requirements of a fair and public

hearing, in general violation of Article 14 of the International Covenant for Civil and

Political Rights (ICCPR).

149.     Qatar's proceedings are in violation of Articles 9(2) and 14(3) of the (ICCPR),

as well as Principles 10 and 13 of the Body of Principles for the Protection of All

Persons under Any Form of Detention of Imprisonment.

150.     Tohme's subsequent detention without a judicial order further violated Article

9 of the Universal Declaration of Human Rights (UDHR) and Article 9(1) of the

ICCPR, which prohibits arbitrary deprivation of liberty.

151.     Even if a legal avenue theoretically existed on paper, in practice Al Thani,

Qatari law enforcement, and the Qatari judiciary will ensure the failure of any issues

brought before its courts through the adverse and biased conduct of its judges and

other public authorities – none of whom are independent from the political whims

and interferences of Al Thani.[1]

---

1.    [1] The United Nations Human Rights Council has expressed concern about the independence of the Qatari judicial systems and this very issue. In 2015, the United Nations issued a Report of the Special Rapporteur noting that "[w]hile any direct interference in the independence of judges is extremely difficult to document, reports of pressures of the executive on the work of the judiciary, particularly in cases involving powerful persons, are a matter of concern to the Special Rapporteur." The Special Rapporteur also reported allegations that the public prosecution is directly involved in fabricating charges and in tampering with evidence. *See*, Report of the Special Rapporteur, Gabriela Knaul – *Mission to Qatar, Human Rights Council,* A/HR/29/26/Add.1, 31 March 2015, paragraphs 36 and 77, available at: https://undocs.org/en/A/HRC/29/26/Add.1.

## Al Thani's Employment of Robert Von Smith

152.     Smith was employed by Al Thani as a race car driver and industry consultant from on or about July 2008 to on or about July 2016.

153.     Smith raced for Al Thani's Al Anabi Racing, Speedtech, and AAP racing teams. Documentation showing such is attached hereto and incorporated therein by reference as **Exhibit 21**.

154.     Smith worked in the United States, Qatar, Bahrain, and the United Arab Emirates (Abu Dhabi).

155.     During his employment, Smith was issued State of Qatar work visas by Al Thani. Documentation showing such is attached hereto and incorporated therein by reference as **Exhibit 22**.

156.     When in Qatar, Smith worked at Al Thani's Qatar Race Club.

157.     Approximately 75% of Smith's work for Al Thani was performed in the United States.

158.     Smith's initial 2008 contract with Al Thani dictated an annual salary of $120,000.00 USD plus $10,000.00 USD bonuses for each race won; $50,000.00 USD bonuses for each championship won; and a percentage of all race purses.

159.     When racing in the Middle East, Smith was to receive double foreign pay and a weekly per diem of 800 Qatari Rial (approximately $215.00 USD).

160.     A copy of Smith's most recent contract and non-disclosure for Al Thani's AAP race team is attached hereto and incorporated herein as **Exhibit 17.**

161.     His most recent contract was for the United States racing season of 2016 and 2017, and he was promised an annual salary of $75,000.00 USD, a $10,000.00 USD bonus for each race won; a $50,000.000 USD bonus for each championship won; and an end-of-the-season bonus of $25,000.00 USD.

162.     Smith was required to work a regular 40-hour workweek and race in the

United States.

163.     Instead of 40-hour work weeks, Smith was subject to long working hours,

ranging from fifty (50) hour work weeks when the teams were not racing to one

hundred (100) hour work weeks when the teams were racing. Smith worked an

average work week consisting of eighty (80) hours per week without compensation

for overtime.

164.     After Smith executed his contract and began racing, Al Thani changed his

mind and only paid Smith an annual salary of $40,000.00 USD.

165.     Smith was paid by cash, check, direct deposit, and bank wire. A copy of his

bank statements showing some of the bank wires from Al Thani is attached hereto

and incorporated therein by reference as **Exhibit 23**.

*Carousel of Fraud*

166.     At Al Thani's direction, Smith was instructed to speak to Greenbaum about

his salary and bonuses.

167.     Routinely, throughout Smith's employment, Greenbaum would feign

ignorance of Smith's bonuses or salary, and/or state that Al Thani would be making

any necessary payments to Smith.

168.     When Smith would question Al Thani about his outstanding pay, Al Thani

would feign ignorance or deflect and state that Greenbaum would pay Smith.

169.     Smith would then return to Greenbaum, who would state that he was waiting

on Al Thani or that he had to ask Al Thani for the funds.

170.     Neither Greenbaum nor Al Thani would pay Smith the appropriate salary or

bonuses on behalf of Al Thani.

171.    Beginning in 2012, Al Thani routinely withheld pay for up to four months at a time.

172.    When Smith was eventually paid, it was not for the amount negotiated in Smith's contract or the correct bonus amount.

173.    For example, on or about September 6, 2013, Al Thani was supposed to sponsor a racing championship in the United States. Smith won the race and was due $50,000.00 USD. Despite numerous requests, Al Thani and Greenbaum did not pay Smith. Greenbaum went so far as to issue a public legal statement that Al Thani's employees (Smith) had been paid their bonuses. Documentation stating such is attached hereto and incorporated herein by reference as **Exhibit 24**.

174.    In or about 2016, at a race in Indianapolis, Indiana, one excuse that Greenbaum used not to pay Smith was that Al Thani had bought Speedtech and did not have money to pay Smith.

175.    At the U.S. Nationals on September 4, 2016 in Brownsburg, Indiana, Smith earned a racing bonus of $500.00 USD for winning. Greenbaum, present at the race, improperly took Smith's racing bonus and told him the team needed it.

176.    In March of 2015, Al Thani temporarily disbanded his racing teams due to lack of financing, and promised Smith and Hope that they could keep their team's racing rig, valued at the time at approximately $300,000.00 USD, in order to allow Smith and Hope to continue racing.

177.    On or about October 1, 2015, Greenbaum came to Smith and Hope's team shop in Oak Ridge, Tennessee, and took the racing rig from Smith and Hope with no legal basis to do so, depriving them of their ability to utilize it in the upcoming racing season to earn their livelihood.

*Held in Qatar*

178.     Throughout Smith's employment, Al Thani confiscated Smith's passport to

prevent him from leaving Qatar.

179.     Smith's passport was confiscated immediately upon Smith's arrival into Qatar

by Al Thani's employee, Mustafa Atat. Mustafa Atat is a race car driver for Al

Thani.

180.     From 2008 to 2016, Smith's passport was confiscated for two days to two

weeks per racing season.

181.     Smith was not permitted to leave Qatar until Al Thani approved.

182.     During the Middle East racing season, Al Thani held Smith in Qatar for one

to two weeks beyond their contractual agreements.

183.     Smith feared retaliation if he chose to leave without Al Thani's permission.

184.     Smith feared criminal charges if he contested Al Thani's decision that Smith

remain in Qatar beyond their contractual agreement.

*Medical treatment withheld*

185.     In April of 2009, Smith was injured while racing at the Qatar Race Club and

subsequently taken to the hospital.

186.     While at the hospital, Smith was not treated until Al Thani permitted him to

seen by medical staff.

187.     Smith was unable to dictate his own medical care despite being alert and
coherent.

*Outstanding pay and bonuses*

188.     Smith was not paid $50,000.00 USD for employment from May 2008 to

October 2008.

189.     Smith was not paid $70,000.00 USD for his foreign pay of 2008;

190.     Smith was not paid the following racing bonuses:

a.  Shakedown at Etown, October 2008 - $10,000.00 USD;

b.  Bahrain, November 2008 – (two races) $20,000.00 USD;

c.  Bahrain, December 2008 - $10,000.00 USD;

d.  Qatar, January 2009 (championship) - $100,000.00 USD;

e.  Bahrain, November 2009 (four races) - $40,000.00 USD;

f.  Qatar, November 2009 (four races) - $40,000.00 USD;

g.  United States, 2010 (AAA Insurance Midwest National, April 30-May 2; NHRA, Englishtown, NJ, June 10-13; NHRA Thunder Valley National, Bristol, TN) - $30,000.00 USD;

h.  United States, 2010 NHRA Championship, Madison, IL; November 14, 2010 - $50,000.00 USD;

i.  Qatar, October 2010 (three races) - $30,000.00 USD;

j.  Qatar, November 2011 (championship) - $100,000.00 USD;

k.  Qatar, November 2012 (three races) - $30,000.00 USD;

l.  United States, 2013 (ADRL, Dinwiddie, VA, June; ADRL, Memphis, TN, August)- $20,000.00 USD;

m.  United States, 2013 ADRL Championship, September 6, 2013 - $50,000.00 USD;

n.  Qatar, November 2013 (three races) - $30,000.00 USD;

o.  United States, 2014, (NHRA Gainesville, FL, Gator National, March 13-16, 2014; NHRA Englishtown, NJ, Toyota Summer National, May 29-June 1, 2014; NHRA Concord, NC, Pepboys National, September 12-14, 2014) - $30,000.00 USD;

p.  United States, 2016, (NHRA, U.S. National Brownsburg, In, August 31- September 5) - $10,000.00 USD.

*Termination*

191.     At the conclusion of the 2016 United States racing season, Al Thani informed

Smith that if Smith did not travel to Qatar immediately to drive Al Thani's car for

the Middle Eastern racing season, Smith would be terminated.

192.     Smith stated that his contract only required that he race in the United States,

and that if Al Thani wanted to drive in the Middle East, they would have to agree to

new contract terms.

193.     Smith was wrongfully terminated at the conclusion of the 2016 racing season,

on or about October 1, after Smith refused to work for Al Thani in Qatar.

*Intimidation*

194.     On or about August 8, 2019, after Smith posted a Facebook posting of an

article regarding litigation against Al Thani, Al Thani employee Mustafa Atat called

Smith.

195.     Atat called Smith and harassed, threatened and intimidated Smith, telling him

to take down the article about Al Thani.

**Al Thani's Employment of Terry Hope**

196.     Hope was employed by Al Thani from on or about July 2008 to July 2018.

197.     Hope worked in numerous roles for Al Thani and Al Thani's Al Anabi, AAP,

and Speedtech race car teams. Hope drove Al Thani's race car transporters;

organized data and video acquisition; coordinated logistics for the crews and the

cars; maintained bookkeeping including payroll; installed computer software/fraud

programming; drone specialist; served as a marketing/public relations point of

contact; and cooked for the team at the various tracks. Hope also built the Qatar

Race Club's concession stand, created promotional videos for Al Thani, and

maintained Al Thani's racing teams racing rigs.

198.	Hope worked throughout the United States, Kingdom of Bahrain, and the United Arab Emirates (Abu Dhabi).

199.	Hope was issued State of Qatar work visas by Al Thani. Documentation reflecting same is attached hereto and incorporated herein by reference as **Exhibit 25.**

200.	Approximately 80% of Hope's work for Al Thani was performed in the United States.

201.	Hope's initial contract with Al Thani dictated an annual salary of $62,000.00 USD and bonuses. When working abroad, Hope was promised double foreign pay and a weekly per diem of 800 Qatari Rial (approximately $215.00 USD). Additionally, he was promised 25% of sales from the Qatar Race Club concession stand that he helped build and staff.

202.	Hope's contract dictated that he work five, eight-hour work days a week with two days off per week.

203.	As his employment progressed, Hope's salary was increased to an annual salary of $96,000.00 USD.

204.	After traveling to Qatar to work for Al Thani in October of 2015, Al Thani changed his mind and refused to pay Hope more than $72,000.00 USD.

205.	Instead of 40-hour work weeks, Hope was subject to long working hours, ranging from fifty (50) hour work weeks when the teams were not racing to one hundred (100) hour work weeks when the teams were racing.

206.	Hope worked an average work week consisting of eighty (80) hours per week without compensation for overtime.

207.     Hope was paid by Al Thani via cash, check credit card, and bank wire. Documentation reflecting same is attached hereto and incorporated therein by reference as **Exhibit 26.**

208.     At Al Thani's direction, Hope worked with Greenbaum when Al Thani's vehicles would be shipped to and from the United States. Documentation reflecting same is attached hereto and incorporated herein by reference as **Exhibit 27.**

209.     Hope contacted Greenbaum when Hope needed to have outstanding team invoices paid or pay their racing team.

*Carousel of Fraud*

210.     At Al Thani's direction, Greenbaum was the individual that Hope was instructed to speak to about his salary and bonuses.

211.     In the same manner as Smith was treated, Greenbaum would feign ignorance of Hope's bonuses or salary, or state that Al Thani would be making necessary payments to Hope.

212.     When Hope would question Al Thani about his outstanding pay, Al Thani would feign ignorance or deflect and state that Greenbaum would pay Hope.

213.     Hope would return to Greenbaum, who would state that he was waiting on Al Thani or that he had to ask Al Thani for the funds.

214.     Neither Greenbaum nor Al Thani would pay Hope the appropriate salary or bonuses on behalf of Al Thani.

215.     Beginning in 2011, Al Thani routinely withheld Hope's pay.

216.     In 2011, Al Thani did not pay Hope for three months at a time.

217.     In 2012, Al Thani withheld Hope's pay for five months.

218.     From 2013 to 2018, Al Thani withheld pay for an average of three to five months at a time per calendar year.

219.     When Hope was eventually paid, it was not for the amount negotiated in
Hope's contract nor the correct bonus amount.

*Drones*

220.     On or around July 15, 2015, Al Thani requested that Hope obtain a three-foot
drone from the United States.

221.     Hope obtained a drone for Al Thani.

222.     Al Thani withheld Hope's passport and exit visa for two months, until the
beginning of October 2015, until Hope obtained additional components for the
drone.

223.     Hope obtained the additional components for the drone.

224.     Al Thani then asked Hope to modify and weaponize the drone to allow Al
Thani to shoot individuals.

225.     Hope refused.

*Hacking*

226.     On or about June 1, 2009, Al Thani requested Hope's assistance in what
Hope believed was a security system designed to protect Al Thani's business
websites.

227.     Hope assisted Al Thani in designing a computer security system.

228.     Al Thani later pressured Hope into utilizing the tactics and software to obtain
improper access to an Al Thani family member, members of two other royal families,
and three private citizens from different countries.

*Outstanding pay, bonuses, and commission*

229.     In 2013, Hope was not paid $18,000.00 USD in wages, an annual $10,000.00
USD bonus, and $4,000.00 USD in racing bonuses (ADRL, Dinwiddie, VA, June;
ADRL, Memphis, TN, August; 2013 ADRL Championship, September);

230.     In 2014, Hope was not paid $24,000.00 USD in wages, an annual $10,000.00 USD bonus, and $26,000.00 USD in racing bonuses (NHRA Gainesville, FL, Gator National, March 13-16; NHRA Englishtown, NJ, Toyota Summer National, May 29-June 1; NHRA Concord, NC, Pepboys National, September 12-14);

231.     In 2015, Hope was not paid $18,000.00 USD in wages, an annual $10,000.00 USD bonus, $5,160.00 USD in foreign per diem, and approximately $7,500.00 USD in concession stand profit sharing.

232.     In 2016, Hope was not paid $48,000.00 USD in wages, an annual $10,000.00 USD bonus, $5,160.00 USD in foreign per diem, approximately and approximately $7,500.00 USD in concession stand profit sharing.

233.     In 2017, Hope was not paid $18,000.00 USD in wages, an annual $10,000.00 USD bonus, $5,160.00 USD in foreign per diem, and approximately $7,500.00 USD in concession stand profit sharing.

234.     In 2018, Hope was not paid $56,000.00 USD in wages and approximately $7,500.00 USD in concession stand profit sharing.

### *Held in Qatar*

235.     On at least five occasions throughout Hope's employment, Al Thani held Hope against his will, refusing to grant him an exit visa from Qatar or return his passport for six weeks to two and a half months at a time.

236.     Upon entry into Qatar, Al Thani would require Hope to surrender his passport to Al Thani himself, Mustafa Atat, and Fahad Mohammed Bahzad.

237.     Al Thani would withhold Hope's exit visa and maintain custody of Hope's passport, and require Hope to complete certain actions, such as he did with the drone in July of 2015.

238.     Even after Hope had completed an action, as he did in July of 2015 with the drone, Al Thani continued to withhold Hope's exit visa or passport for two to three months at a time.

239.     Hope feared retaliation and criminal charges if he attempted to leave without Al Thani's permission.

240.     On January 31, 2013, Hope was hospitalized after ingesting a substance given to him by Al Thani that Hope was told was aspirin. Documentation reflecting same is attached hereto and incorporated herein by reference as **Exhibit 28.**

241.     Al Thani instructed that medical care be withheld and Hope be transferred to a second hospital.

242.     Hope was unable to dictate his own medical care despite being alert and coherent.

243.     Al Thani instructed Hope not to discuss with the hospital staff what had occurred regarding his ingestion of the substance.

244.     Hope feared that if he was truthful about his medical history that Al Thani would seek retaliation.

245.     At the second hospital, from February 1-4, 2013, Hope was held against his will at the instruction of Al Thani. Al Thani placed an armed guard in Hope's hospital room, and prevented Hope from leaving.

246.     At one point, unaware of the prescribed medical treatment or prognosis, Hope awoke to medical staff shaving his testicles, causing severe emotional distress.

247.     Al Thani had ordered the medical staff to conduct a cardiac catherization procedure on Hope without his knowledge or permission.

248.     At another point, Hope believed his organs would be harvested, causing Hope to panic and believe he would be killed.

249.     After being released, Al Thani held Hope against his will for two months.

250.     On or about October 15, 2016, Al Thani forced Hope to attend a party at Al Thani's residence where Hope was held against his will.

251.     Al Thani twice shot at Hope with a pistol when Hope attempted to leave.

252.     Directly thereafter, Al Thani forced Hope to watch Al Thani and his employees sodomize a male prostitute with a billiard stick.

### *Solicitations of murder*

253.     On or about December 2009, in Doha, Qatar, Al Thani asked Hope to murder two individuals related to a racing league in the United States.

254.     Hope refused.

255.     On or about February 2010, in Doha Qatar, Al Thani asked Hope to murder the same two individuals.

256.     Hope refused.

257.     On or about June 15, 2010, in Walland, Tennessee, Al Thani asked Hope to murder the same two individuals.

258.     Hope refused.

259.     On or about August 30, 2010, in Brownsburg, Indiana, asked Hope to murder the same two individuals.

260.     On or about November 2016, in Doha, Qatar, Al Thani asked Hope to murder one of Al Thani's employees.

261.     Hope refused.

262.     Al Thani then forced Hope to watch Al Thani and his Qatari law enforcement staff beat an Al Thani employee to death.

263.     On or about November 4, 2017, in Las Vegas, Nevada, Al Thani solicited Hope to murder one of Al Thani's employees.

264.    Hope refused.

265.    On or about November 7, 2017, in Beverly Hills, California, Al Thani solicited Hope to murder one of Al Thani's employees.

266.    Hope refused.

267.    On or about June 6, 2018, via telephone while Hope was in Selma, North Carolina and Al Thani was in Qatar, Al Thani asked Hope to murder an individual.

268.    Hope refused.

### *Termination*

269.    From November 2017 to July 2018, Hope worked 50 to 70 hours a week for Al Thani in the United States completing computer software programming, and locating race car rigs.

270.    In July of 2018, Al Thani asked Hope to recruit employees to work for Al Thani, to support the upcoming racing seasons in the United States and Qatar.

271.    In response, Hope asked Al Thani for his outstanding pay.

272.    Al Thani then told Hope that unless he agreed to kill the individuals, the same individuals that Al Thani had asked Hope to murder in November of 2017, then Al Thani would not pay Hope.

273.    Al Thani told Hope he needed to demonstrate his loyalty to Al Thani.

274.    Hope refused to murder the individuals.

275.    Al Thani told Hope that he did not make the cut for his inner circle and terminated his employment.

### **Al Thani's Employment of Ramez Tohme**

276.    Tohme was employed by Al Thani from on or about June 2017 to on or about June 28, 2018.

277.     Tohme was employed by Al Thani as a real estate advisor, and as business advisor for Al Thani's AAP racing team as well KH Holding, Al Thani's Qatari holding company. Tohme also coordinated racing logistics of Al Anabi Racing and AAP and entertained guests visiting AAP.

278.     Tohme worked for Al Thani in the United States, Qatar, and England.

279.     After arriving in Qatar, Tohme was issued a State of Qatar permanent residency permit sponsored by Al Thani. Documentation reflecting same is attached hereto and incorporated herein by reference as **Exhibit 29**.

280.     Al Thani organized a Bank of Qatar account for Tohme in order for him to receive direct deposit.

281.     During the course of Tohme's employment, Al Thani never deposited funds into Tohme's account.

282.     Initially, Al Thani promised to compensate Tohme through business

283.     Tohme's three-year contract with Al Thani dictated that he would receive an annual salary of $100,000.00 USD, housing, and twice-yearly compensated travel home.

*Carousel of Fraud*

284.     After signing his contract, despite numerous requests to Al Thani and Al Thani's Chairman Advisor, Tohme was not provide a copy of his contract. Documentation reflecting one such communication is attached hereto and incorporated therein by reference as **Document 30**.

285.     Tohme repeatedly requested payment from Al Thani, Al Thani's Chairman Advisor, Al Thani's KH Holding Human Resources department, and KH Holding's Managing Director.

286.     All would feign ignorance or fraudulently state that it was in the process of

being paid, or, in other instances would simply ignore Tohme's request.

287.     Over the course of his employment, Al Thani only paid Tohme $10,000.00

USD. Documentation reflecting same is attached hereto and incorporated therein by

reference as **Exhibit 31**.

288.     With the exception of one week during his employment, Tohme never

received his promised housing. The week that he was provided housing, Tohme was

housed in a furnished room that did not have air conditioning; the outside temperate

at this time in Qatar was 115 degrees Fahrenheit.

289.     Tohme was required to live with Al Thani.

290.     Tohme worked for Al Thani seven days per week, averaging approximately

eighteen hours a day.

291.     On at least five occasions, Tohme worked for 20 to 36 hours straight, with no

opportunity for sleep.

292.     From June 2017 to July 2018, Tohme arranged logistics for Al Anabi and

AAP as they raced throughout the United States and the Middle East.

293.     Tohme assisted in the design of AAP's jackets. (**Exhibit 15**)

294.     Tohme attended an industry event as an AAP employee with Al Thani.

Documentation reflecting same is attached hereto and incorporated herein by

reference as **Exhibit 32.**

295.     Tohme arranged travel for an Al Anabi security staff member.

296.     Tohme accompanied Al Thani to the Qatar Race Club in Qatar, and provided

marketing and business ideas for AAP.

297.     Tohme arranged for various United States business referrals for Al Thani

including legal counsel, a car rental company, a tattoo artist for Al Anabi crew

members, and a chiropractor. He also arranged personal events for Al Thani's family

and stayed overnight at Al Thani's hotel to assist Al Thani.

*Real estate contract defaulted*

298.      Tohme consulted and searched for real estate for Al Thani.

299.      In July of 2017, Tohme reviewed real estate documentation on behalf of Al

Thani, showed Al Thani homes, and secured a lease for a rental home at 1474

Bluejay Way, Los Angeles, California 90069 for Al Thani. Documentation reflecting

same is attached hereto and incorporated therein by reference as **Exhibit 33.**

300.      Al Thani refused to honor the lease, and Tohme was later sued while in Qatar

working for Al Thani. A judgment against Tohme was entered for $175,000.00 USD.

Documentation showing same is attached hereto and incorporated herein by

reference as **Exhibit 34**.

301.      When Tohme sought repayment from Al Thani and Al Thani's Chairman

Advisor, he was ignored and brushed off.

*Vehicles*

302.      In August of 2017, Tohme arranged for Al Thani to test drive and purchase

six vehicles.

303.      Tohme arranged for Al Thani to purchase two Bentleys and four Chevy

Suburbans.

304.      Two of the vehicles were purchased and paid for directly by Al Thani.

305.      The remaining four were to be paid for directly by Al Thani but despite

numerous requests to Al Thani, Greenbaum, and Al Thani's Chairman Advisor, Al

Thani never ultimately paid in full for the vehicles. Documentation reflecting same is

attached hereto and incorporated therein by reference as **Exhibit 35**.

306.      Al Thani repeatedly blamed his Chairman Advisor for payment delays.

307.     In response to one of requests to be paid for the shipping of the tires, Al

Thani's Chairman Advisor faked a bank wire of $6,000.00 USD. Documentation

stating such is attached hereto and incorporated therein by reference as **Exhibit 36.**

308.     Al Thani would later falsely imprison and threatened to harm Tohme if the

vehicles were not registered and shipped to him in Qatar despite never having paid

for the vehicles (discussed in further detail below).

*Private Schools*

309.     In September of 2017, Tohme scouted schools for Al Thani's children.

Documentation reflecting same is attached hereto and incorporated therein by

reference as **Exhibit 37**.

*AAP Racing*

310.     From September 2017 to October 2017, Tohme assisted with the logistics of

six races that AAP raced in, handling travel and food arrangements.

311.     On December 4, 2017, Tohme traveled to Qatar and began working for Al

Thani in Qatar.

312.     From on or about December 7, 2017 to on or about June 15, 2018, Tohme

advised Al Thani on Al Thani's proposed real estate developments including the

Lusail Luxury Tower. Tohme advised on the hospitality aspects of development,

proposing design and substance of the restaurants, nightlife, and social spaces.

When Tohme requested other substantive corporate work, as dictated in his contract, Al

Thani's Chairman Advisor requested that Tohme first install a personal cinema system

for Al Thani in Al Thani's residence and transfer the titles of the cars Al Thani had

feigned purchasing a few months prior in Los Angeles; only then would Tohme be given

substantive work.

*Held in Qatar*

313.     From December 17, 2017 to July 5, 2018, on at least seven occasions Al Thani held Tohme against his will.

314.     Al Thani held Tohme for at least twenty-four hours on the dates of December 17, 2017; December 31, 2017-January 5, 2018; March 31-April 1, 2018; on or about June 15, 2018; July 1-5, 2018.

315.     Al Thani locked Tohme in his personal residences, and placed armed guards at the entrances and exits. Al Thani did not permit Tohme to go outside or interact with other individuals without Al Thani's permission.

316.     On at least three occasions, including but not limited to, on or about December 17, 2017, April 1, 2018, and July 1, 2018, Al Thani seized and held Tohme's phone.

317.     Tohme repeatedly requested to leave Al Thani's residences.

318.     Al Thani refused.

319.     With at least one of Tohme's requests to leave, Al Thani brandished a firearm, pointed the firearm at Tohme, and/or threatened to kill Tohme and his family if he attempted to leave Al Thani's residence.

320.     Al Thani threatened to bring criminal charges against Tohme in Qatar, Lebanon, and the United States.

321.     On or about June 15, 2018, during the approximately fifth time that Tohme was held against his will, he was able to leave and reach the United States Embassy where he requested assistance in safely leaving the country.

322.     An exit visa was required to exit Qatar, and the United States Embassy could not immediately secure a safe exit for Tohme. Tohme was forced to return to Al Thani's residence.

37

323.       Tohme attempted to obtain an exit visa from KH Holding. KH Holding refused without Al Thani's consent.

324.       Tohme's family unsuccessfully attempted to help Tohme exit Qatar.

325.       On June 28, 2018, Tohme left Al Thani's residence and moved to a hotel while he contacted the U.S. Embassy and attempted to exit the country.

326.       On or about June 29, 2018, Al Thani contacted Tohme and promised to pay Tohme his back wages if he returned to his residence.

327.       Upon returning to Al Thani's residence, Al Thani demanded that Tohme ship wheels to Qatar that Al Thani had purchased while in California. Al Thani refused to pay for shipping and demanded that the shipping be paid by the Tohme family.

328.       Al Thani, brandishing a firearm, verbally and physically threatened Tohme.

329.       Tohme attempted to leave Al Thani's residence but was taken back inside by Qatari law enforcement.

330.       Tohme was arrested by Qatari law enforcement at Al Thani's request.

331.       Al Thani physically assaulted Tohme while he was handcuffed and in the custody of Qatari law enforcement.

332.       Tohme was transported to a jail, arraigned by a judge the next morning on or about July 1, 2018, and released on the condition that he not speak badly about the country of Qatar.

333.       While Tohme was completely release paperwork, he was immediately arrested a second time at Al Thani's request.

334.       Al Thani ordered that Tohme be charged with new criminal conduct.

335.       While Tohme was incarcerated, Al Thani's legal counsel and Al Thani's Chairman Advisor requested that Tohme's family register the vehicles Al Thani had previously stated he would purchase but failed to pay for. Al Thani's staff asked that

the vehicles be registered to Al Anabi Racing USA, LLC and Al Anabi Performance. (**Exhibit 35)**

336.     Tohme was held for an additional eight hours before being released a second time.

337.     Tohme required the assistance of the Qatari Embassy to the United States, the Qatari Ministry of Foreign Affairs, and the Director of PR Permanent Mission of the State of Qatar to the UN to safely exit the country on July 4, 2018. Documentation showing such is attached hereto and incorporated therein by reference as **Exhibit 38**.

338.     Since his exit from Qatar, Tohme has suffered from post-traumatic stress disorder.

### Al Thani's Employment of Matthew Pittard

339.     Pittard was employed by Al Thani as private security and defense from September 17, 2017 to July 10, 2018.

340.     Pittard provided security and defense services for Al Thani, and Al Thani's Al Anabi Racing, AAP, and Speedtech teams.

341.     Pittard was also required to jointly develop a security and defense contracting company with Al Thani.

342.     Pittard was also required to conduct training at the Police Training Institute in Qatar.

343.     A copy of Pittard's contract with Al Thani is attached hereto and incorporated herein by reference as **Exhibit 39.**

344.     Pittard was employed to work in the United States, England and throughout the Middle East. Documentation reflecting same is attached hereto and incorporated herin as **Exhibit 40.**

345.     Pittard was promised an annual salary of $102,000.00 USD plus an end-of-the-year bonus as well as a percentage of sales and a share of ownership of Geostrategic Defense Solutions, LLC in exchange for working regular 40-hour work weeks with two days off per week.

346.     Instead, Pittard was subject to long working hours, ranging from sixty (60) to ninety-six (96) hours per week.

347.     Al Thani dictated Pittard's work hours.

348.     Plaintiff was on-call 24/7.

349.     Pittard was paid via cash and wire. A copy of bank statements showing some of the bank wires from Al Thani is attached hereto and incorporated therein by reference as **Exhibit 41.**

### *Carousel of Fraud*

350.     Al Thani willfully never properly paid Pittard.

351.     Despite numerous requests to Al Thani and his Chairman Advisor, Al Thani was repeatedly late, and months behind in Pittard's pay.

352.     Al Thani's staff would repeatedly be untruthful or ignore Pittard.

353.     Al Thani never paid Pittard's bonuses or any portion of Geo Strategic Defense Solutions.

### *Weapons Trafficking*

354.     On December 3, 2017, Pittard attempted to prevent an illegal weapons purchase by Al Thani that ultimately, through no fault of Pittard's, was unsuccessfully with the weapons later arriving in Qatar through improper channels and without proper regulatory permits. Documentation reflecting the weapons is attached hereto and incorporated therein by reference as **Exhibit 42**.

### *Solicitation for murder*

355.     In approximately late September 2017 and November 2017, in Los Angeles, California, Al Thani asked Pittard to murder two males and a female who Al Thani viewed as threats to his social reputation and personal security.

356.     Pittard refused.

*Intimidation*

357.     In early June 2018, Al Thani granted Pittard vacation time/leave.

358.     After Pittard departed Qatar, two days later Al Thani changed his mind, and on June 18, 2018, Al Thani issued Pittard a "warning letter" advising Pittard that he was violating company policy. Al Thani gave Pittard two days to return to Qatar. Documentation stating same is attached hereto and incorporated therein by reference as **Exhibit 43**.

359.     Pittard responded that Al Thani had previously approved his vacation time/leave, and that Pittard was not in violation of policy. Documentation stating same is attached hereto and incorporated therein by reference as **Exhibit 44.**

*Solicitation for kidnapping*

360.     On or about the week of June 29, 2018, Al Thani held Tohme against his will on at least two occasions.

361.     Pittard assisted Tohme in safely exiting Al Thani's custody.

362.      On or about July 4, 2018, Al Thani threatened and intimidated Pittard to turn Tohme over to Al Thani.

363.     Pittard refused.

364.     On or about July 5, 2018, Al Thani and his employees threatened and intimidated Pittard to turn Tohme over to Al Thani.

365.     Al Thani told Pittard that he would kill Pittard and bury his body in the desert, and that he would kill Pittard's family.

366.     Pittard again refused to turn over Tohme to Al Thani.

367.     For the next three to four days, Pittard awaited the assistance of the United States Embassy to exit Qatar as Al Thani and his employees searched for Pittard.

*Held in Qatar*

368.     On July 10, 2018, Al Thani agreed to issue Pittard's exit visit to leave Qatar.

369.     Pittard met with Al Thani at his office.

370.     Pittard's cellular phones were taken, and he was physically escorted by Qatari law enforcement and Al Thani's family members to Al Thani's office.

371.     Al Thani expressed disgust of Pittard, and terminated Pittard for refusing to assist Al Thani in kidnapping Tohme.

372.     While in Al Thani's office, Al Thani brandished a pistol, which he tapped while sitting near Pittard, and forced Pittard to sign several employment documents. Documentation signed by Pittard is attached hereto and incorporated herein by reference as **Exhibit 45.**

373.     Al Thani threatened to arrest Pittard if he did not sign termination documents offered by Al Thani.

374.     Pittard feared that he would be arrested and face criminal charges brought by Al Thani if he did not sign the documents offered by Al Thani.

375.     Over the course of the next 24 hours, with the assistance of Qatari law enforcement and Al Thani's family members, Al Thani twice held Pittard against his will.

376.     Pittard asked Al Thani, Al Thani's legal counsel, and Al Thani's Chief Executive Officer of KH Holdings for his cellular phone at least twelve times in order to call the United States Embassy. They refused.

377.     Al Thani instructed Pittard to turn over all of his personal and work
belongings, including work laptops, cellular phones, and business log books.

378.     Al Thani's employees told Pittard to comply or they would take him into the
desert and kill him, and obtain his work equipment regardless.

379.     Pittard turned over his work equipment under duress.

380.     Al Thani stole Pittard's work equipment including Pittard's business work
laptop containing approximately seventeen years of personal and business records
and data, documents, contractual documents, proprietary data, and personal and
professional contacts as well as personal pictures.

381.     Al Thani confiscated Pittard's electronics, and erased the information from
some of the devices..

382.     Al Thani later showed the stolen information to Mollenbrink, and told
Mollenbrink that he had sequestered Pittard, took Pittard's electronics and
medication, and buried Pittard in the desert.

383.     Pittard flew home from Qatar on July 11, 2018. Documentation reflecting
same is attached hereto and incorporated therein by reference as **Exhibit 46.**

*Intimidation continues*

384.     From July 12-21, 2018, Pittard made several requests for his items to be
returned. Documentation reflecting same is attached hereto and incorporated herein
by reference as **Exhibit 47.**

385.     On July 23, 2018, Pittard received a cease-and-desist letter from counsel for
Al Thani's holding company. Documentation reflecting same is attached hereto and
incorporated therein by reference as **Exhibit 48.**

*Misuse of Pittard's Business Information*

386.     Al Thani stole and misused Pittard's business information to further Al

Thani's interests.

387.     Al Thani utilized Pittard's business contacts cultivated by Pittard prior to his

employment with Al Thani, and attempted to misappropriate business that normally

would have been contracted by and with Pittard.

388.     Al Thani utilized information to contact weapons and ammunition supplier

Stillwood Ammunition, located in North Carolina, and invited the company

president, Joshua Kratky, to Doha, Qatar from January 5-9, 2018. Mr. Kratky met

with Al Thani on January 7, 2018 and January 9, 2018 and discussed serving as a

supplier of ammunition to Al Thani's various businesses, including Geo Strategic

Defense Solutions.

389.     Al Thani instructed Mr. Kratky that if he wanted to do business with Al

Thani and/or in Qatar, Mr. Kratky could not tell Pittard about their meeting.

390.     Twenty-four hours after the meeting, Mr. Kratky informed Pittard of Al

Thani's use of Pittard's information and attempt to conduct business with the

weapons and ammunition supplier.

391.     After Pittard was terminated by Al Thani, Pittard was forced to close his

privately-owned consulting firm.

392.     Pittard was required to re-draft hundreds of business templates and contracts

and re-seek legal review of his business documents.

393.     On or between July 10 – July 23, 2018, after Al Thani terminated Pittard, Al

Thani interfered with a five-year security, law enforcement contract and arms

brokerage contract, that Pittard had negotiated with the Police Training Institute,

resulting in an annual loss of $10,665,230.17 USD, and a contractual loss of

$53,326,150.85. Documentation reflecting the contract is attached hereto and incorporated herein by reference as **Exhibit 49**.

**Al Thani's Employment of Matthew Allende**

394.    Allende was employed by Al Thani as a paramedic from on or about October 15, 2017 to February 4, 2018.

395.    Allende was required to provide medical services to Al Thani, and Al Thani's Al Anabi Racing, AAP, and Speedtech teams.

396.    Allende's contract dictated that his work schedule would consist of seven eight-hour shifts per week for a total of fifty-six hours per week and days off upon request.

397.    Allende received his job duties from Al Thani.

398.    From October 15, 2017 to December 5, 2017, Allende worked for Al Thani in Los Angeles, California.

399.    On December 5, 2017, Allende flew with Al Thani en route to Qatar, with a layover in London, England. Information reflecting same is attached hereto and incorporated herein by reference as **Exhibit 50.**

400.    From December 5, 2017, to February 4, 2018, Allende worked for Al Thani in Qatar.

401.    In Qatar, Allende worked at the Qatar Race Club, and Al Thani's residence.

402.    Allende's contract with Al Thani was a daily salary of $500.00 USD per day in the United States, and premium foreign pay of $20,000.00 USD when outside of the United States.

403.    Allende was paid via cash and bank wire. A copy of Allende's bank statements showing bank wires from Al Thani is attached hereto and incorporated herein by reference as **Exhibit 51.**

*Carousel of Fraud*

404.     Al Thani willfully never properly paid Allende.

405.     Despite numerous requests to Al Thani and Al Thani's Chairman Advisor, Al

Thani withheld payment and did not properly pay Allende his foreign pay.

406.     Al Thani's staff would repeatedly be untruthful or ignore Allende.

Documentation showing such is attached hereto and incorporated therein by

reference as **Exhibit 52**.

*Held in Qatar*

407.     Allende worked for the first three weeks of December without a day off.

408.     Over the course of the first three weeks of employment, Allende worked an

average of 110 hours per week.

409.      On or about December 17, 2017, after Al Thani required Allende to stay

awake and work for 36-hours straight, Allende requested a day off from Al Thani.

410.     Al Thani initially granted Allende's request.

411.     After departing Al Thani's residence for several hours, Allende returned and

once again departed, this time with Tohme.

412.     Allende and Tohme were stopped by Al Thani's security, and held against

their will. Allende told Al Thani's guard that Al Thani had approved his time off.

The guard replied that Al Thani had changed his mind, and Allende was not

permitted to leave.

413.     Allende escaped by scaling an 18-foot perimeter wall of Al Thani's residence.

414.     Allende suffered severe injury, and was taken back into Al Thani's residence.

415.     Allende fractured his heel and required immediate hospitalization. Allende

was hospitalized for three days, undergoing surgery to repair his injuries.

Documentation reflecting same is attached hereto and incorporated therein by reference as **Exhibit 53.**

416.    Allende was permitted two days off by Al Thani, and then required to return to work for Al Thani.

417.    Allende worked on crutches for almost six weeks before he was terminated. Documentation reflecting same is attached hereto and incorporated therein by reference as **Exhibit 54**.

418.    Allende worked 12 hours per day during his remaining six weeks of employment.

### *Termination*

419.    On February 4, 2018, Al Thani's Chairman Advisor informed Allende that Allende was terminated. Allende was sent home.

### *Injury*

420.    Despite undergoing physical therapy in the United States, Allende suffers from a permanent limp, his right leg is permanently half an inch shorter than the left.

421.    Allende cannot complete full work shifts even with employer accommodations.

422.    Allende was found to be disabled by the State of California. Documentation reflecting same is attached hereto and incorporated therein by reference as **Exhibit 55**.

### *Al Thani's request for reemployment*

423.    On March 14, 2018, Al Thani requested Allende to return to Qatar and work for him. Documentation stating such is attached hereto and incorporated therein by reference as **Exhibit 56.**

424.     Allende declined. Documentation stating such is attached hereto and incorporated therein by reference as **Exhibit 57**.

**Al Thani's Employment of Jason Mollenbrink**

425.     Mollenbrink was employed by Al Thani as a nurse from on or about May 2018 to on or about March 2019.

426.     Mollenbrink was required to provide medical services to Al Thani, and Al Thani's Al Anabi Racing, AAP, and Speedtech teams.

427.     From October 15, 2017 to December 5, 2017, Mollenbrink worked for Al Thani in Los Angeles, California.

428.     During his employment, Mollenbrink was issued State of Qatar work visas by Al Thani. Documentation showing such is attached hereto and incorporated therein by reference as **Exhibit 58**.

429.     In the Middle East, Mollenbrink worked at the Qatar Race Club, Al Thani's residence, and throughout Turkey during one of Al Thani's personal trips.

430.     Mollenbrink's three-year, full-time contract with Al Thani dictated that he would earn $25,000.00 USD per month.

431.     A copy of an employment verification letter from Al Thani is attached hereto and incorporated therein by reference as **Exhibit 59**.

432.     A copy of Mollenbrink's bank statements showing the bank wires from Al Thani and his companies are attached hereto and incorporated therein by reference as **Exhibit 18**.

433.     Mollenbrink was also paid via cash while in the United States and Qatar.

434.     Mollenbrink received his job duties from Al Thani.

435.     Mollenbrink's contract dictated that his work schedule would consist of seven eight-hour shifts per week for a total of 56 hours per week and days off upon request.

436.    Instead, Mollenbrink worked seven days per week, approximately 12 hours per day.

437.    Over the course of his employment with Al Thani, Mollenbrink worked 14 shifts of 24-hours, sleeping and eating when Al Thani slept.

438.    Mollenbrink averaged 84 hours per week, exclusive of the 14 times where he worked for 24 hours straight.

439.    Despite requests to Al Thani, Mollenbrink was deprived of all routine days off.

*Carousel of Fraud*

440.    Al Thani willfully never properly paid Mollenbrink.

441.    Despite numerous requests of Al Thani and Al Thani's Chairman Advisor, Al Thani was repeatedly late, and months behind in Mollenbrink's pay and never paid Mollenbrink for overtime.

442.    Al Thani's staff would repeatedly be untruthful or ignore Mollenbrink. Documentation reflecting same is attached hereto and incorporated by reference as **Exhibit 60**.

*Physical Intimidation, Assault, and Harassment*

443.    Al Thani created an environment of intimidation and harassment.

444.    Throughout Mollenbrink's employment, Al Thani would demand and seize Mollenbrink's cellular phone and review his messages.

445.    Throughout employment, when making requests of Mollenbrink, if Mollenbrink was reluctant to comply Al Thani would utilize his security guards to physically intimidate Mollenbrink into meeting Al Thani's requests.

446.    Al Thani required Mollenbrink to complete menial tasks as a form of harassment or punishment including needlessly packing and repacking medication

49

that Al Thani had intentionally kicked over, requiring him to sit alongside Al Thani

to watch TV, and inventory medical supplies multiple times.

447.      Mollenbrink was required to sit directly next to Al Thani during his meal

breaks, which were only taken with Al Thani's permission.

448.      Mollenbrink was only permitted quick bathroom breaks with Al Thani's

permission.

449.      Throughout his employment, Al Thani accused Mollenbrink of working for

the United States Central Intelligence Agency ("CIA'), and would enter into

Mollenbrink's private quarters and verbally abuse him with the presence of his

security guards.

450.      When accusing Mollenbrink of working for the CIA and throughout

Mollenbrink's work shifts, Al Thani would point a pistol at Mollenbrink.

451.      Al Thani frequently told Mollenbrink that he "controlled" Mollenbrink.

452.      Al Thani frequently called Mollenbrink derogatory terms during his shift.

453.      Al Thani frequently required Mollenbrink to stand at attention before him,

and state, "Yes, sir," or "No, sir," as if Al Thani was a military commander.

454.      Throughout his employment, Al Thani physically beat Mollenbrink.

455.      Al Thani would grab Mollenbrink's forearms and twist his hands in the

opposite direction to inflict pain and the sensation of a burn.

456.      On or about April 5, 2018, Al Thani punched Mollenbrink in the face.

457.      On or about April 8, 2018, Al Thani seized Mollenbrink's cellular phone and

then grabbed Mollenbrink by his shirt collar and shoved him onto a sofa that was

approximately three feet away.

458.     On or about April 8, 2018, after physically assaulting Mollenbrink, Al Thani

publicly berated Mollenbrink in front of other Al Thani staff, demanding that they

also verbally abuse Mollenbrink.

459.     On or about April 27, 2018, Al Thani physically grabbed Mollenbrink and

dragged him off of a sofa that he had been seated on. Al Thani then threw a crystal

ashtray at Mollenbrink, striking him in his genitals and causing physical injury.

460.     On or about June 2018, Al Thani exposed his penis to Mollenbrink and

forced Mollenbrink to show Al Thani his penis.

461.     On or about July 2018, Al Thani sexually propositioned Mollenbrink in his

bathroom.

462.     When Mollenbrink provided Al Thani with medical treatment, Al Thani

intentionally made it difficult for Mollenbrink to properly perform blood draws or IV

treatments.

463.     As a result of Al Thani's actions, Mollenbrink developed a stress-induced

tremor, and lost approximately 10 pounds.

### *Held in Qatar*

464.     Mollenbrink was not permitted to leave Qatar unless Al Thani approved.

465.     On at least four occasions in February, March, and April of 2018,

Mollenbrink quit.

466.     Al Thani refused to accept Mollenbrink's resignations.

467.     Mollenbrink was unable to leave without an exit permit approved by Al

Thani.

468.     Mollenbrink feared retaliation if he insisted that Al Thani accept his

resignation.

469.     Mollenbrink feared criminal charges if he contested Al Thani's decision that Mollenbrink was not permitted to quit employment.

470.     On or about March 5, 2019, Al Thani got into an altercation with an employee and Al Thani held a gun against the employee's head.

471.     Al Thani told Mollenbrink that if it was Mollenbrink that he had had the altercation with, Al Thani would have pulled the trigger.

472.     After Al Thani's statement, Al Thani required Mollenbrink to continue to complete his shift. During his shift, Al Thani got into another altercation, this time with his wife, where Al Thani asked his wife to shoot him (Al Thani), exposing Mollenbrink to a dangerous and hostile environment.

473.     The altercation caused Mollenbrink severe emotional distress.

474.     On or about March 16, 2019, Mollenbrink was terminated after Al Thani was forcibly removed from his residence by his brother, the Emir of Qatar.

475.     Mollenbrink was provided a ticket home, and returned to the United States. Travel documentation stating same is attached hereto and incorporated therein by reference as **Exhibit 61**.

476.     Mollenbrink continues to suffer from severe emotional distress and post-traumatic stress disorder as a result of his employment with Al Thani, and has been attending therapy.

## The Organized Scheme to Defraud

477.     The factual basis for this case demonstrates that Al Thani, a member of the royal family of Qatar, has the power and resources to manipulate the government systems of Qatar, including law enforcement, customs and immigration, and the judiciary.

478.     Al Thani does not wield the same power in the United States.

479.     Al Thani and Greenbaum created the United States corporate structure of Al Anabi Racing, Racing Limited, AAP, and Speedtech in a manner to allow Al Thani to engage in business activities in the car racing industry in the United States, and to mask Al Thani's true ownership of the businesses so as to avoid incurred liability arising from Al Thani's actions and business activities.

480.     As Al Thani sought to expand his racing teams in the United States and the Middle East, he began to engage in an international-level of systematic fraud that failed to honor contractual obligations and communicated false statements about pay and benefits, allowing Al Thani to continue operating, uninterrupted, in the car racing industry, and maintain a forged and false image of wealth and stature that would allow him to continue to hire new labor and maintain current labor.

481.     As the corporate officer/manager/president/organizer of Al Thani's companies, Greenbaum has direct, personal knowledge of matters related to their corporate matters including managing and accessing corporate records including financial records, ledgers, and bank accounts; managing business activities including oversight of operating agreements; maintaining assets; preparing, filing and authorizing corporate registrations, reports, and filings; paying federal and state taxes, expenses, payroll, and employee benefits.

482.     Al Thani lured employees into initial or continued employment, by promising wages or payment that Al Thani and Greenbaum knew would not be paid at previously negotiated salaries or at all.

483.     At the time of initial hiring, Al Thani wooed Plaintiffs with certain luxuries such as higher-than-average salaries, luxury travel arrangements, and high per diem.

484.     After their initial hiring, Al Thani willfully began to delay and withhold Plaintiffs' wages.

485.     Throughout their employment, when questioned by plaintiffs as to the status of their compensation and expense reimbursements, Al Thani and Greenbaum would utilize various excuses and pretexts, and failed and refused to timely pay employees

486.     Greenbaum made numerous false statements regarding forthcoming payment in an attempt to keep Al Thani's employees engaged in employment despite their lack of wages.

487.     Al Thani's actions escalated beyond willfully withholding wages. Al Thani began knowingly and willfully holding employees against their will, with no intention to pay them for their services.

488.     Al Thani held employees for a substantial amount of time, ranging from twenty-four hours to four months.

489.     Al Thani confiscated employee's passports.

490.     Al Thani withheld Qatar exit visas, holding employees against their will within the country.

491.     Employees could not leave the country of Qatar without Al Thani agreeing to issue an exit visa.

492.     Employees could not work for another employer in the country of Qatar without being sponsored by another employer.

493.     Al Thani forced employees to continue working for the benefit of him and his car racing companies.

494.     Al Thani made numerous unlawful requests of employees, including solicitation of murder, kidnapping, and weapons trafficking.

495.     In the cases of Hope and Pittard, failure to cede to Al Thani's unlawful demands resulted in termination of employment.

496.     Greenbaum continued to manage and operate Al Anabi Racing, Racing
Limited, AAP, and Speedtech knowing that Al Thani could not, would not, or was
not paying his car racing industry employees and expenses.

## RICO Predicate Acts

### *Al Thani and Greenbaum are Engaged in a Pattern of Racketeering Activity*

497.     Al Thani and Greenbaum and others known and unknown to plaintiffs are
knowingly and willfully engaged in an open-ended pattern of racketeering activity as
defined and prohibited by 18 U.S.C. § 1961 *et. seq.*

498.     Al Thani and Greenbaum's racketeering activity consists of more than two
acts of racketeering activity, the most recent of which occurred within 10 years after
the commission of a prior act of racketeering.

## 18 U.S.C. §1589 – Forced Labor

499.     Al Thani, Greenbaum and others, known and unknown to plaintiffs, have
knowingly and willfully violated and continue to violate 18 U.S.C. §1589 which
prohibits obtaining the labor and services of a person by using: (1) force, threats of
force, physical restraint, or threats of physical restraint; (2) serious harm or threats of
serious harm; (3) the abuse or threatened abuse of law or legal process, or (4) any
scheme, plan, or pattern intended to cause the person to believe that, if that person
did not perform such labor or services, that person would suffer serious harm or
physical restraint.

500.     The most recent act occurred from on or about June 8-11, 2020 when Pittard
assisted an Al Thani employee, who was being held against his will by Al Thani at
Al Thani's beach. The employee had been held since on or about March 2020. On or
about June 7, 2020, Pittard was contacted by the family member of an Al Thani
employee, and later the employee, being held against his will, and requested Pittard's

assistance in his exit from Qatar. Pittard informed United States federal law enforcement, and assisted in the employee's safe exit from Qatar.

### 18 U.S.C. §1590 – Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor

501.     Al Thani, Greenbaum and others, known and unknown to plaintiffs,  have violated and continue to violate 18 U.S.C §1590 which prohibits trafficking with respect to peonage, slavery, involuntary servitude, or forced labor. 18 U.S.C. §1590(a) states, "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both."

### 18 U.S.C. §1343 – Fraud by wire, radio, or television

502.     Al Thani, Greenbaum and others, known and unknown to plaintiffs, have violated and continue to violate 18 U.S.C. §1343 which prohibits devising or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

### 18  U.S.C. §373 – Solicitation to commit a crime of violence

**503.**     Al Thani and employees of Al Thani, known and unknown, have violated and continue to violate 18 U.S.C. §373, which states, "Whoever, with intent that

another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years."

504.     Additionally, Al Thani's racketeering activity violated:

    a.  California Penal Code § 653f – Solicitation of murder;

    b.  Nevada Code NRS 200.30, 193.330, Attempted murder;

    c.  Tennessee Code § 39-11-117, First degree murder;

    d.  Virginia § 18.2-29 Criminal solicitation; penalty; and

    e.  North Carolina Gen. Stat. § 14-17, Murder in the first and second degree;

    f.  18 U.S.C. §1201 - Kidnapping.

505.     Al Thani and Greenbaum conducted an ongoing enterprise engaged in the pattern and practice of wire fraud, forced labor, false imprisonment, and violations of the FLSA repeatedly and continuously over a period of thirteen years.

506.     Forced labor and human trafficking are valid underlying claims for RICO. Thus, plaintiffs have standing to bring a claim under 18 U.S.C. 1964(c).

507.     Al Thani conducted an ongoing enterprise engaged in the pattern and practice of kidnapping and soliciting crimes of violence, including kidnapping and murder.

508.     Two plaintiffs were solicited for crimes of violence.

509.    Al Thani and Greenbaum and others, known and unknown to Plaintiffs, have
engaged in a pattern of racketeering by engaging in at least two incidents of
racketeering conduct that have the same or similar intents, results, participants,
victims and methods of commission, and are not isolated incidents, in that at least
one such incident occurred after the effective date of the Act, and that the last such
incident occurred within 5 years after a prior incident of racketeering conduct.

510.    Greenbaum and Al Thani worked together to obtain free labor, beginning
through contractual relationships for agreed upon services, and then later by threats,
fiscal control, medical control, mental, emotional, and physical abuse, the threats of
arrest and imprisonment, and actual arrest.

511.    The abuses were continuous and systematic.

512.    Each violation constitutes "racketeering activity" under RICO.

513.    But for the actions of Al Thani and Greenbaum, Plaintiffs would not have
suffered injury.

### *Distinct Threat of Long-Term Racketeering*

514.    Based on the *modus operandi* of Al Thani and Greenbaum and others known
and unknown to plaintiffs, their racketeering activity involves a distinct threat of
future long-term racketeering activity.

515.    Specifically, Al Thani and Greenbaum actions were related to each other,
directed towards the same victims, had the same results, had the same participants,
and were committed to the same or similar purpose: to obtain forced labor for over a
decade. In the case of Al Thani, he's been soliciting for murder for over a decade.

516.    Additionally, the frequent use of legal entities by Al Thani and Greenbaum
and others known and unknown to Plaintiffs to advance forced labor, and in relation
to Al Thani, Al Thani's solicitation of crimes of violence, the ease by which they

manipulate employees into Al Thani's employment, the transfer of funds via wire both from and to bank accounts in the United States, including this District, and the material enrichment they derive from this unlawful activity with impunity to date, can only entice them to continue this unlawful pattern.

### RICO Enterprise I

517.     The ongoing pattern of violations of 18 U.S.C.1589, 18 U.S.C.1590, 18 U.S.C. §1343, since on or about 2008 constitute an "enterprise" as defined by RICO.

518.     Al Thani, Al Thani's employees, and Greenbaum participate in wrongful acts obtaining the labor and services of a person by using force, the threat of force, physical restraint, or threats of physical restraint; serious harm or threats of serious harm; and the abuse or threatened abuse of law or legal process; and knowingly recruited and obtained by any means, a person for forced labor or services.

519.     Throughout Smith's employment, Al Thani confiscated Smith's passport to prevent him from leaving Qatar.

520.     Smith's passport was confiscated immediately upon Smith's arrival into Qatar by Al Thani's employee, Mustafa Atat. Mustafa Atat is a race car driver for Al Thani.

521.     From 2008 to 2016, Smith's passport was confiscated for two days to two weeks per racing season.

522.     Smith was not permitted to leave Qatar until Al Thani approved.

523.     During the Middle East racing season, Al Thani held Smith in Qatar for one to two weeks beyond their contractual agreements.

524.     Smith feared retaliation if he chose to leave without Al Thani's permission.

525.     Smith feared criminal charges if he contested Al Thani's decision that Smith remain in Qatar beyond their contractual agreement.

526.     In April of 2009, Smith was injured while racing at the Qatar Race Club and subsequently taken to the hospital.

527.     While at the hospital, Smith was not treated until Al Thani permitted him to seen by medical staff.

528.     Smith was unable to dictate his own medical care despite being alert and coherent.

529.     On or around July 15, 2015, Al Thani requested that Hope obtain a three-foot drone from the United States.

530.     Al Thani withheld Hope's passport and exit visa until Hope obtained additional components for the drone.

531.     On at least five occasions throughout Hope's employment, Al Thani held Hope against his will, refusing to grant him an exit visa from Qatar or return his passport.

532.     Upon entry into Qatar, Al Thani would require Hope to surrender his passport to Al Thani himself, Mustafa Atat, and Fahad Mohammed Bahzad.

533.     Al Thani would withhold Hope's exit visa and maintain custody of Hope's passport, and require Hope to complete certain actions, such as he did with the drone in July of 2015.

534.     Even after Hope had completed an action, as he did in July of 2015 with the drone, Al Thani continued to withhold Hope's exit visa or passport for two to three months at a time.

535.     Hope feared retaliation and criminal charges if he attempted to leave without Al Thani's permission.

536.     On January 31, 2013, Hope was hospitalized after ingesting a substance given to him by Al Thani that Hope was told was aspirin.

537.     Al Thani instructed that medical care be withheld and Hope be transferred to a second hospital.

538.     Hope was unable to dictate his own medical care despite being alert and coherent.

539.     Al Thani instructed Hope not to discuss with the hospital staff what had occurred regarding his ingestion of the substance.

540.     Hope feared that if he was truthful about his medical history that Al Thani would seek retaliation.

541.     At the second hospital, from February 1-4, 2013, Hope was held against his will at the instruction of Al Thani. Al Thani placed an armed guard in Hope's hospital room, and prevented Hope from leaving.

542.     Al Thani ordered medical staff to conduct a cardiac catherization procedure on Hope without his knowledge or permission.

543.     Al Thani twice shot at Hope with a pistol when Hope attempted to leave.

544.     From December 17, 2017 to July 5, 2018, on at least seven occasions Al Thani held Tohme against his will.

545.     Al Thani held Tohme for at least twenty-four hours on the dates of  December 17, 2017; December 31, 2017-January 5, 2018; March 31-April 1, 2018; on or about June 15, 2018; July 1-5, 2018.

546.     Al Thani locked Tohme in his personal residences, and placed armed guards at the entrances and exits. Al Thani did not permit Tohme to go outside or interact with other individuals without Al Thani's permission.

547.     On at least three occasions, including but not limited to, on or about December 17, 2017, April 1, 2018, and July 4, 2018, Al Thani seized and held Tohme's phone.

548.    Tohme repeatedly requested to leave Al Thani's residences and Al Thani refused.

549.    When refusing Tohme's requests to leave, Al Thani would often brandish a firearm, point the firearm at Tohme, and/or threaten to kill Tohme and his family if he attempted to leave Al Thani's residence.

550.    Al Thani threatened to bring criminal charges against Tohme in Qatar, Lebanon- where he claimed to have power, and the United States.

551.    On or about June 15, 2018, Tohme was held against his will.
without Al Thani's consent.

552.    On or about June 29, 2018, Al Thani, brandishing a firearm, verbally and physically threatened Tohme.

553.    Tohme attempted to leave Al Thani's residence but was taken back inside by Qatari law enforcement.

554.    Tohme was arrested by Qatari law enforcement at Al Thani's request.

555.    Al Thani physically assaulted Tohme while he was handcuffed and in the custody of Qatari law enforcement.

On July 1, 2018,Tohe was arrested a second time at Al Thani's request.

556.    Al Thani ordered that Tohme be charged with new criminal conduct.

557.    Tohme was held for an additional eight hours before being released a second time.

558.    On July 10, 2018, Al Thani brandished a pistol, which he tapped while sitting near Pittard, and forced Pittard to sign several employment documents.

559.    Al Thani threatened to arrest Pittard if he did not sign termination documents offered by Al Thani.

560.    Pittard feared that he would be arrested and face criminal charges brought by
Al Thani if he did not sign the documents offered by Al Thani.

561.    Over the course of the next 24 hours, with the assistance of Qatari law
enforcement and Al Thani's family members, Al Thani twice held Pittard against his
will.

562.    Al Thani instructed Pittard to turn over all of his personal and work
belongings, including work laptops, cellular phones, and business log books.

563.    Al Thani's employees told Pittard to comply or they would take him into the
desert and kill him, and obtain his work equipment regardless.

564.    On or about December 17, 2017, Allende and Tohme were stopped by Al
Thani's security, and held against their will. Allende told Al Thani's guard that Al
Thani had approved his time off. The guard replied that Al Thani had changed his
mind, and Allende was not permitted to leave.

565.    Allende escaped by scaling an 18-foot perimeter wall of Al Thani's residence.

566.    Allende suffered severe injury, and was taken back into Al Thani's residence.

567.    Al Thani frequently told Mollenbrink that he "controlled" Mollenbrink.

568.    Al Thani frequently required Mollenbrink to stand at attention before him,
and state, "Yes, sir," or "No, sir," as if Al Thani was a military commander.

569.    Throughout his employment, Al Thani physically beat Mollenbrink.

570.    Al Thani would grab Mollenbrink's forearms and twist his hands in the
opposite direction to inflict pain and the sensation of a burn.

571.    On or about April 5, 2018, Al Thani punched Mollenbrink in the face.

572.    On or about April 8, 2018, Al Thani seized Mollenbrink's cellular phone and
then grabbed Mollenbrink by his shirt collar and shoved him onto a sofa that was
approximately three feet away.

573.     On or about April 8, 2018, after physically assaulting Mollenbrink, Al Thani
publicly berated Mollenbrink in front of other Al Thani staff, demanding that they
also verbally abuse Mollenbrink.

574.     On or about April 27, 2018, Al Thani physically grabbed Mollenbrink and
dragged him off of a sofa that he had been seated on. Al Thani then threw a crystal
ashtray at Mollenbrink, striking him in his genitals and causing physical injury.

575.     On or about June 2018, Al Thani exposed his penis to Mollenbrink and
forced Mollenbrink to show Al Thani his penis.

576.     On or about July 2018, Al Thani sexually propositioned Mollenbrink in his
bathroom.

577.     Mollenbrink was not permitted to leave Qatar unless Al Thani approved.

578.     On at least four occasions in February, March, and April of 2018,
Mollenbrink quit and Al Thani refused to accept Mollenbrink's resignations.

579.     Mollenbrink was unable to leave without an exit permit approved by Al
Thani.

580.     Mollenbrink feared retaliation if he insisted that Al Thani accept his
resignation.

581.     Mollenbrink feared criminal charges if he contested Al Thani's decision that
Mollenbrink was not permitted to quit employment.

### *Wire Fraud*

582.     Al Thani devised a scheme to defraud or obtain money or property by means
of false or fraudulent pretenses, representations, or promises through wire
transmissions in interstate or foreign commerce, writings for the purpose of executing
such a scheme.

583.

*Scheme One – Tires*

*and*

*Scheme Two- Vehicles*

584.     Al Thani devised a scheme to ship car rims for free that he had purchased

while in California, and to obtain the title of three vehicles without paying for them.

When Al Thani's scheme fails, he held Tohme against his will and had him twice

arrested by Qatari law enforcement.

585.     In the summer of 2017, Al Thani agreed to purchase four Suburbans from TT

International, which is owned and managed by Tohme's father, Dr. Tohme.

586.     Al Thani had also purchased rims.

587.     All were being stored by Dr. Tohme.

588.     The estimated cost of shipping the wheels to Doha was $6,000.00 USD and

Al Thani was to pay for it.

589.     The cost of the vehicles was $146,000.00 USD.

590.     On or about May 14, 2018, Dr. Tohme advised Al Thani's Chairman Advisor

that he did not receive funds due on that date, and that he had tried contacting the

Chairman Advisor. Dr. Tohme advised that the matter needed to be resolved.

(**Exhibit 35**)

591.     On May 14, 2018, Al Thani's Chairman Advisor faked a $6,000.00 USD wire

confirmation that he claims he sent four weeks prior for the shipping of the car rims,

to induce Dr. Tohme to send the rims.

592.     On May 18, 2018, Dr. Tohme advised that no funds had been received.

593.     On June 7, 2018, Dr. Tohme advised Al Thani's Chairman Advisor that a

resolution with the vehicles needed to be reached, and that the wire that the

Chairman Advisor had sent was never received.

594.    On June 8, 2018, Al Thani's Chairman Advisor e-mailed Dr. Tohme expressing dismay that the cars that Dr. Tohme was also storing for Al Thani had to be paid for before the title of the vehicles would be transferred.

595.    Al Thani's Chairman Advisor also again referred to the wire he claims to have sent, and reiterated that it had been sent.

596.    Al Thani's Chairman Advisor then suggested that another person and Qatari Embassy should handle any further issues to avoid delay.

597.     On June 9, 2018, Dr. Tohme once again confirmed with Al Thani's Chairman Advisor that no funds were received.

598.    On June 28, 2018, at this point in time in Qatar, Tohme left Al Thani's residence and prepared to leave the country of Qatar with the assistance of the Embassy.

599.    On June 30, 2018, Dr. Tohme reached out to an Al Thani employee, Ali Ray, regarding the cars that he is storing on behalf of Al Thani.

600.    On June 30, 2018, Al Thani continued to prevent Tohme from leaving Qatar, and instructed members of his security team to find Tohme in Doha.

601.    Al Thani employee Ali Ray responded to Dr. Tohme and told him to give Al Thani the wheels.

602.    When Al Thani's scheme to just be given the wheels and vehicles fails, Al Thani had Tohme arrested twice in Qatar.

603.    On July 1, 2018 at 11:21 PM, Al Thani's legal counsel e-mailed Dr. Tohme and requested that he execute a bill of sale despite the fact that Al Thani has not paid for the vehicles. At this point in time in Qatar, Tohme is still incarcerated.

604.    On July 1, 2018, at 1:38 PM, Al Thani's legal counsel advised Dr. Tohme that the name of the purchaser of Al Thani's car should read "Al Anabi Performance

LLC" and that AAP would be represented by Jason Sharpe; Jason Sharpe is an American employee of Al Thani.

605.     Al Thani's legal counsel stated, "this is an urgent matter since this matter has been dragged down too long and affecting the relationship." At this point in time Tohme is still incarcerated in Qatar.

606.     On July 2, 2018, at 5:47 AM, Al Thani's legal counsel reached out again, asking for an update. Tohme was still incarcerated.

607.     On July 4, 2018, Tohme exited the country of Qatar.

608.     On July 5, 2018, the Qatari Embassy paid for the vehicles.

609.     Al Thani coupled his employee's e-mail communications and a fake bank wire, with the false imprisonment and arrest of Tohme to further Al Thani's pecuniary interests in obtaining vehicles and rims for his benefit.

610.     Al Thani's scheme to defraud utilizing a fake bank wire and e-mail communications of his emails ultimately culminated in Al Thani receiving vehicles paid for by the Qatari Embassy.

### Scheme Three

611.     Al Thani and Greenbaum habitually failed to pay employees their racing bonuses, falsely representing that employees would be paid. In one instance, Al Thani did not meet his financial obligations as a sponsor for a race, the Battle of the Belts that occurred on September 6, 2013.

612.     Despite Al Thani not funding the sponsorship of the race, it was held. The race organizer, Kenny Nowling, issued a public statement stating that the sponsor had been unable to fulfill their obligations and that he, Kenny Nowling, would work to pay the winning bonuses to the drivers who had won. Documentation stating such is attached hereto and incorporated herein as **Exhibit 62**.

613.     Smith had won the race and was due $50,000.00 USD.

614.     To maintain the façade of fraud and to save money, in response to Kenny

Nowling's statement, Greenbaum issued an online statement on behalf of Al Anabi

Racing stating that Al Anabi Racing had paid its sponsorship to Kenny Nowling and

that it had also directly paid its employees their winning bonuses. Documentation

stating such is attached hereto and incorporated herein as **Exhibit 63.**

615.     Smith was not paid by Al Thani or Greenbaum.

616.     Greenbaum's statement is an online transmission in interstate or foreign

commerce devised of false representation.

617.     Smith was harmed as he did not receive his $50,000.00 USD bonus.

618.     Greenbaum's public statement that Al Anabi had been paid precluded Smith

from receiving the actual bonus from Kenny Nowling because Greenbaum had

publicly stated that Smith had been paid, and therefore Kenny Nowling relied on

that statement and did not pay Smith.

619.     Smith was not paid by anyone due to the actions of Al Thani and subsequent

actions of Greenbaum.

620.      Al Thani and Greenbaum financially profited from Greenbaum's statement

as they retained Smith's bonus under fraudulent pretenses.

621.     A substantial portion of the monies unlawfully obtained by Al Thani and

Greenbaum and others, known and unknown to plaintiffs, were transferred to and

from bank accounts in Massachusetts owned and/or controlled by Al Thani and

Greenbaum.

622.     Al Thani and Greenbaum and others, known and unknown to plaintiffs,

share the common purpose of profiting from the aforementioned activities by using

funds for their exclusive benefit.

623.     The association and interplay between Al Thani and Greenbaum, various Al

Thani employees, and others, known and unknown to plaintiffs, are precisely the

types of enterprises which RICO is intended to punish and deter.

### *Affect on Interstate Commerce*

624.     The enterprises affect interstate commerce because the funds utilized to

further the scheme and intermittently pay Al Thani's employees, such as plaintiffs,

are transferred via wire from bank accounts in Massachusetts owned and/or

controlled by Greenbaum and Al Thani, across the U.S. border to bank accounts in

Cyprus owned and/or controlled by Greenbaum and Al Thani.

625.     Funds maintained by the enterprise are transferred via wire across the

Cyprus/U.S. border and deposited to bank accounts in the United States, including

this District, owned and/or controlled by Al Thani, Greenbaum and/or others

known  or unknown to plaintiffs.

626.     In the commission of this racketeering activity, Al Thani and Greenbaum

regularly made false statements as to proposed income, moved goods and people

across state lines and internationally, engaging in interstate commerce.

627.     The wire transfers also affect interstate commerce through the use of

telecommunications technology, thus implicating interstate commerce.

628.     Al Thani, Greenbaum and others, known and unknown to plaintiffs, accepted

and retained the benefits of the racketeering activity, thereby ratifying the conduct of

all those assisting in committing the racketeering activity.

### *Plaintiffs have been Damaged by the RICO I Enterprise*

629.     Plaintiffs have been financially and emotionally harmed by the RICO I

enterprise.

630.     Al Thani and Greenbaum injured plaintiffs by depriving them of their

freedom by holding their passports, forcing them to work without wages for weeks

and months at a time, frequently never paying them at all.

631.     Al Thani held plaintiffs against their will in his residences; held plaintiffs

against their will and unable to make their own medical decisions resulting in their

belief that their organs would be harvested; held them against their will in the

country of Qatar were they were physically threatened, beaten, and harmed.

**RICO Enterprise II**

632.     The ongoing pattern of violations of 18 U.S.C. 373, since on or about 2009,

constitute and "enterprise" as defined by RICO.

633.     Al Thani solicits employees for crimes of violence, conditioning the

employment of his employees upon the commission of the crime of violence on at

least two occasions.

   a.  On or about December 2009, in Doha, Qatar, Al Thani asked Hope to

        murder two individuals related to a racing league in the United States. Hope

        refused.

   b.  On or about February 2010, in Doha Qatar, Al Thani asked Hope to murder

        the same two individuals. Hope refused.

   c.  On or about June 15, 2010, in Walland, Tennessee, Al Thani asked Hope to

        murder the same two individuals. Hope refused.

   d.  On or about August 30, 2010, in Brownsburg, Indiana, asked Hope to murder

        the same two individuals. On or about November 2016, in Doha, Qatar, Al

        Thani asked Hope to murder one of Al Thani's employees. Hope refused.

   e.  On or about the week of July 1, 2018, Al Thani held Tohme against his will

        on at least two occasions. Pittard assisted Tohme in safely exiting Al Thani's

custody. On or about July 4, 2018, Al Thani threatened and intimidated Pittard to turn Tohme over to Al Thani. Pittard refused.

f.   On or about July 5, 2018, Al Thani and his employees threatened and intimidated Pittard to turn Tohme over to Al Thani. Pittard again refused to turn over Tohme to Al Thani.

g.   In approximately late September 2017 and November 2017, in Los Angeles, California, Al Thani asked Pittard to murder two males and a female who Al Thani viewed as threats to his social reputation and personal security. Pittard refused.

h.   On or about November 4, 2017, in Las Vegas, Nevada, Al Thani solicited Hope to murder one of Al Thani's employees. Hope refused.

i.   On or about November 7, 2017, in Beverly Hills, California, Al Thani solicited Hope to murder one of Al Thani's employees. Hope refused.

j.   On or about June 6, 2018, via telephone while Hope was in Selma, North Carolina and Al Thani was in Qatar, Al Thani asked Hope to murder an individual. Hope refused.

### *Affect on Interstate Commerce*

634.   The enterprise affects interstate commerce because the funds utilized to further the scheme and intermittently pay Al Thani's employees, such as plaintiffs, whom Al Thani solicits for crimes of violence, are transferred via wire from bank accounts in Massachusetts owned and/or controlled by Greenbaum and Al Thani, across the U.S. border to bank accounts in Cyprus owned and/or controlled by Greenbaum and Al Thani.

635.   Funds derived from the enterprise are transferred via wire across the Cyprus/U.S. border and deposited to bank accounts in the United States, including

this District, owned and/or controlled by Al Thani, Greenbaum and/or others known or unknown to plaintiffs.

636.     In the commission of this racketeering activity, Al Thani solicited Hope and Pittard to travel and cross state and international lines, engaging in interstate commerce.

637.     The wire transfers of the funds of the enterprise also affect interstate commerce through the use of telecommunications technology, thus implicating interstate commerce.

### *The Enterprises have a Distinct Nexus to Massachusetts*

638.     The enterprises have a distinct nexus to Massachusetts because of the telephone and email communications made from Massachusetts, and multiple wire transfers and payments by Al Thani and/or Greenbaum from Massachusetts bank accounts and Massachusetts-operated companies utilized to pay Al Thani's employees. Additionally  Greenbaum is also a resident of Massachusetts.

639.     The racketeering activity described herein affects individuals employed by Al Thani, Al Anabi Racing, Racing Limited, AAP, and Speedtech.

### *Plaintiffs have been Damaged by the RICO Enterprise II*

640.     Plaintiffs have been financially and emotionally harmed by the RICO enterprises.

641.     Al Thani terminated Hope and Pittard's employment for refusing to commit crimes of violence for which he solicited.

642.     Al Thani fostered a hostile environment of violence, intimidation, and fear, invoking emotional distress and fear in plaintiffs.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

<u>**Violation of Federal RICO – 18 U.S.C. §1589**</u>

208. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

209. The foregoing conduct constitutes a violation of RICO as outlined in 18 U.S.C. §1589 as well as 18 U.S.C.§1962(c).

210. Plaintiffs suffered and continue to suffer damages as a result of Al Thani and Greenbaum's violations of 18 U.S.C. §1589.

211. Plaintiffs are entitled to consequential damages, treble damages, attorneys' fees, interests, costs, and all such other and further relief as the interests of justice may require or permit.

## SECOND CAUSE OF ACTION

<u>**Violation of Federal RICO – 18 U.S.C. §1590**</u>

212. Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

213. The foregoing conduct constitutes a violations of RICO as outlined in 18 U.S.C. §1590 as well as 18 U.S.C.§1962(c).

214. Plaintiffs suffered and continue to suffer damages as a result of Al Thani and Greenbaum's violations of 18 U.S.C. §1590.

215. Plaintiffs are entitled to consequential damages, treble damages, attorneys' fees, interests, costs, and all such other and further relief as the interests of justice may require or permit.

## THIRD CAUSE OF ACTION

<u>**Violation of Federal RICO – 18 U.S.C. §1343**</u>

216. Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

217. The foregoing conduct constitutes a violation of RICO as outlined in 18 U.S.C. §1343 as well as 18 U.S.C.§1962(c).

218. Plaintiffs suffered and continue to suffer damages as a result of Al Thani and Greenbaum's violations of 18 U.S.C. §1343.

219. Plaintiffs are entitled to consequential damages, treble damages, attorneys' fees, interests, costs, and all such other and further relief as the interests of justice may require or permit.

**FOURTH CAUSE OF ACTION**

**Violation of Federal RICO – 18 U.S.C. §373**

220. Plaintiffs reallege and incorporates by reference all allegations in all preceding paragraphs.

221. The foregoing conduct constitutes a violations of RICO as outlined in 18 U.S.C. §373 as well as 18 U.S.C.§1962(c).

222. Plaintiffs suffered and continue to suffer damages as a result of Al Thani violations of 18 U.S.C. §373.

223. Plaintiffs are entitled to consequential damages, treble damages, attorneys' fees, interests, costs, and all such other and further relief as the interests of justice may require or permit.

**FIFTH CAUSE OF ACTION**

**Fair Labor Standards Act – Unpaid Overtime Wages**

645.   Plaintiffs reallege and incorporate by reference all allegations made in all preceding paragraphs.

646.   Al Thani, Al Anabi Racing, AAP, and Speedtech failed to pay Plaintiffs overtime wages for all hours worked above 40 hours per week thereby violating the FLSA, 29 U.S.C. § 207(a)(1).

647.    Defendants unlawful conduct, as described in this Complaint, was willful and intentional. Defendants were aware, or should have been aware, that the practices described in this Complaint were, and are, unlawful. Accordingly, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255(a).

648.    As a result of the Defendants violations of the FLSA, Plaintiffs have been deprived of overtime compensation and other wages in amounts to be determined at trial, and is thus entitled to recovery of such amounts, liquidated damages, attorney's fees and costs, and other compensation pursuant to 29 U.S.C. § 216(b).

## SIXTH CAUSE OF ACTION

### Florida Labor Law– Unpaid Overtime Wages

**(Brought only on behalf of Pittard)**

649.    Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

650.    Al Thani, Al Anabi Racing, AAP, and Speedtech failed to pay Pittard overtime wages for all hours worked above ten (10) hours per day, thereby violating FLL § 448.01.

651.    Due to Defendants' violations of the FLL, Pittard is entitled to recovery of his unpaid wages, and reasonable attorney's fees, pursuant to FLL § 448.04.

## SEVENTH CAUSE OF ACTION

### California Labor Law– Unpaid Overtime Wages

**(Brought only on behalf of Tohme, Allende, and Mollenbrink)**

652.    Plaintiffs allege and incorporate by reference all allegations in all preceding paragraphs.

653.    Al Thani, Al Anabi Racing, AAP, and Speedtech failed to pay Plaintiffs overtime wages for all hours worked in excess of eight hours in one workday and work above forty (40) hours per week, thereby violating CLC § 510.

654.     Defendants' failure to pay Plaintiffs their overtime compensation lacked a good faith

basis within the meaning of CLC § 13520.

655.     Due to Defendants' violations of the CLC, Plaintiffs are entitled to recovery of their

unpaid overtime wages, reasonable attorney's fees and costs of the action, and pre-judgment

and post-judgment interest, pursuant to CLC § 1194.

## EIGHTH CAUSE OF ACTION

### Fair Labor Standards Act – Prohibited Retaliation

### (Brought only on behalf of Hope and Pittard)

656.     Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

657.     Al Thani retaliated against Plaintiffs by terminating their employment after Plaintiffs

refused to engage in conduct against public policy, in violation of 29 U.S.C.A. § 215(a)(3).

658. Hope was terminated for refusing to murder individuals for Al Thani.

659. Pittard was terminated for refusing to aid and abet Al Thani in the kidnapping and

false imprisonment of Tohme.

658.     Due to Al Thani's unlawful retaliation against Plaintiffs, Plaintiffs have suffered

harm and are entitled to recovery of back wages, front wages, liquidated damages, damages

for emotional distress, punitive damages, attorney's fees, costs, and other such damages of

an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### Florida Law – Prohibited Retaliation

### (Brought only on behalf of Pittard)

659.     Plaintiff realleges and incorporates by reference all allegations in all preceding

paragraphs.

660.    Al Thani retaliated against Pittard by wrongfully terminating his employment after Pittard refused to engage in criminal activity at the request of Al Thani, in violation of FLL § 448.102.

661. Al Thani requested Pittard engage in criminal activity when he demanded that Pittard aid and abet in Al Thani's kidnapping and false imprisonment of Tohme.

661.    Due to Al Thani's unlawful retaliation against Pittard, he has suffered financial hardship and emotional distress and is entitled to recovery of lost wages, benefits, reasonable attorney's fees, court costs, and other such damages of an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### Tennessee Law- Breach of Employment Contract

### (Brought only on behalf of Smith)

668. Smith realleges and incorporates by reference all allegations in all preceding paragraphs.

669. Al Thani employed Smith.

670. Al Thani breached Smith's employment contract when he hired Smith under the auspices that he would be paid for his employment; when Al Thani withheld and dictated Smith's medical care after Smith was injured in Qatar; falsely imprisoned Smith; and when Al Thani wrongfully terminated Smith's employment contract with Al Thani and AAP after Smith refused to engage in job duties outside of his employment contract.

670.    Due to Al Thani's unlawful retaliation and breach of Smith's employment contract, Smith has suffered financial hardship and emotional distress and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### Tennessee Law- Breach of Employment Contract

### (Brought only on behalf of Hope)

668.    Hope realleges and incorporates by reference all allegations in all preceding

paragraphs.

669. Al Thani employed Hope.

670. Al Thani wrongfully breached Hope's employment contract with Al Thani, Al Anabi

Racing, AAP, and Speedtech when Al Thani hired Hope under the auspices that he would

be paid for his employment; when Hope was falsely imprisoned by Al Thani in Qatar; when

Al Thani withheld and dictated Hope's medical care after Hope was hospitalized in Qatar;

and when Hope refused to engage in murder for Al Thani.

670.    Due to Al Thani's unlawful retaliation and breach of employment contract, Hope

has suffered financial hardship and emotional distress is entitled to recovery of future

pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of

enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to

be determined at trial.

## TWELFTH CAUSE OF ACTION

### California Law- Breach of Employment Contract

### (Brought only on behalf of Tohme)

671.    Tohme realleges and incorporates by reference all allegations in all preceding

paragraphs.

672.    Al Thani employed Tohme.

673. Al Thani wrongfully breached Tohme's employment contract with Al Thani, KH

Holding, AAP, and Al Anabi Racing when Al Thani lured Tohme to Qatar under the

auspices that he would be paid for his employment; when Tohme was falsely imprisoned on

at least seven occasions by Al Thani; when Tohme was improperly arrested twice at the direction of Al Thani; and when Tohme was assaulted and battered by Al Thani.

673.    Due to Al Thani's breach of Tohme's employment contract, Tohme has suffered financial hardship and emotional distress and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

## THIRTEENTH CAUSE OF ACTION

## California Law- Breach of Employment Contract

## (Brought only on behalf of Mollenbrink)

674.    Mollenbrink realleges and incorporates by reference all allegations in all preceding paragraphs.

675. Al Thani employed Mollenbrink.

675.    Al Thani wrongfully breached Mollenbrink's employment contract with Al Thani, Al Anabi Racing, AAP, and Speedtech when Al Thani Mollenbrink under the auspices that he would be paid for his employment; when Mollenbrink was falsely imprisoned by Al Thani; when Al Thani exposed his penis to Mollenbrink and forced Mollenbrink to expose his penis to Al Thani; when Al Thani sexually propositioned Mollenbrink; and/or when Mollenbrink was assaulted and battered by Al Thani.

676.    Due to Al Thani's breach of employment contract, Mollenbrink has suffered financial hardship and emotional distress and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

## FOURTEENTH CAUSE OF ACTION

## California Law- Breach of Employment Contract

### (Brought only on behalf of Allende)

668.   Allende realleges and incorporates by reference all allegations in all preceding paragraphs.

669. Al Thani employed Allende.

669.   Al Thani wrongfully breached Allende's employment contract with Al Thani, AAP, Al Anabi Racing, and Speedtech, when Al Thani lured Allende to Qatar under the auspices that he would be paid for his employment; when Allende was falsely imprisoned by Al Thani and physically injured as a result; and when Al Thani retaliated against Allende by wrongfully terminating Allende after he was injured as a result of Al Thani's actions.

### FIFTEENTH CAUSE OF ACTION

### Florida Law- Breach of Employment Contract

### (Brought only on behalf of Pittard)

668.   Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

669. Al Thani employed Pittard.

672.   Al Thani wrongfully breached Pittard's employment contract with Al Thani, AAP, Al Anabi Racing, Speedtech, and Geo Strategic Defense Solutions when Al Thani lured Pittard to Qatar under the auspices that he would be paid for his employment; when Al Thani thrice solicited Pittard for murder in Los Angeles, California; when Pittard was falsely imprisoned on at least two occasions by Al Thani, Al Thani's employees, and Al Thani's family members in Qatar; when Al Thani retaliated against Pittard by wrongfully terminating Pittard when he refused to aid and abet in the kidnapping of Tohme; when Al Thani willfully stole, and then misused Pittard's proprietary business contacts and information on January 7-9, 2018; and/or when Al Thani wrongfully and improperly

interfered with Pittard's contract with the Police Training Institute on or between July 10-23, 2018.

673.    Due to Al Thani's breach of Pittard's employment contract, Pittard has suffered financial hardship and emotional distress and is entitled to recovery of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

## SIXTEENTH CAUSE OF ACTION

### Florida Deceptive and Unfair Trade Practices Act

### Tortious Interference with Business Contract

**(Brought only on behalf of Pittard)**

677.    Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

678.    Al Thani retaliated against Pittard by misusing his business information. For example, Al Thani intentionally interfered and disrupted a contract between Pittard and the Police Training Institute, in violation of FL Stat § 501.204.

678. Al Thani knew of the contract and intentionally acted to disrupt the contract to harm Pittard, resulting in a contractual loss of $53,326,150.85 USD.

679.    Due to Al Thani's tortious interference, Pittard is entitled to loss of business and profit, attorney's fees, costs, and other such damages of an amount to be determined at trial.

680.    Pittard also requests from this Honorable Court an order of permanent injunction preventing Al Thani from utilizing Pittard's personal and business information.

## SEVENTEENTH CAUSE OF ACTION

### Florida Deceptive and Unfair Trade Practices Act

### Tortious Interference with Business Relationship

Case 1:20-cv-11143-RGS   Document 83   Filed 10/31/20   Page 82 of 97

**(Brought only on behalf of Pittard)**

681. Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

682.   Al Thani retaliated against Pittard by intentionally interfering and disrupting a business relationship with the Police Training Institute, in violation of FL Stat § 501.204. Al Thani knew of the relationship and intentionally acted to disrupt the relationship to harm Pittard.

683.   Due to Al Thani's tortious interference, Pittard is entitled to loss of business and profit, attorney's fees, costs, and other such damages of an amount to be determined at trial.

## EIGHTEENTH CAUSE OF ACTION

### Fraud in the Inducement and Intentional Misrepresentation

**Tennessee Law – Brought only on behalf of Smith and Hope**

**California Law – Brought only on behalf of Tohme, Allende, and Mollenbrink**

**Florida Law – Brought only on behalf of Pittard**

690.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

691.   At all times material, the express promise and representations made by Al Thani and Greenbaum that if Plaintiffs performed their job duties they would receive compensation and be paid as negotiated were false and known to be false by Al Thani and Greenbaum at the time the representations were made.

692.   Al Thani and Greenbaum made the representations alleged in this complaint and as further produced in the exhibits attached to the complaint intending to induce Plaintiffs to enter employment contracts and to continue working on behalf of Al Thani, Al Anabi Racing, AAP, and Speedtech.

82

693.    Plaintiffs would not have entered into in their employment contracts but for Al Thani and Greenbaum's false representations.

694. Al Thani and Greenbaum, through Al Anabi Racing, Racing Limited, AAP and Speedtech, accepted the benefit of months and/or years of work of Plaintiffs.

695. At all times material, Plaintiffs relied to their detriment upon Al Thani and Greenbaum's representations and assurances as set forth in the above paragraphs, and reasonably believed Al Thani and Greenbaum's promises and representations as to the fact that Plaintiffs would be paid for their employment.

696.    Al Thani and Greenbaum acted with a willful, wanton, malicious and callous indifference and disregard for Plaintiffs and their rights.

697. Al Thani and Greenbaum intended that Plaintiffs would rely on their false promises, representations and agreements that Al Thani and Greenbaum did not perform, and Al Thani and Greenbaum intended to thereby deceive and defraud Plaintiffs.

693.    As a result of Al Thani and Greenbaum's fraud, Plaintiffs have suffered and are entitled to economic damages, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

695.    Due to Al Thani and Greenbaum's acts, Plaintiffs are entitled to attorney's fees, costs, and other such damages of an amount to be determined at trial.

## NINETEENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

**Tennessee Law - (Brought only on behalf of Smith and Hope)**

**California Law - (Brought only on behalf of Tohme, Allende, Mollenbrink)**

696.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

697.   Al Thani knowingly, willingly, and intentionally inflicted mental and emotional distress upon Plaintiffs by and through their actions.

698.   Plaintiffs suffered emotional distress from Al Thani's intentional conduct.

699.   Al Thani's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

700.   Plaintiffs were damaged by Al Thani's conduct and suffered irreparable injury in the form of extreme emotional distress, emotional pain, mental anguish, depression, insomnia, general physical illness, humiliation, loss of dignity, loss of enjoyment of life, and past and future medical expenses.

701.   Al Thani's actions were the cause of Plaintiffs' severe distress and of a nature that no reasonable person could be expected to endure.

702.   Due to Al Thani's intentional acts, Plaintiffs are entitled to compensatory damages, restitution damages, punitive damages, and reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

703.   Plaintiffs also request from this Honorable Court an order of permanent injunction preventing Al Thani from any contact with Plaintiffs, their families, and their businesses.

## TWENTIETH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

**Tennessee Law - (Brought only on behalf of Smith and Hope)**

**California Law - (Brought only on behalf of Tohme, Allende and Mollenbrink)**

704.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

705.   Al Thani negligently inflicted mental and emotional distress upon Plaintiffs by and through their actions.

706.   Plaintiffs suffered emotional distress from Al Thani's negligent conduct.

707.    Al Thani's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

708.    Plaintiffs were damaged by Al Thani's conduct and suffered irreparable injury in the form of extreme emotional distress, emotional pain, mental anguish, depression, insomnia, general physical illness, humiliation, loss of dignity, loss of enjoyment of life, and past and future medical expenses.

709.    The actions of Al Thani were the cause of Plaintiffs' severe distress and of a nature that no reasonable person could be expected to endure.

710.    Due to Al Thani's acts, Plaintiffs are entitled to compensatory damages, restitution damages, punitive damages, and reasonable attorney's fees, costs, and other such damages of an amount to be determined at trial.

711.    Plaintiffs also request from this Honorable Court an order of permanent injunction preventing Al Thani from any contact with Plaintiffs, their families, and their businesses.

## TWENTY-FIRST CAUSE OF ACTION

### M.G.L. c. 12 § 11 H - False Imprisonment

**(Brought only on behalf of Hope)**

712.    Hope realleges and incorporates by reference all allegations in all preceding paragraphs.

713.    Al Thani intentionally confined and restrained Hope in Al Thani's home and Al Thani's businesses against Hope's will by use of threats and violence.

714.    Al Thani's intentional actions constitute false imprisonment.

715.    Al Thani falsely imprisoned Hope in order to secure free labor and services to benefit himself, Al Anabi Racing, AAP, and Speedtech.

715.    Hope is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-SECOND CAUSE OF ACTION

### M.G.L. c. 12 § 11 H - False Imprisonment

**(Brought only on behalf of Tohme)**

716.    Tohme realleges and incorporates by reference all allegations in all preceding paragraphs.

717.    Al Thani intentionally confined and restrained Tohme in Al Thani's home against Tohme's will by use of threats, physical abuse, and violence.

718.    Al Thani's intentional actions constitute false imprisonment.

719.    Al Thani falsely imprisoned Tohme in order to secure free labor and services to benefit himself, Al Anabi Racing, and AAP.

719.    Tohme is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-THIRD CAUSE OF ACTION

### M.G.L. c. 12 § 11 H - False Imprisonment

**(Brought only on behalf of Pittard)**

720.    Pittard realleges and incorporates by reference all allegations in all preceding paragraphs.

721.    Al Thani intentionally confined and restrained Pittard in Al Thani's businesses, and in Pittard's place of residence in Qatar, against Pittard's will by use of threats, physical abuse, and violence.

722.    Al Thani's intentional actions constitute false imprisonment.

723.    Al Thani falsely imprisoned Pittard in order to secure Pittard's signature on employment-related termination paperwork that benefited Al Thani; and to steal Pittard's business and proprietary information for his professional advantage.

723.    Pittard is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-FOURTH CAUSE OF ACTION

### M.G.L. c. 12 § 11 H - False Imprisonment

**(Brought only on behalf of Allende)**

724.    Allende realleges and incorporates by reference all allegations in all preceding paragraphs.

725.    Al Thani intentionally confined and restrained Allende in Al Thani's home against Allende's will by use of threats, and violence.

726.    Al Thani's intentional actions constitute false imprisonment.

727.    Al Thani falsely imprisoned Allende in order to secure free labor and services to benefit himself, Al Anabi Racing, AAP, and Speedtech.

727.    Allende is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## TWENTY-FIFTH CAUSE OF ACTION

### M.G.L. c. 12 § 11 H - False Imprisonment

**(Brought only on behalf of Mollenbrink)**

728.    Mollenbrink realleges and incorporates by reference all allegations in all preceding paragraphs.

729.    Al Thani intentionally confined and restrained Mollenbrink in Al Thani's home against Mollenbrink's will by use of threats, physical abuse, and violence.

730.    Al Thani's intentional actions constitute false imprisonment.

731.    Al Thani falsely imprisoned Mollenbrink in order to secure free labor and services to benefit himself, Al Anabi Racing, AAP, and Speedtech.

731.    Mollenbrink is entitled to an award of compensatory and punitive damages to be determined, reasonable attorney's fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek the following relief:

A. Issuance of a declaratory judgment that the practices and actions complained of in this complaint are unlawful under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq., and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1589-90 and 18 U.S.C. §1343, and Florida, California, and Tennessee law;

B. Unpaid overtime wages under the FLSA and an additional and equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b) and the supporting United States Department of Labor regulations;

C. Unpaid overtime wages under the Florida and California law; reasonable attorney's fees and costs of this action, and pre-judgment and post-judgment interest;

D. Unpaid overtime wages under the CLC, reasonable attorney's fees and costs of this action, and pre-judgment and post-judgment interest, pursuant to CLC § 1194;

E. Civil penalties of One Thousand One Hundred Dollars ($1,100.00) for each of Defendants' willful and repeated violations of the FLSA pursuant to 29 U.S.C. § 216(b);

F. If liquidated damages pursuant to FLSA, 29 U.S.C §216(b) are not awarded, an award of pre-judgment interest pursuant to 28 U.S.C. § 1961 and a permanent injunction requiring Defendants to pay all statutorily required wages pursuant to the FLSA, FLL, and CLC;

G. Treble damages, reasonable attorney fees, and costs pursuant to RICO, 18 U.S.C. § 1964(c);

H. An award of back wages, front wages, damages for emotional distress, and punitive damages, attorney's fees, costs, and other such damages as appropriate for the Defendants prohibited retaliation against Plaintiff pursuant to federal, Florida, California, and Tennessee law

I. An award of back wages, front wages, liquidated damages, damages for emotional distress, punitive damages, and liquidated damages up to a maximum of Ten Thousand Dollars ($10,000), for Defendants' prohibited retaliation against Allende pursuant to CLC § 1102.5;

J. An award of statutory damages up to a maximum of Four Thousand Dollars ($4,000), for Defendants' failure to provide Plaintiff Allende with accurate wage statements pursuant to CLC § 226;

K. An award of back wages, front wages, damages for emotional distress, punitive damages, attorney's fees, costs, and other such damages as appropriate for the Defendants' prohibited retaliation against Plaintiff Pittard;

K. An award of loss of business and profit, attorney's fees, costs, and other such damages as appropriate for the Defendants' intentional interference and disruption of a valid contract between Plaintiff Pittard and the Police Training Institute, and other such damages as appropriate for the Defendants' acts;

L. An award of loss of business and profit, attorney's fees, costs, and other such damages as appropriate for the Defendants' intentional interference and disruption of a business relationship, and other such damages as appropriate for the Defendants' acts;

M. An award of damages for general pain and suffering; permanent physical injury; damages for loss of enjoyment of life, both past and future; travel and travel-related expenses, past and future; emotional distress, and future emotional distress; pharmaceutical expenses, past and future; related wage and loss earning capacity damages; and, all other ordinary, incidental and consequential damages as would be anticipated to arise under the circumstances for Defendants' conduct that directly and proximately caused injury;

N. As award of pre-judgment and post-judgment interest pursuant to Florida § 55.03; ten percent (10%) pursuant to California Code 685.010; and ten percent (10%) pursuant to Tennessee Code Annotated § 47-14-121;

O. A permanent injunction preventing Al Thani from contacting Plaintiffs, their families, and their businesses;

P.  A permanent injunction preventing Al Thani from utilizing Plaintiff Pittard's personal and business information;

Q. Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Respectfully submitted
Attorneys for Plaintiffs,

*/s/ Rebecca L. Castaneda*
Rebecca L. Castaneda
Massachusetts Bar No. 676527
rc@attorneyrebeccacastaneda.com
The Castaneda Law Firm
506 N. Armenia Avenue
Tampa, Florida 33609-1703
(813) 694-7780

*/s/ Humberto R. Dominguez*
Humberto R. Dominguez
Florida Bar No. 837903
bert@dominguezlaw.com
Humberto R. Dominguez, PA
Museum Tower
150 West Flagler Street
Penthouse Two - 2900
Miami, Florida 33130
(305) 373-6400

## LIST OF ATTACHED EXHIBITS

| | |
|---|---|
| Exhibit 1 | Shipping bills / bills of lading/ invoices/ insurance company to/from Greenbaum |
| Exhibit 2 | Awesome Al Anabi Motor Sports, LLC - New York State Department of State Corporation documents (Point of Contact: Michael Castellana) |
| Exhibit 3 | National Hot Rod Association Profile of Michael Castellana, a race car driver who served as Al Thani's point of contact for his Awesome Al Anabi Racing Corporation documents |
| Exhibit 4 | Al Thani Corporations Corporate Diagram; affidavit of Douglas Schnoover, private investigator |
| Exhibit 5 | Corporate filings of Al Thani Corporations |
| | |
| Exhibit 6 | Al Thani U.S. Patent and Trademark Filing of "Al-Anabi Racing" |
| | Al Thani U.S. Patent and Trademark Filing of "Al-Anabi" |
| | |
| Exhibit 7 | Al Thani U.S. Patent and Trademark Filing of "KH" |
| | |
| Exhibit 8 | Al Thani's ownership of Al Anabi Racing USA |
| | Al Thani's personal hero card |
| | Al Anabi Racing team hero card |
| | Al Anabi Racing race car |
| | Al Thani talking with crew x 2 |
| | Social media links describing Al Thani as owner of Al Anabi Racing |
| | State of Qatar statement about Al Thani owning Al Anabi Racing; AAP Facebook page; affidavit of Dwayne Denny, forensic expert |
| | AAP information accompanying forensic expert affidavit |
| | |
| Exhibit 9 | Racing Limited-generated IRS-1099 provided to Hope |
| | |
| Exhibit 10 | Corporate profiles utilizing Greenbaum's phone number |
| | |
| Exhibit 11 | Social media posts and photographs of Speedtech |
| | |
| Exhibit 12 | State of Qater-published newspapers stating Al Thani owns Al Anabi; translated by an interpreter. |
| | |
| Exhibit 13 | Hotrod Article, *A 560CI V6? Yup, and it Runs 50 PSI of Boost, Too!,* (Michael Galimi) Jan. 27, 2017, at https://www.hotrod.com/articles/560ci-v6-yup-runs-50-psi-boost/ (describing Al Thani as owning and designing a patented V8 KH Series engine). |
| | |
| Exhibit 14 | Al Thani's legal statement as owner of Al Anab Racing made through counsel, February 3, 2010,at https://www.dragzine.com/news/the-difficult-case-of-moe-atat-al-anabi-adrl/ (discussing employee of Al Thani's involved in legal issues. |
| | |
| Exhibit 15 | AAP jacket designs, designed by Los Angeles designer Philip Ayler, coordinated by Tohme on behalf of Al Thani for AAP. |
| | |

| Exhibit 16 | Email from Al Thani's Qatari staff to Hope with salaries for 2009, set by Al Thani |
| Exhibit 17 | Smith's contract and non-disclosure agreement with Al Thani |
| Exhibit 18 | Bank wires from Al Thani to Mollenbrink |
| Exhibit 19 | Invoice of shipping for Al Thani's private vehicles, paid for by Al Anabi Racing USA, and coordinated by Greenbaum |
| Exhibit 20 | Cease and Desist Letter from Dinsmore & Shohl; profile of attorney at Dinsmore & Shohl that also organized AAP; AAP organization |
| Exhibit 21 | Racing photographs of Smith working for Al Thani |
| Exhibit 22 | Smith's State of Qatar issued work visas, translated from Arabic to English by interpreter |
| Exhibit 23 | Bank wires from Al Thani to Smith |
| Exhibit 24 | Greenbaum's fraudulent statement about Al Thani paying racing bonuses |
| Exhibit 25 | Hope's State of Qatar issued work visas, translated from Arabic to English |
| Exhibit 26 | Bank wires from Al Thani to Hope |
| Exhibit 27 | Email from Greenbaum to Hope to pick up vehicles |
| Exhibit 28 | United States medical record, treating physician of Hope discussing Qatari hospitalization |
| Exhibit 29 | Tohme's State of Qatar issued work visas, translated from Arabic to English by interpreter |
| Exhibit 30 | Email from Tohme to Al Thani's Chairman Advisor requesting a copy of Tohme's contract |
| Exhibit 31 | Message between Al Thani's Chairman Advisor and Tohme with Advisor confirming $10,000.00 USD payment |
| Exhibit 32 | Tohme's AAP industry pass from event in Los Angeles, CA with Al Thani |
| Exhibit 34 | Judgment against Tohme for lease Al Thani desired<br>Complaint filed for lease Al Thani desired |
| Exhibit 35 | E-mail communications between Tohme's family, Al Thani's Chairman's Advisor, the Qatari Embassy contact, and Ali Ray, an employee of Al Thani |
| Exhibit 36 | Fake $6,000.00 USD wire from Al Thani's Chairman's Advisor |

| | |
|---|---|
| Exhibit 37 | Email regarding Al Thani family school grades and options |
| | |
| Exhibit 38 | Tohme flight confirmation from Qatar to U.S. |
| | |
| Exhibit 39 | Pittard's Contract with Al Thani<br>Proof of employment with Al Thani on Al Thani letterhead |
| | |
| Exhibit 40 | Pittard's passport with stamps; translated from Arabic to English by interpreter |
| | |
| Exhibit 41 | Bank wires from Al Thani to Pittard |
| | |
| Exhibit 42 | Weapons from Smokin' Barrel guns |
| | |
| Exhibit 43 | Pittard's Geo Strategic Defense Warning Letter |
| | |
| Exhibit 44 | Pittard's response to Al Thani's staff regarding warning letter |
| | |
| Exhibit 45 | Pittard's termination documents |
| | |
| Exhibit 46 | Pittard flight confirmation from Qatar to U.S. |
| | |
| Exhibit 47 | Pittard's request for his belongings |
| | |
| Exhibit 48 | Pittard's Dinsmore & Shohl cease and desist letter on behalf of KH Holding |
| | |
| Exhibit 49 | Pittard's Police Training Institute Contract |
| | |
| Exhibit 50 | Allende's passport with stamps |
| | |
| Exhibit 51 | Bank wires from Al Thani to Allende |
| | |
| Exhibit 52 | Allende's request for foreign pay from Al Thani's Chairman's Advisor |
| | |
| Exhibit 53 | Allende medical records |
| | |
| Exhibit 54 | Allende's email to Al Thani's Chairman's Advisor |
| | |
| Exhibit 55 | Allende's California disability letter |
| | |
| Exhibit 56 | Al Thani's request for Allende to Qatar |
| | |
| Exhibit 57 | Allende declination to return to Qatar |
| | |
| Exhibit 58 | Mollenbrink's passport with stamps; translated from Arabic to English by interpreter |
| | |
| Exhibit 59 | Mollenbrink's Al Thani employment verification letter |

| | |
|---|---|
| Exhibit 60 | Emails from Mollenbrink to Al Thani's Chairman's Advisor |
| | |
| Exhibit 61 | Mollenbrink email confirming flight from Qatar to the U.S. |
| | |
| Exhibit 62 | ADRL Kenny Nowling open letter about race not being sponsored |
| | |
| Exhibit 63 | Greenbaum's fraudulent statement regarding Al Anabi Racing teams being paid |
| | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed on the 31ST of October, 2020, with the Clerk of the Court using the CM/ECF system which will automatically transmit an electronic copy to counsel of record.

By:

*/s/Rebecca L. Castaneda*
Rebecca L. Castaneda
Massachusetts Bar No. 676527
rc@attorneyrebeccacastaneda.com
The Castaneda Law Firm
506 N. Armenia Avenue
Tampa, Florida 33609-1703
(813) 694-7780